# 22-3054

## In the
## United States Court of Appeals
### For the Second Circuit

◆

DANIEL HALLER and LONG ISLAND SURGICAL PLLC,

*Plaintiffs-Appellants,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
200 INDEPENDENCE AVENUE SW, WASHINGTON, DC 20201,

*Defendants-Appellees,*

*(See inside cover for continuation of caption)*
ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (CENTRAL ISLIP)

## AMENDED JOINT APPENDIX

THE WILDER LAW FIRM
*Attorneys for Plaintiffs Appellants*
301 West 57th Street, 19b
New York, New York 10019
(212) 951-0042
nick@wilder.law

KEVIN B. SOTER
JOSHUA M. SALZMAN
UNITED STATES DEPARTMENT OF JUSTICE
   CIVIL DIVISION, APPELLATE STAFF
*Attorneys for Defendants-Appellees*
950 Pennsylvania Avenue, NW
Washington, District of Columbia 20530
(202) 514-3602
kevin.b.soter@usdoj.gov
joshua.m.salzman@usdoj.gov

———————————————

XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF HEALTH
AND HUMAN SERVICES, 200 INDEPENDENCE AVENUE SW, WASHINGTON,
DC 20201, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, KIRAN
AHUJA, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE U.S. OFFICE OF
PERSONNEL MANAGEMENT, 1900 E STREET NW WASHINGTON, DC 20415,
UNITED STATES DEPARTMENT OF LABOR, 200 CONSTITUTION AVENUE NW
WASHINGTON, DC 20210, JULIE SU, IN HER OFFICIAL CAPACITY AS ACTING
SECRETARY OF LABOR, 200 CONSTITUTION AVENUE NW WASHINGTON,
DC 20210, UNITED STATES DEPARTMENT OF THE TREASURY, 1500
PENNYSLVANIA AVENUE NW, WASHINGTON DC 20220 and JANET YELLEN,
IN HER OFFICIAL CAPACITY AS SECRETARY OF THE TREASURY,
1500 PENNSYLVANIA AVENUE NW WASHINGTON, DC 20220,

*Defendants-Appellees.*

———————————————

i

# Table of Contents

**Page**

District Court Docket Entries ........................................................ JA-1

Complaint for Declaratory and Injunctive Relief,
  Dated December 31, 2021 .........................................................JA-12

Civil Cover Sheet, Dated January 3, 2022 ...................................JA-31

Summons in a Civil Action, Dated February 22, 2022 .................JA-33

Declaration of Dr. Daniel Haller, Plaintiff, in Support of Motion
  for a Temporary Restraining Order and Preliminary
  Injunction, Dated March 24, 2022 ............................................JA-36

Notice of Motion by Plaintiffs for Preliminary Injunction,
  Dated April 4, 2022....................................................................JA-44

Notice of Motion by Defendants to Dismiss Complaint,
  Dated April 26, 2022..................................................................JA-46

Memorandum Decision and Order of Honorable Ann M.
  Donnelly, Dated August 10, 2022, Appealed From.................JA-48

Judgment of The United States District Court, Eastern District
  of New York, Dated August 11, 2022, Appealed From............JA-74

Notice of Appearance, Dated October 31, 2022 .........................JA-76

Notice of Appeal, Dated November 17, 2022 ..............................JA-77

Plaintiffs' Memorand um of law  March 31, 2022 ....................... JA-88

Plaintiffs' Memorand um of law  May 4, 2022.............................JA-119

Transcript of June 22, 2022, Argument on Motion ........................ JA-160

**Query    Reports    Utilities    Help    Log Out**

APPEAL,ACO

# U.S. District Court
# Eastern District of New York (Central Islip)
## CIVIL DOCKET FOR CASE #: 2:21-cv-07208-AMD-AYS

| | |
|---|---|
| Haller et. al. v. U.S. Department of Health and Human Services et. al. | Date Filed: 12/31/2021 |
| | Date Terminated: 08/11/2022 |
| Assigned to: Judge Ann M Donnelly | Jury Demand: None |
| Referred to: Magistrate Judge Anne Y. Shields | Nature of Suit: 440 Civil Rights: Other |
| Cause: 28:2201 Declaratory Judgement | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**Dr. Daniel Haller**                          represented by    **Edward A. Smith**
Abrams, Fensterman, Fensterman, Eisman,
Formato, Ferrara, Wo
81 Main Street, Suite 306
White Plains, NY 10601
(914) 607-7010
Email: easmith@venable.com
*TERMINATED: 09/28/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Tyler Kelton**
Abrams, Fensterman, Fensterman, Eisman,
Formato, Ferrara, Wo
81 Main Street, Suite 306
White Plains, NY 10601
(914) 607-7010
Email: jkelton@abramslaw.com
*TERMINATED: 09/28/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Joseph Wilder**
The Wilder Law Firm
301 West 57 Street
Ste 19b
New York, NY 10019
212-951-0042
Email: nick@wilder.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert A. Spolzino**
Abrams, Fensterman, Fensterman, Eisman,
Formato, Ferrara, Wo
81 Main Street, Suite 306

JA-2

White Plains, NY 10601
(914) 607-7010
Email: rspolzino@abramslaw.com
*TERMINATED: 09/28/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Michael Birnbaum**
Abrams Fensterman, LLP
1 Metrotech Center
Ste 17th Floor
Brooklyn, NY 11201
718-215-5300
Email: amichaelbirnbaum@gmail.com
*TERMINATED: 09/28/2022*
*ATTORNEY TO BE NOTICED*

**Mordecai Geisler**
Abrams Fensterman, LLP
Abrams Fensterman, LLP
1 Metrotech Center
Suite 1701
Brooklyn, NY 11201
718-215-5300
Email: mgeisler@abramslaw.com
*TERMINATED: 09/28/2022*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Long Island Surgical PLLC**                  represented by  **Edward A. Smith**
                                                (See above for address)
                                                *TERMINATED: 09/28/2022*
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Justin Tyler Kelton**
                                                (See above for address)
                                                *TERMINATED: 09/28/2022*
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Nicholas Joseph Wilder**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Robert A. Spolzino**
                                                (See above for address)
                                                *TERMINATED: 09/28/2022*
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Adam Michael Birnbaum**
                                                (See above for address)

**JA-3**

*TERMINATED: 09/28/2022*
*ATTORNEY TO BE NOTICED*

**Mordecai Geisler**
(See above for address)
*TERMINATED: 09/28/2022*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**U.S. Department of Health and Human Services**
*200 Independence Avenue SW, Washington, DC 20201*

represented by **Anna Lynn Deffebach**
DOJ-Civ
Civil Division- Federal Programs Branch
1100 L ST NW
Ste Lst 12104
Washington, DC 20005
202-993-5182
Email: anna.l.deffebach@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Joel McElvain**
U.S. Dept of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave, Nw
Washington, DC 20530
202-514-2988
Fax: 202-616-8202
Email: joel.mcelvain@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Joseph Anthony Marutollo**
U. S. Attorney's Office
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6288
Fax: 718-254-7489
Email: joseph.marutollo@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Xavier Becerra**
*in his official capacity as Secretary of Health and Human Services, 200 Independence Avenue SW, Washington, DC 20201*

represented by **Anna Lynn Deffebach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel McElvain**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph Anthony Marutollo**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA-4

**Defendant**

**U.S. Office of Personnel Management**
*1900 E Street NW Washington, DC 20415*

represented by **Anna Lynn Deffebach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel McElvain**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph Anthony Marutollo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kiran Ahuja**
*in her official capacity as Director of the*
*U.S. Office of Personnel Management, 1900*
*E Street NW Washington, DC 20415*

represented by **Anna Lynn Deffebach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel McElvain**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph Anthony Marutollo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Department of Labor**
*200 Constitution Avenue NW Washington,*
*DC 20210*

represented by **Anna Lynn Deffebach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel McElvain**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph Anthony Marutollo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Martin J. Walsh**
*in his official capacity as Secretary of*
*Labor, 200 Constitution Avenue NW*
*Washington, DC 20210*

represented by **Anna Lynn Deffebach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel McElvain**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph Anthony Marutollo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Department of the Treasury**
*1500 Pennyslvania Avenue NW, Washington DC 20220*

represented by **Anna Lynn Deffebach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel McElvain**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph Anthony Marutollo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Janet Yellen**
*in her official capacity as Secretary of the Treasury, 1500 Pennsylvania Avenue NW Washington, DC 20220*

represented by **Anna Lynn Deffebach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel McElvain**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph Anthony Marutollo**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/31/2021 | 1 | COMPLAINT against All Defendants filing fee $ 402, receipt number ANYEDC-15153913 Was the Disclosure Statement on Civil Cover Sheet completed -No,, filed by Long Island Surgical PLLC, Daniel Haller. (Kelton, Justin) (Entered: 12/31/2021) |
| 01/03/2022 | | Notice: Re: Incomplete Civil Cover Sheet. The Clerk's Office cannot assign this case without a completed Civil Cover Sheet. Please submit a Civil Cover Sheet. This event can be found under the event Other Filings - Other Documents - Proposed Summons/Civil Cover Sheet. (Flanagan, Doreen) (Entered: 01/03/2022) |
| 01/03/2022 | 2 | Civil Cover Sheet.. by Daniel Haller, Long Island Surgical PLLC (Kelton, Justin) (Entered: 01/03/2022) |
| 01/04/2022 | 3 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made. (Flanagan, Doreen) (Entered: 01/04/2022) |
| 01/04/2022 | | Case Assigned to Judge Ann M Donnelly and Magistrate Judge Anne Y. Shields. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Flanagan, Doreen) (Entered: 01/04/2022) |
| 01/04/2022 | 4 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences. Do NOT return or file the** |

JA-6

|  |  | consent **unless** all parties have signed the consent. (Flanagan, Doreen) (Entered: 01/04/2022) |
|---|---|---|
| 02/15/2022 | 5 | NOTICE of Appearance by Adam Michael Birnbaum on behalf of All Plaintiffs (aty to be noticed) (Birnbaum, Adam) (Entered: 02/15/2022) |
| 02/15/2022 | 6 | Proposed Summons. Re 2 Proposed Summons/Civil Cover Sheet by Daniel Haller, Long Island Surgical PLLC (Attachments: # 1 Proposed Summons for Director Kiran Ahuja, # 2 Proposed Summons for U.S. Department of Labor, # 3 Proposed Summons for U.S. Department of Health and Human Services, # 4 Proposed Summons for U.S. Office of Personnel Management, # 5 Proposed Summons for Secretary Xavier Becerra, # 6 Proposed Summons for Secretary Martin J. Walsh, # 7 Proposed Summons for Secretary Janet Yellen, # 8 Proposed Summons for U.S. Department of the Treasury) (Birnbaum, Adam) (Entered: 02/15/2022) |
| 02/18/2022 |  | Your proposed summons was not issued for one of the following reasons: **The CLERK OF COURT name needs to be updated., As of 2/1/2022, Brenna B. Mahoney is the Clerk of Court for the Eastern District of New York.**<br><br>Please correct and resubmit using Proposed Summons/Civil Cover Sheet. *Also please submit one proposed summons with attached rider. (Guzzi, Roseann) (Entered: 02/18/2022) |
| 02/18/2022 | 7 | Proposed Summons. Re 2 Proposed Summons/Civil Cover Sheet by Daniel Haller, Long Island Surgical PLLC (Birnbaum, Adam) (Entered: 02/18/2022) |
| 02/22/2022 | 8 | Summons Issued as to Kiran Ahuja, Xavier Becerra, U.S. Department of Health and Human Services, U.S. Department of Labor, U.S. Department of the Treasury, U.S. Office of Personnel Management, Martin J. Walsh, Janet Yellen. (Guzzi, Roseann) (Entered: 02/22/2022) |
| 03/09/2022 | 9 | NOTICE of Appearance by Mordecai Geisler on behalf of All Plaintiffs (aty to be noticed) (Geisler, Mordecai) (Entered: 03/09/2022) |
| 03/09/2022 | 10 | AFFIDAVIT of Service for Summons and Complaint served on U.S. Department of Health and Human Services on March 2, 2022, filed by Daniel Haller, Long Island Surgical PLLC. (Geisler, Mordecai) (Entered: 03/09/2022) |
| 03/09/2022 | 11 | AFFIDAVIT of Service for Summons and Complaint served on Xavier Becerra, Secretary, Department of Health and Human Services on March 2, 2022, filed by Daniel Haller, Long Island Surgical PLLC. (Geisler, Mordecai) (Entered: 03/09/2022) |
| 03/09/2022 | 12 | AFFIDAVIT of Service for Summons and Complaint served on U.S. Office of Personnel Management on March 2, 2022, filed by Daniel Haller, Long Island Surgical PLLC. (Geisler, Mordecai) (Entered: 03/09/2022) |
| 03/09/2022 | 13 | AFFIDAVIT of Service for Summons and Complaint served on Kiran Ahuja, Director, U.S. Office of Personnel Management on March 2, 2022, filed by Daniel Haller, Long Island Surgical PLLC. (Geisler, Mordecai) (Entered: 03/09/2022) |
| 03/09/2022 | 14 | AFFIDAVIT of Service for Summons and Complaint served on U.S. Department of Labor on March 2, 2022, filed by Daniel Haller, Long Island Surgical PLLC. (Geisler, Mordecai) (Entered: 03/09/2022) |
| 03/09/2022 | 15 | AFFIDAVIT of Service for Summons and Complaint served on Martin J. Walsh, Secretary, U.S. Department of Labor on March 2, 2022, filed by Daniel Haller, Long Island Surgical PLLC. (Geisler, Mordecai) (Entered: 03/09/2022) |

JA-7

| 03/09/2022 | 16 | AFFIDAVIT of Service for Summons and Complaint served on U.S. Department of Treasury on March 2, 2022, filed by Daniel Haller, Long Island Surgical PLLC. (Geisler, Mordecai) (Entered: 03/09/2022) |
|---|---|---|
| 03/09/2022 | 17 | AFFIDAVIT of Service for Summons and Complaint served on Janet Yellen, Secretary, Department of Treasury on March 2, 2022, filed by Daniel Haller, Long Island Surgical PLLC. (Geisler, Mordecai) (Entered: 03/09/2022) |
| 03/09/2022 | 18 | AFFIDAVIT of Service for Summons and Complaint served on Merrick Garland, U.S. Attorney General on March 2, 2022, filed by Daniel Haller, Long Island Surgical PLLC. (Geisler, Mordecai) (Entered: 03/09/2022) |
| 03/09/2022 | 19 | AFFIDAVIT of Service for Summons and Complaint served on U.S. Department of Justice, Assistant Attorney General for Administration on March 2, 2022, filed by Daniel Haller, Long Island Surgical PLLC. (Geisler, Mordecai) (Entered: 03/09/2022) |
| 03/09/2022 | 20 | AFFIDAVIT of Service for Summons and Complaint served on U.S. Attorney, Eastern District of New York on March 2, 2022, filed by Daniel Haller, Long Island Surgical PLLC. (Geisler, Mordecai) (Entered: 03/09/2022) |
| 04/01/2022 | 21 | MOTION for Preliminary Injunction *Order to Show Cause* by Daniel Haller, Long Island Surgical PLLC. (Spolzino, Robert) (Entered: 04/01/2022) |
| 04/01/2022 | 22 | AFFIDAVIT/DECLARATION in Support re 21 MOTION for Preliminary Injunction *Order to Show Cause* filed by Daniel Haller, Long Island Surgical PLLC. (Spolzino, Robert) (Entered: 04/01/2022) |
| 04/01/2022 | 23 | MEMORANDUM in Support re 22 Affidavit in Support of Motion, 21 MOTION for Preliminary Injunction *Order to Show Cause* filed by Daniel Haller, Long Island Surgical PLLC. (Spolzino, Robert) (Entered: 04/01/2022) |
| 04/01/2022 | | ORDER denying 21 Motion for Preliminary Injunction. <br><br> The plaintiffs submit 21 an "*ex parte* application for a temporary restraining order and order to show cause why Defendants should not be preliminarily enjoined from implementing, enforcing, or otherwise carrying out the specific provisions of the" No Surprises Act and governing regulations. "No *ex parte* order, or order to show cause to bring on a motion, will be granted except upon a clear and specific showing by affidavit of good and sufficient reasons why a procedure other than by notice of motion is necessary." *Gullas v. 37-31 73rd St. Owners Corp.*, No. 12-CV-2301, 2012 WL 1655520, at *1 (E.D.N.Y. May 10, 2012) (quoting Loc. Civ. R. 6.1(d)). "A temporary restraining order may be issued without notice only if 'specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition.'" *FEI Hong Kong Co. Ltd. v. GlobalFoundries, Inc.*, No. 20-CV-2342, 2020 WL 1444956, at *2 (S.D.N.Y. Mar. 25, 2020) (quoting Fed. R. Civ. P. 65(b)(1)(A)). <br><br> There is no discussion in the plaintiffs' submissions 21 22 23 about why *ex parte* relief is appropriate. The plaintiffs have not made a clear and specific showing by affidavit of good and sufficient reasons why a procedure other than by notice of motion is necessary. Ordered by Judge Ann M. Donnelly on 4/1/2022. (Mathew, Joshua) (Entered: 04/01/2022) |
| 04/04/2022 | 24 | NOTICE of Appearance by Anna Lynn Deffebach on behalf of All Defendants (aty to be noticed) (Deffebach, Anna) (Entered: 04/04/2022) |
| 04/04/2022 | 25 | MOTION for Preliminary Injunction by Daniel Haller, Long Island Surgical PLLC. (Spolzino, Robert) (Entered: 04/04/2022) |

| 04/04/2022 | | ORDER. The Court has received the plaintiffs' notice 25 of motion for a preliminary injunction. The plaintiffs are directed to submit a brief letter advising the Court whether they will file a declaration and memorandum in support of the motion, or if they intend to rely on the previously-filed submissions 22 23 . Ordered by Judge Ann M. Donnelly on 4/4/2022. (Mathew, Joshua) (Entered: 04/04/2022) |
|---|---|---|
| 04/05/2022 | 26 | Letter *in response to Court's minute entry of April 4, 2022* by Daniel Haller, Long Island Surgical PLLC (Kelton, Justin) (Entered: 04/05/2022) |
| 04/05/2022 | | SCHEDULING ORDER: The defendants are directed to file their opposition to the plaintiffs' motion for preliminary injunction by April 19, 2022, and the plaintiffs are directed to file their reply, if any, by April 26, 2022. A hearing on the plaintiffs' motion for a preliminary injunction is scheduled for May 3, 2022 at 3:30 p.m. in Courtroom 4G North. Ordered by Judge Ann M. Donnelly on 4/5/2022. (Mathew, Joshua) (Entered: 04/05/2022) |
| 04/07/2022 | 27 | Letter by Kiran Ahuja, Xavier Becerra, U.S. Department of Health and Human Services, U.S. Department of Labor, U.S. Department of the Treasury, U.S. Office of Personnel Management, Martin J. Walsh, Janet Yellen (Deffebach, Anna) (Entered: 04/07/2022) |
| 04/08/2022 | 28 | Letter *in Response to Defendants' Letter dated April 7, 2022* by Daniel Haller, Long Island Surgical PLLC (Geisler, Mordecai) (Entered: 04/08/2022) |
| 04/08/2022 | | SCHEDULING ORDER: The Court has received the parties' letters 27 28 . The defendants' request to waive the pre-motion conference requirement in anticipation of a motion to dismiss is granted.

The parties state that one or more non-parties will seek to participate in this action as *amici curiae*, but do not identify them. "District Courts have broad discretion in deciding whether to accept *amicus* briefs." *Jamaica Hosp. Med. Ctr., Inc. v. United Health Grp., Inc.*, 584 F. Supp. 2d 489, 497 (E.D.N.Y. 2008) (citation omitted). "Additionally, the circumstances under which an *amicus* brief is considered 'desirable' are limited[.]" *Id.* The parties have not shown that those circumstances are present here.

The revised briefing schedule does not include *amicus* briefing, but accommodated the defendants' anticipated motion to dismiss. The defendants' memorandum in opposition to the plaintiffs' motion for a preliminary injunction and in support of their motion to dismiss is due by April 26, 2022 and must not exceed 40 pages. The plaintiffs' memorandum in opposition to the defendants' motion to dismiss and reply in support of their motion for a preliminary injunction is due by May 24, 2022 and must not exceed 40 pages. The defendants' reply in support of their motion to dismiss is due by May 31, 2022 and must not exceed 10 pages. A hearing on the plaintiffs' motion for a preliminary injunction and the defendants' motion to dismiss is scheduled for June 7, 2022 at 10:00 a.m. in Courtroom 4G North. Ordered by Judge Ann M. Donnelly on 4/8/2022. (Mathew, Joshua) (Entered: 04/08/2022) |
| 04/26/2022 | 29 | Notice of MOTION to Dismiss for Failure to State a Claim *and Opposition to Plaintiffs' Motion for a Preliminary Injunction* by Kiran Ahuja, Xavier Becerra, U.S. Department of Health and Human Services, U.S. Department of Labor, U.S. Department of the Treasury, U.S. Office of Personnel Management, Martin J. Walsh, Janet Yellen. (Deffebach, Anna) (Entered: 04/26/2022) |
| 04/26/2022 | 30 | MEMORANDUM in Opposition re 25 MOTION for Preliminary Injunction , MEMORANDUM in Support *of Defendants' Motion to Dismiss* filed by All Defendants. (Deffebach, Anna) (Entered: 04/26/2022) |

| 05/24/2022 | 31 | MEMORANDUM in Opposition *to Defendants' Motion to Dismiss, and in Further Support of Plaintiffs' Motion for a Preliminary Injunction* filed by All Plaintiffs. (Spolzino, Robert) (Entered: 05/24/2022) |
| 05/30/2022 | 32 | NOTICE of Appearance by Joseph Anthony Marutollo on behalf of All Defendants (aty to be noticed) (Marutollo, Joseph) (Entered: 05/30/2022) |
| 05/31/2022 | 33 | REPLY in Support re 29 Notice of MOTION to Dismiss for Failure to State a Claim *and Opposition to Plaintiffs' Motion for a Preliminary Injunction* filed by All Defendants. (Deffebach, Anna) (Entered: 05/31/2022) |
| 06/02/2022 | 34 | NOTICE of Appearance by Joel McElvain on behalf of All Defendants (aty to be noticed) (McElvain, Joel) (Entered: 06/02/2022) |
| 06/07/2022 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Motion Hearing held on 6/7/2022 re 25 Motion for Preliminary Injunction filed by the plaintiffs and 29 Motion to Dismiss for Failure to State a Claim filed by the defendants. Robert Spolzino and Justin Kelton appeared for the plaintiffs. Anna Deffebach, Joel McElvain and Joseph Marutollo appeared for the defendants. Case called. Discussion held. (Court Reporter Michele Lucchese.) (Mathew, Joshua) (Entered: 06/07/2022) |
| 08/10/2022 | 35 | MEMORANDUM DECISION AND ORDER. The plaintiffs' motion for preliminary injunction is denied. The plaintiffs' Seventh Amendment and takings claims are dismissed with prejudice. Their due process claim is unripe and is dismissed for lack of subject matter jurisdiction without prejudice. Ordered by Judge Ann M. Donnelly on 8/10/2022. (Greene, Donna) (Entered: 08/10/2022) |
| 08/11/2022 | 36 | JUDGMENT: It is ORDERED and ADJUDGED that the plaintiffs' motion for preliminary injunction is denied; that the plaintiffs' Seventh Amendment and takings claims are dismissed with prejudice; and that their due process claim is unripe and is dismissed for lack of subject matter jurisdiction without prejudice. Ordered by Jalitza Poveda, Deputy Clerk on behalf of Brenna B. Mahoney, Clerk of Court on 8/11/2022. (Latka-Mucha, Wieslawa) (Entered: 08/12/2022) |
| 09/16/2022 | 37 | Letter MOTION to Withdraw as Attorney by Daniel Haller, Long Island Surgical PLLC. (Kelton, Justin) (Entered: 09/16/2022) |
| 09/28/2022 | | ORDER granting 37 Motion to Withdraw as Attorney: In light of the fact that this matter is closed, and all claims have been dismissed, the application is granted. Attorney Justin Tyler Kelton; Edward A. Smith; Robert A. Spolzino; Adam Michael Birnbaum and Mordecai Geisler terminated. So Ordered by Magistrate Judge Anne Y. Shields on 9/28/2022. (Minerva, Deanna) (Entered: 09/28/2022) |
| 10/31/2022 | 38 | NOTICE of Appearance by Nicholas Joseph Wilder on behalf of All Plaintiffs (aty to be noticed) (Wilder, Nicholas) (Entered: 10/31/2022) |
| 10/31/2022 | 39 | First MOTION for Extension of Time to File *Notice of Appeal* by Daniel Haller, Long Island Surgical PLLC. (Attachments: # 1 Affidavit in Support, # 2 Exhibit Judgment, # 3 Exhibit Physician's Letter, # 4 Exhibit Surgery Notes, # 5 Exhibit Aff. of Goldberg, # 6 Exhibit Notice of Appeal, # 7 Memorandum in Support Memorandum of Law) (Wilder, Nicholas) (Entered: 10/31/2022) |
| 10/31/2022 | 40 | NOTICE by Daniel Haller, Long Island Surgical PLLC *Notice of Appeal* (Wilder, Nicholas) (Entered: 10/31/2022) |
| 11/01/2022 | | SCHEDULING ORDER directing the defendants to respond to 39 the plaintiff's motion to extend the time to file a notice of appeal before November 7, 2022. Ordered by Judge Ann M. Donnelly on 11/1/2022. (CG) (Entered: 11/01/2022) |

JA-10

| 11/02/2022 | 41 | RESPONSE to Motion re 39 First MOTION for Extension of Time to File *Notice of Appeal Notifying Court of Defendants' Non-Opposition* filed by All Defendants. (Deffebach, Anna) (Entered: 11/02/2022) |
|---|---|---|
| 11/03/2022 | | ORDER granting 39 the plaintiff's motion to extend time to file a notice of appeal. Because one of the parties is a United States agency, the plaintiff was required to file his notice of appeal within 60 days after the entry of judgment. Fed. R. App. P. 4(a)(1)(B). Judgment entered on the court's order denying the plaintiff's motion for a preliminary injunction and granting the defendant's motion to dismiss on August 11, 2022. Accordingly, the plaintiff's time to file a notice of appeal lapsed on October 11, 2022. However, the Court may extend the time to file a notice of appeal for good cause or excusable neglect if the motion is made within 30 days of the expiration. Fed. R. App. P. 4(a)(5)(A). The plaintiff filed his motion for an extension of time on October 31, 2022. <br><br> An excusable neglect standard is appropriate here because the plaintiff's delay was partially caused by his substitution of counsel. *Alexander v. Saul*, 5 F.4th 139, 142 (2d Cir. 2021), *cert. denied sub nom. Alexander v. Kijakazi*, 212 L.Ed. 2d 548, 142 S. Ct. 1461 (2022) ("[t]he excusable neglect standard applies when the need for an extension results from factors within the movant's control.") The Court finds that the plaintiff counsel's neglect was excusable here, because the illness which prevented a timely filing was "so physically and mentally disabling that counsel [was] unable to file the appeal[.]" *Michael Aksman, v. Greenwich Quantitative Research LP*, No. 20-CV-8045, 2021 WL 6551082, at *2 (S.D.N.Y. Dec. 21, 2021). Ordered by Judge Ann M. Donnelly on 11/3/2022. (CG) (Entered: 11/03/2022) |
| 11/09/2022 | 42 | Letter *Concerning the 1-3-22 Order* by Daniel Haller, Long Island Surgical PLLC (Wilder, Nicholas) (Entered: 11/09/2022) |
| 11/09/2022 | | SCHEDULING ORDER: The Court acknowledges receipt of 42 the plaintiff's letter. The plaintiff must file his notice of appeal before November 17, 2022. Ordered by Judge Ann M. Donnelly on 11/9/2022. (CG) (Entered: 11/09/2022) |
| 11/17/2022 | 43 | NOTICE by Daniel Haller, Long Island Surgical PLLC *Notice of Appeal* (Wilder, Nicholas) (Entered: 11/17/2022) |
| 11/29/2022 | | Incorrect Case/Document/Entry Information. As per email from Central Islip clerks office advised that Counsel filed document #43 incorrectly as a notice. Counsel shall refile. (RG) (Entered: 11/29/2022) |
| 11/29/2022 | | SCHEDULING ORDER: The plaintiff is directed to file a corrected notice of appeal by November 30, 2022. Ordered by Judge Ann M. Donnelly on 11/29/2022. (CG) (Entered: 11/29/2022) |
| 11/30/2022 | 44 | NOTICE OF APPEAL by Daniel Haller, Long Island Surgical PLLC. Filing fee $ 505, receipt number ANYEDC-16179990. (Wilder, Nicholas) (Entered: 11/30/2022) |
| 11/30/2022 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 44 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 11/30/2022) |

| PACER Service Center |
|---|
| Transaction Receipt |
| 03/23/2023 00:56:26 |

## JA-11

| PACER Login: | appealteam | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 2:21-cv-07208-AMD-AYS |
| Billable Pages: | 11 | Cost: | 1.10 |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

DR. DANIEL HALLER and LONG ISLAND
SURGICAL PLLC,

                                        Plaintiffs,

          – against –

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, 200 Independence
Avenue SW, Washington, DC 20201,

and

XAVIER BECERRA, in his official capacity as
Secretary of Health and Human Services, 200
Independence Avenue SW, Washington, DC
20201,

U.S. OFFICE OF PERSONNEL
MANAGEMENT, 1900 E Street NW
Washington, DC 20415,

and

KIRAN AHUJA, in her official capacity as
Director of the U.S. Office of Personnel
Management, 1900 E Street NW Washington,
DC 20415,

U.S. DEPARTMENT OF LABOR, 200
Constitution Avenue NW Washington, DC
20210,

and

MARTIN J. WALSH, in his official capacity as
Secretary of Labor, 200 Constitution Avenue
NW Washington, DC 20210,

U.S. DEPARTMENT OF THE TREASURY,
1500 Pennsylvania Avenue NW, Washington,
DC 20220,

and

JANET YELLEN, in her official capacity as
Secretary of the Treasury, 1500 Pennsylvania

Avenue NW Washington, DC 20220,

Defendants.

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by their attorneys, Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP, complaining of the defendants, allege as follows:

1.   This is an action for a declaration that three provisions of the No Surprises Act, Pub. L. 116-260 (the "Act"), are unconstitutional, and for an injunction prohibiting its enforcement. The provisions in issue are 42 U.S.C. § 300gg-111(c), which determines the rates health care plans are required to pay to out-of-network physicians, *i.e.*, physicians with whom they do not have direct contractual relationships, and establishes an "independent dispute resolution process" to adjudicate disputes with respect to those rates, and 42 U.S.C. § 300gg-131 and 300gg-132, which prohibit physicians from billing patients for the amounts of their fees that the health care plans are not required to pay.

2.   The Act was passed on December 27, 2020, as part of the Consolidated Appropriations Act, 2021. Its requirements generally go into effect on January 1, 2022.

3.   The Act restricts the amount that physicians are entitled to be paid for their services by patients and by health care plans with which the physicians do not have contractual relationships. It impermissibly delegates the authority to determine the physicians' state-created common law claims to an administrative tribunal. It deprives physicians of the right to a jury trial guaranteed to them by the Seventh Amendment to the Unites States Constitution. It violates the Due Process Clause of the Fifth Amendment to the United States Constitution by requiring physicians to adjudicate their claims against health plans in an "independent dispute resolution process" that is

2

not independent at all because the health plans unilaterally define the standard by which the physicians' claims are determined. It takes the physicians' property without just compensation by prohibiting physicians from recovering the balance of the fair value of their services from their patients.

4.    This is also an action under the Administrative Procedure Act to set aside specific provisions of an interim final rule entitled "Requirements Related to Surprise Billing; Part II," 86 Fed. Reg. 55,980 (Oct. 7, 2021) (the "Rule"), issued by the Department of Health and Human Services, the Department of Labor, the Department of the Treasury, and the Office of Personnel Management (collectively, the "Departments") because the Rule is inconsistent with the express terms of the Act.

5.    The Rule purports to implement provisions of the Act with respect to the rate at which physicians must be paid by health plans, but effectively ignores the factors that the Act requires be used in setting the payment rate and, instead, creates a presumption in favor of just one of these factors – the "qualifying payment amount" or "QPA" – which is determined solely by the health plans, and is based on in-network (as opposed to out-of-network) data to which the out-of-network providers are not privy.

### JURISDICTION AND VENUE

6.    The Court has jurisdiction over this action under 28 U.S.C. § 1331.

7.    The Court has the authority to grant the requested declaratory and injunctive relief under the Administrative Procedure Act and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

8.   Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(C) because this is an action against officers and agencies of the United States and Plaintiffs reside in the Eastern District of New York.

PARTIES

9.   Plaintiff Dr. Daniel Haller is an acute care surgeon with his principal office at c/o Long Island Surgical PLLC, 2000 North Village Avenue, Rockville Center, New York 11570.

10.   Plaintiff Long Island Surgical PLLC is a New York professional limited liability company with its principal office at 2000 North Village Avenue, Rockville Center, New York 11570.

11.   Plaintiffs are residents of Nassau County, New York, which is within the Eastern District of New York.

12.   Dr. Haller and the other surgeons of Long Island Surgical PLLC perform approximately 2,682 emergency consultations and surgical procedures on patients admitted to hospitals through their emergency departments each year.

13.   Approximately 78% of the patients that Dr. Haller and Long Island Surgical PLLC treat each year are covered by health plans with whom Dr. Haller and Long Island Surgical PLLC have no contractual relationship. With respect to those patients, Dr. Haller and Long Island Surgical PLLC are nonparticipating providers within the meaning of the Act whose fees will be determined by the Act and the procedures it establishes.

14.   Defendant Department of Health and Human Services is an executive department of the United States headquartered in Washington, D.C.

15.   Defendant Department of the Treasury is an executive department of the United States headquartered in Washington, D.C.

4

16.   Defendant Department of Labor is an executive department of the United States headquartered in Washington, D.C.

17.   Defendant Office of Personnel Management ("OPM") is an executive agency of the United States headquartered in Washington, D.C.

18.   Defendant Xavier Becerra is the Secretary of Health and Human Services. Secretary Becerra is sued in his official capacity only.

19.   Defendant Janet Yellen is the Secretary of the Treasury. Secretary Yellen is sued in her official capacity only.

20.   Defendant Martin J. Walsh is the Secretary of Labor. Secretary Walsh is sued in his official capacity only.

21.   Defendant Kiran Ahuja is the Director of OPM. Director Ahuja is sued in her official capacity only.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

22.   A physician who treats a patient is entitled under New York law to be paid for his or her services.

23.   Where there is an agreement between the physician and the patient with respect to the physician's fee, the physician is entitled under New York law to be paid the agreed upon fee.

24.   Where the patient is covered by a health plan and the physician has entered into a contract with the health plan to treat the patient for a particular fee, or for a fee to be determined in accordance with a particular formula, *i.e.*, the physician is "in network," the physician is entitled under New York law to be paid the agreed upon fee by the health plan and customarily agrees to waive recovery of the balance of the fee from the patient.

Case 22-3064, Document 38, 08/28/2023, 3562946, Page20 of 893

25.   Where the patient is covered by a health plan and the physician does not have an agreement with that health plan, *i.e.*, the physician is "out-of-network" or "nonparticipating," and the patient assigns his or her right to benefits to the physician, the physician is entitled under New York law to be paid by the health plan in the amount required by the health plan's contract with the patient and the patient is obligated to pay the balance of the amount due to the physician pursuant to the agreement between the physician and the patient.

26.   In those situations where the patient requires emergency services and has not agreed with the physician on the physician's fee, and may not have even spoken with the physician before the services are rendered, the physician is entitled under New York law to be paid for the services he or she has rendered on the basis of an implied contract with the patient.

27.   The amount to which the physician is entitled pursuant to the implied contract is determined, under New York common law, in *quantum meruit*, on the basis of the reasonable value of the services that the physician has provided.

28.   The determination of the reasonable value of services provided by a physician for purposes of a *quantum meruit* claim under New York law involves an analysis of usual and customary charges for the service provided, among other factors.

29.   In October 2014, the New York State Legislature adopted the New York State Emergency Medical Services and Surprise Bill Act (the "New York Surprise Bill Act"). The New York Surprise Bill Act applies where the patient is covered by a health plan regulated by the State of New York, the physician is an out-of-network or nonparticpating provider with respect to that health plan, and the patient has assigned his or her benefits to the physician. Financial Services Law § 605(a).

30.   The New York Surprise Bill Act prohibits an out-of-network physician from billing a patient who receives emergency care (and certain post-stabilization care) for the balance of the physician's fee that the patient's health plan will not pay, but, as under the common law, the physician remains entitled to recover the "usual and customary cost of the service," Financial Services Law § 604(f), an approach one court has described in dicta as "akin to the common law approach."

31.   As a result, under current New York law, including the New York Surprise Bill Act, physicians, including physicians providing services to patients who require emergency services and have not agreed with the physician on the physician's fee, are entitled to be paid the reasonable value of the services they provide to the patient.

32.   The Act deprives the physician of this right under New York law to be paid the reasonable value of the physician's services.

33.   The Act provides that a non-participating provider "shall not bill, and shall not hold [the patient] liable" for any amount beyond what the patient's health plan pays the physician. 42 U.S.C. §§ 300gg-131(a); 300gg-132(a).

34.   The Act also determines the amount that the health plan must pay for the physician's services, regardless of the physician's right under New York law to be paid their reasonable value.

35.   Under the Act, the fee for the physician's services is determined in accordance with either (i) "a specified State law with respect to such plan, coverage, or issuer, respectively," if the state in which the services are provided has such a law; or (ii) "an All-Payer Model Agreement under section 1315a of this title [the Social Security Act];" or (iii) if the state has no such law or agreement and the physician and the health plan cannot agree upon the fee, the amount determined by an "independent dispute resolution process" established by the Act, *i.e.*, by arbitration. 42

U.S.C. § 300gg(a)(3)(H).

36.    The independent dispute resolution process established by the Act is a "baseball-style" arbitration in which the provider and health plan each submit their best and final offers for the amount each considers to be reasonable payment. Specifically, once an arbitrator is selected, the provider and the health plan have 10 days to submit (1) an offer for a payment amount, (2) any information requested by the arbitrator, and (3) any additional information the party wishes the arbitrator to consider, including information relating to statutory factors the arbitrator must consider. 42 U.S.C. § 300gg-111(c)(5)(B), (C)(ii).

37.    The arbitrator then reviews the offers and "shall . . . select one of the offers" after "taking into account the considerations in subparagraph (C)," which are: the qualifying payment amounts . . . for the applicable year for comparable services that are furnished in the same geographic region and any additional information that is submitted, including the level of training, experience, and quality and outcomes measurements of the physician, the market share held by the physician or that of the plan in the geographic region in which the item or service was provided, and demonstrations of good faith efforts (or lack of good faith efforts) made by the physician to enter into network agreements and, if applicable, contracted rates with the health plan during the previous four plan years. 42 U.S.C. § 300gg-111(c)(5)(C)(i), (ii).

38.    The qualifying payment amount ("QPA") is defined by the Act as the "median of the contracted rates recognized by the" insurer as of January 31, 2019 in the same insurance market for "the same or similar item or service" provided by a provider "in the same or similar specialty and . . . geographic region," increased by inflation over the base year. 42 U.S.C. § 300gg-111(a)(3)(E)(i).

39.    In addition to determining what the arbitrator may consider, the Act also identifies factors that the arbitrator cannot consider: (i) usual and customary charges; (ii) the amount the provider would have billed for the item or service if the Act's billing provisions did not apply; and (iii) the amount a public payer (like Medicare) would have paid. *Id.* § 300gg-111(c)(5)(D).

40.    The Act provides that the determination made in the "independent dispute resolution process" is binding upon the parties and is not subject to judicial review except in cases of fraud, bias, misconduct or where the arbitrator exceeded his or her authority. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).

41.    The Act requires that the arbitrator consider each of these factors in determining which offer to select and left it to the discretion and expertise of the arbitrator to decide how much weight to give each factor in light of the facts and circumstances of a particular case. It does not give presumptive weight to any single factor.

42.    Congress did not authorize the Departments to determine how the statutory factors should be considered.

43.    Despite this, the Rule provides that the arbitrator "must presume that the QPA is [the] appropriate" out-of-network rate and "*must* select the offer closest to the QPA" unless the physician "clearly demonstrates" that the QPA is "materially different from the appropriate out-of-network rate." 45 C.F.R. § 149.510(c)(4)(ii)(A) (emphasis added); 86 Fed. Reg. at 55,995.

44.    The Rule further provides that if the arbitrator does not choose the offer closest to the QPA, it must provide a "detailed explanation" as to why it found the QPA to be materially different from the appropriate rate, including a description of "the additional considerations relied upon, whether the information about those considerations submitted by the parties was credible, and the basis upon which the certified IDR entity determined that the credible information demonstrated

that the QPA is materially different from the appropriate out-of-network rate." 86 Fed. Reg. at 56,000.

45.    The Rule provides that the arbitrator need not consider any factor beyond the QPA unless "a party submits information . . . that the certified IDR entity determines is credible." 86 Fed. Reg. at 55,997; *see id.* (entity "must consider" Congress's other five mandated factors only "to the extent credible information is submitted by a party"). There is no such limitation in the Act.

46.    The Rule then defines "credible information" as "information that upon critical analysis is worthy of belief and is trustworthy." 45 C.F.R. § 149.510(a)(2)(v). There is no such requirement in the Act.

47.    The Rule also affirmatively forbids the arbitrator from scrutinizing the QPA. It states, "[I]t is not the role of the certified IDR entity to determine whether the QPA has been calculated by the [insurer] correctly[.]" *See* 86 Fed. Reg. at 55,996. There is no such requirement in the Act.

48.    As the Chairman and Ranking Member of the House Ways and Means Committee have recently explained in a letter to the Secretaries, the Rule "strays from the No Surprises Act in favor of an approach that Congress *did not* enact in the final law," since "Congress deliberately crafted the law to avoid any one factor tipping the scales during the IDR process." https://www.gnyha.org/wp-content/uploads/2021/10/2021.10.04-REN-KB-Surprise-Billing-Letter80.pdf (emphasis added).

49.    A recent letter from 150 other Members of Congress said the same thing. The Rule "do[es] not reflect the way the law was written, do[es] not reflect a policy that could have passed Congress, and do[es] not create a balanced process to settle payment disputes." Letter from Members    of    Congress    to    Department    Secretaries    (Nov.    5,    2021), https://wenstrup.house.gov/uploadedfiles/2021.11.05_no_surprises_act_letter.pdf.

50.   The Act and the Rule effectively allow the health plan to determine the result of the "independent dispute resolution process."

STATEMENT OF CLAIMS FOR RELIEF

COUNT I

THE ACT EXCEEDS THE AUTHORITY OF CONGRESS BY REQUIRING PHYSICIANS TO
ADJUDICATE THEIR STATE COMMON-LAW CLAIMS FOR PAYMENT BEFORE AN
ADMINISTRATIVE TRIBUNAL ESTABLISHED BY CONGRESS

51.   Plaintiffs repeat and reallege all of the previous allegations in this complaint.

52.   Congress can require that a right it has created be adjudicated by an administrative tribunal it creates.

53.   Congress has no authority to require that a right created by the common law of the State of New York be adjudicated in an administrative tribunal.

54.   Plaintiffs' right to be paid the reasonable value of the services they have provided to patients is established by the common law of the State of New York.

55.   Congress, therefore, has no authority to require that the plaintiffs' claims for the reasonable value of the services they have provided to patients be determined by the "independent dispute resolution process" established by the Act.

56.   The provisions of the Act which require physicians, including the plaintiffs, to submit to the "independent dispute resolution process" their claims for the reasonable value of the services they have rendered to patients are illegal and unconstitutional. They must be set aside and their enforcement must be enjoined.

COUNT II

**BY REQUIRING PHYSICIANS, INCLUDING PLAINTIFFS, TO SUBMIT THEIR
CLAIMS FOR THE REASONABLE VALUE OF THE SERVICES THEY HAVE
RENDERED TO PATIENTS TO AN "INDEPENDENT DISPUTE RESOLUTION
PROCESS" IN WHICH THERE IS NO JURY TRIAL, THE ACT DEPRIVES
PHYSICIANS, INCLUDING PLAINTIFFS, OF THEIR RIGHT TO TRIAL BY
JURY UNDER THE SEVENTH AMENDMENT TO THE UNITED STATES
CONSTITUTION**

57.   Plaintiffs repeat and reallege all of the previous allegations in this complaint.

58.   The Seventh Amendment to the United States Constitution entitles litigants to a jury trial with respect to any cause of action at law where the amount in issue is more than $20.

59.   A physician's action to recover the reasonable value of services rendered to a patient is an action at law where the measure of damages is *quantum meruit.*

60.   In every, or nearly every, dispute between a physician and a patient or an insurer, the amount in issue is more than $20.

61.   The Act requires physicians to submit their claims for the reasonable value of the services they have provided to patients for determination by the "independent dispute resolution process" established by the Act.

62.   The "independent dispute resolution process" established by the Act is binding on the parties and does not allow for a jury trial.

63.   By requiring physicians to submit their claims for the reasonable value of the services they have provided to patients for determination by a non-judicial body where there is no jury trial, the Act deprives physicians, including Plaintiffs, of their right to a jury trial guarantied by the Seventh Amendment to the United States Constitution.

COUNT III

BY REQUIRING PHYSICIANS, INCLUDING PLAINTIFFS, TO SUBMIT THEIR CLAIMS FOR THE
REASONABLE VALUE OF THE SERVICES THEY HAVE RENDERED TO PATIENTS TO AN
"INDEPENDENT DISPUTE RESOLUTION PROCESS" WHICH IS NOT INDEPENDENT AT ALL BECAUSE
THE STANDARD OF DECISION IS DEFINED BY THE ADVERSE PARTY, THE HEALTH PLAN, THE ACT
DEPRIVES PHYSICIANS, INCLUDING PLAINTIFFS, OF THEIR RIGHT TO DUE PROCESS OF LAW AS
GUARANTIED BY THE FIFTH AMENDMENT O THE UNITED STATES CONSTITUTION

64.    Plaintiffs repeat and reallege all of the previous allegations in this complaint.

65.    The Fifth Amendment to the United States Constitution guarantees to each person

the right to due process of law.

66.    Due process of law requires an impartial tribunal that will determine the issues before

it on the basis of a standard of decision established by law.

67.    Due process of law is denied where one party to the dispute is given the unilateral

right to determine the standard of decision.

68.    The Act requires that the "independent dispute resolution process" determine the

amount to which a physician is entitled on the basis of the "qualifying payment amounts . . . for

the applicable year for comparable services," with the potential to also consider additional

circumstances, such as the physician's level of training or experience; acuity of the individual

receiving treatment; market share of the physician or health plan; and demonstrations of good faith

efforts to enter into network agreements. 42 U.S.C. § 300gg-111(c)(5)(C). The Act specifically

excludes consideration of "usual and customary charges;" the amount the provider would have

charged had the No Surprise Act not applied; or the amounts payable under Medicare or Medicaid.

42 U.S.C. § 300gg-111(c)(5)(D).

69.    The Act defines the "qualifying payment amount" as the "median of the contracted

rates recognized by the" insurer as of January 31, 2019 in the same insurance market for "the same

or similar item or service" provided by a provider "in the same or similar specialty and . . .

JA-25

geographic region," increased by inflation over the base year. 42 U.S.C. § 300gg-111(a)(3)(E)(i).

70.     The Act thus defines the amount to which every physician, including the plaintiffs are entitled to be paid for their services by the amount the health plan has agreed to pay other physicians, subject to the potential consideration of a handful of additional circumstances but expressly excluding consideration of the amount the physician would customarily charge.

71.     By defining the "qualifying payment amount" on the basis of what the health plan has agreed to pay other physicians, while expressly excluding the amounts the physician customarily charges, the Act has given one party to the "independent dispute resolution process" – the health plan – the unilateral right to define the standard by which the outcome of that process will be determined.

72.     The Act therefore deprives physicians, including Plaintiffs, of their property rights to the reasonable value of the services they have rendered without due process of law by allowing health plans to determine the standard by which the "independent dispute resolution process" determines physicians' claims.

## COUNT IV

**BY PROHIBITING PHYSICIANS, INCLUDING PLAINTIFFS, FROM BILLING PATIENTS FOR THE AMOUNTS INSURERS WILL NOT PAY, THE ACT DEPRIVES PHYSICIANS, INCLUDING PLAINTIFFS, OF PROPERTY WITHOUT DUE PROCESS OF LAW AND DOES SO WITHOUT JUST COMPENSATION**

73.     Plaintiffs repeat and reallege all of the previous allegations in this complaint.

74.     Physicians, including Plaintiffs, have the right under New York law to be paid the reasonable value of the services they render to patients.

75.     The "independent dispute resolution process" established by the Act does not provide for the payment to physicians of the reasonable value of their services.

14

76. Nevertheless, the Act prohibits physicians from billing patients for the reasonable value of the services they have rendered that exceeds the amount determined by the "independent dispute resolution process" as the health plan's responsibility.

77. By denying to physicians, including the plaintiffs, the right to bill their patients for the reasonable value of the services they have rendered that exceeds the amount determined by the "independent dispute resolution process," the Act deprives Plaintiffs of that property right without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.

78. By denying to physicians, including the plaintiffs, the right to bill their patients for the reasonable value of the services they have rendered that exceeds the amount determined by the "independent dispute resolution process," the Act deprives Plaintiffs of that property right without just compensation in violation of the Fifth Amendment to the United States Constitution.

## COUNT V

### THE RULE'S PRESUMPTION IN FAVOR OF THE QPA IS NOT IN ACCORDANCE WITH LAW AND EXCEEDS DEFENDANTS' STATUTORY AUTHORITY

79. Plaintiffs repeat and reallege all of the previous allegations in this complaint.

80. An agency regulation that is inconsistent with the terms of the statute under which it is promulgated is illegal, ultra vires, and void.

81. The Administrative Procedure Act ("APA") provides that courts will "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

82. The Act defines the factors that must be considered in the "independent dispute resolution process." 42 U.S.C. § 300gg-111(c)(5)(C).

83. The Act does not give any one of those factors priority or otherwise dictate how the factors should be weighed in the "independent dispute resolution process." 42 U.S.C. § 300gg-

111(c)(4)(A).

84.   The Rule departs from and is inconsistent with the Act by requiring the independent dispute resolution process" to determine physicians' claims in accordance with the offer closest to the QPA, unless a party "clearly demonstrates that the QPA is materially different from the appropriate out-of-network rate." 86 Fed. Reg. at 55,995.

85.   The Rule is contrary to the statute's plain meaning.

86.   The Rule is an impermissible attempt to rewrite statutory language.

87.   Congress did not delegate to the Departments the authority to promulgate rules requiring that the determination of the "independent dispute resolution process" be based on the QPA.

88.   Promulgating rules requiring that the determination of the "independent dispute resolution process" be based on the QPA is not within the authority of the Departments to "interpret" the Act.

89.   The Departments' attempt to override the language of the statute and upset the balanced approach that Congress required the arbitrator to follow when making payment determinations is ultra vires and contrary to the unambiguous requirements of the No Surprises Act.

PRAYER FOR RELIEF

For these reasons, Plaintiffs demand judgment against Defendants granting the following relief:

1.   Declaring that the Act: (i) illegally and unconstitutionally requires physicians, including the plaintiffs, to submit their state common law claims for the reasonable value of the services they have provided to patients for adjudication by an "independent dispute resolution

16

process" established by the Act; (ii) unconstitutionally deprives physicians, including Plaintiffs, of their right to a jury trial guaranteed by the Seventh Amendment to the United States Constitution by requiring them to state common law claims for the reasonable value of the services they have provided to patients for adjudication in a process that does not provide for a jury trial; (iii) deprives physicians, including Plaintiffs of property without due process of law in violation of the Fourteenth Amendment to the United States Constitution by requiring them to submit their state common law claims for the reasonable value of the services they have provided to patients for adjudication by an "independent dispute resolution process" in which the standard of decision is established by the adverse party; and (iv) deprives physicians, including Plaintiffs, of their property right to reasonable compensation for the services they have provided to patients without just compensation, in violation of their rights under Fifth Amendment to the United States Constitution, by denying to them the right to bill patients for the balance of their reasonable fees in excess of the amount determined by the "independent dispute resolution process;" and

    2.   Declaring that the Departments acted unlawfully by promulgating the Rule establishing a presumption in the "independent dispute resolution process" in favor of the QPA; and

    3.   Vacating as illegal and unconstitutional 42 U.S.C. § 300gg-111(c), 42 U.S.C. § 300gg-131 and 300gg-132; and

    4.   Vacating the provisions of the Rule requiring the "independent dispute resolution process" to employ a presumption in favor of the offer closest to the QPA: 45 C.F.R. § 149.510(a)(2)(v); 45 C.F.R. § 149.510(a)(2)(viii); the second and third sentences of 45 C.F.R. § 149.510(c)(4)(ii)(A); the final sentence of 45 C.F.R. § 149.510(c)(4)(iii)(C); 45 C.F.R. § 149.510(c)(4)(iv); and 45 C.F.R. § 149. 510(c)(4)(vi)(B); 26 C.F.R. § 54.9816-8T(a)(2)(v); 26 C.F.R. § 54.9816-8T(a)(2)(viii); the second and third sentences of 26 C.F.R. § 54.9816-

8T(c)(4)(ii)(A); the final sentence of 26 C.F.R. § 54.9816-8T(c)(4)(iii)(C); 26 C.F.R.; § 54.9816-

8T(c)(4)(iv); and 26 C.F.R. § 54.9816-8T(c)(4)(vi)(B); 29 C.F.R. § 2590.716-8(a)(2)(v); 29 C.F.R.

§ 2590.716-8(a)(2)(viii); the second and third sentences of 29 C.F.R. § 2590.716-8(c)(4)(ii)(A);

the final sentence of 29 C.F.R. § 2590.716-8(c)(4)(iii)(C); 29 C.F.R. § 2590.716-8(c)(4)(iv); and

29 C.F.R. § 2590.716-8(c)(4)(vi)(B); and

     5.   Enjoining and prohibiting the Departments from enforcing these provisions; and

     6.   Enjoining and prohibiting the Departments from promulgating replacement provisions

without notice and comment; and

     7.   Awarding to the plaintiffs the attorneys' fees and costs they have incurred in this action,

pursuant to 28 U.S.C. § 2412; and

     8.   Granting any other relief the Court determines to be just and proper.


Yours, etc.


ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN,
FORMATO, FERRARA, WOLF & CARONE, LLP
*Attorneys for Plaintiffs-Petitioners*


By: _____
Robert A. Spolzino, Esq.
Edward A. Smith, Esq.
Justin T. Kelton, Esq.
81 Main Street, Suite 306
White Plains, NY 10601
(914) 607-7010


Dated: White Plains, New York
      December 31, 2021

JA-30

JS 44  (Rev. 4-29-21)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| DR. DANIEL HALLER and LONG ISLAND SURGICAL PLLC | SEE RIDER ATTACHED |

(b) County of Residence of First Listed Plaintiff    **Nassau**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   **Washington, DC**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Robert A. Spolzino, Abrams Fensterman LLP, 81 Main Street, Suite 308, White Plains, NY 10601, (914)

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [x] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

Does this action include a motion for temporary restraining order or other injunctive relief?
to show cause? Yes [ ] No [x]

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | PERSONAL INJURY     PERSONAL INJURY | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane   [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander   [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | PROPERTY RIGHTS | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 820 Copyrights   [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine   [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | | [ ] 840 Trademark   [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 460 Deportation   [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle   PERSONAL PROPERTY   [ ] 370 Other Fraud | LABOR | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability   [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury   [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | SOCIAL SECURITY | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice   [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff)   [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | [ ] 751 Family and Medical Leave Act | [ ] 863 DIWC/DIWW (405(g))   [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| REAL PROPERTY     CIVIL RIGHTS     PRISONER PETITIONS | | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation   [ ] 440 Other Civil Rights   Habeas Corpus: | | [ ] 791 Employee Retirement Income Security Act | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure   [ ] 441 Voting   [ ] 463 Alien Detainee | | | FEDERAL TAX SUITS | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment   [ ] 442 Employment   [ ] 510 Motions to Vacate Sentence | | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land   [ ] 443 Housing/ Accommodations   [ ] 530 General | | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability   [ ] 445 Amer. w/Disabilities - Employment   [ ] 535 Death Penalty | | IMMIGRATION | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property   [ ] 446 Amer. w/Disabilities - Other   Other:   [ ] 540 Mandamus & Other | | [ ] 462 Naturalization Application   [ ] 465 Other Immigration Actions | | |
| [ ] 448 Education   [ ] 550 Civil Rights | | | | |
| [ ] 555 Prison Condition | | | | |
| [ ] 560 Civil Detainee - Conditions of Confinement | | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202
Brief description of cause:
Declaration that No Surprise Act is unconstitutional

### VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    [ ] Yes    [x] No

### VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE   1/3/22

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

## CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.7 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed

Case is Eligible for Arbitration ☐

I, __Justin T. Kelton__, counsel for __Plaintiffs__, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

☐ monetary damages sought are in excess of $150,000, exclusive of interest and costs.

☑ the complaint seeks injunctive relief.

☐ the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

## NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.) Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County? ☐ Yes ☑ No

2.) If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County? ☑ Yes ☐ No

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District? ☑ Yes ☐ No

c) If this is a Fair Debt Collection Practice Act case, specify the County in which the offending communication was received:

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County? ☐ Yes ☐ No
*(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).*

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

☑ Yes ☐ No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

☐ Yes (If yes, please explain ☑ No

I certify the accuracy of all information provided above.

Signature: _____

Last Modified 11/27/2017

JA-32

**RIDER OF DEFENDANTS**

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, 200 Independence Avenue SW, Washington, DC 20201,

and

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, 200 Independence Avenue SW, Washington, DC 20201,


U.S. OFFICE OF PERSONNEL MANAGEMENT, 1900 E Street NW Washington, DC 20415,

and

KIRAN AHUJA, in her official capacity as Director of the U.S. Office of Personnel Management, 1900 E Street NW Washington, DC 20415,


U.S. DEPARTMENT OF LABOR, 200 Constitution Avenue NW Washington, DC 20210,

and

MARTIN J. WALSH, in his official capacity as Secretary of Labor, 200 Constitution Avenue NW Washington, DC 20210,


U.S. DEPARTMENT OF THE TREASURY, 1500 Pennsylvania Avenue NW, Washington, DC 20220,

and

JANET YELLEN, in her official capacity as Secretary of the Treasury, 1500 Pennsylvania Avenue NW Washington, DC 20220

JA-33

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| Haller et. al.<br><br>_____<br>*Plaintiff(s)*<br>v.<br>U.S. Department of Health and Human Services et. al.<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.   2:21-cv-07208-AMD-AYS

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  **Please see attached rider.**

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Abrams Fensterman, LLP
                                        Attn: Justin T. Kelton, Esq..
                                        1 Metrotech Center, 17th Floor
                                        Brooklyn, New York 11201

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**BRENNA B. MAHONEY**
*CLERK OF COURT*

Date:   2/22/2022
      _____

_____
Roseann Guzzi
*Signature of Clerk or Deputy Clerk*

JA-34

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. **2:21-cv-07208-AMD-AYS**

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ **0.00** .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Civil Action No. 2:21-cv-07208-AMD-AYS

### RIDER OF DEFENDANTS

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, 200 Independence Avenue SW, Washington, DC 20201,

and

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, 200 Independence Avenue SW, Washington, DC 20201,


U.S. OFFICE OF PERSONNEL MANAGEMENT, 1900 E Street NW Washington, DC 20415,

and

KIRAN AHUJA, in her official capacity as Director of the U.S. Office of Personnel Management, 1900 E Street NW Washington, DC 20415,


U.S. DEPARTMENT OF LABOR, 200 Constitution Avenue NW Washington, DC 20210,

and

MARTIN J. WALSH, in his official capacity as Secretary of Labor, 200 Constitution Avenue NW Washington, DC 20210,


U.S. DEPARTMENT OF THE TREASURY, 1500 Pennsylvania Avenue NW, Washington, DC 20220,

and

JANET YELLEN, in her official capacity as Secretary of the Treasury, 1500 Pennsylvania Avenue NW Washington, DC 20220

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

DR. DANIEL HALLER and LONG ISLAND
SURGICAL PLLC,

Plaintiff,

– against –

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, 200 Independence
Avenue SW, Washington, DC 20201, et al.,

Defendants.

Case No. 21-cv-7208-AMD-AYS

**DECLARATION OF
DR. DANIEL HALLER
IN SUPPORT OF PLAINTIFFS'
MOTION FOR A TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

Dr. Daniel Haller, hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am a Plaintiff in this action, and I am the President and 100% owner of Plaintiff

Long Island Surgical PLLC ("Long Island Surgical").  I respectfully submit this Declaration in

support of Plaintiffs' motion for a preliminary injunction prohibiting enforcement of the federal

No Surprises Act, Pub. L. 116-260 (the "Act") and the regulations implementing the Act, and for

a temporary restraining order prohibiting their enforcement while the motion is being heard and

determined.

2.      This declaration is made upon my personal knowledge of the facts and

circumstances set forth herein.

3.      I earned my medical degree in 2006 from the Technion – Israel Institute of

Technology, Faculty of Medicine.  I completed my residency in general surgery at Maimonides

Medical Center, and my fellowship in surgical critical care at North Shore-Long Island Jewish

Health System.  I am board-certified in both general surgery and surgical critical care by the

1

JA-37

American Board of Surgery. I am a fellow of the American College of Surgeons and an Adjunct Clinical Associate Professor of Surgery, teaching both students and residents.

4.      I specialize in general surgery and acute care surgery, which includes general surgery, trauma and critical care surgery.  Among other things, as an acute care surgeon I perform a wide range of services and procedures for urgent medical conditions when patients require either short or long-term treatment for a severe illness or injury in addition to services provided during their recovery period. .  Critical care deals with the sickest patients in the hospital and requires 24 hour a day attention to meet their medical needs.  During the first wave of COVID-19 in March of 2020 we managed two intensive care units in two different hospitals, taking care of over 40 patients a day, while risking our lives during a time of extreme uncertainty on how to safely care for our patients, ourselves and our families.

5.      Long Island Surgical is a general and acute care surgical private practice in Rockville Centre, New York.  We provide individualized and high-quality services to each patient, whether a consult, surgery, and/or follow up.  Patients receive their provider's cell phone number with 24 hour, seven-days-a-week access to discuss their clinical needs.  Long Island Surgical employs six physicians who have over forty combined years of clinical experience.  The practice offers traditional, laparoscopic, and robotic services to best meet the needs of each patient. Additionally, our surgeons offer their time and effort to ensure the best possible patient outcomes. Our surgeons engage in high quality peer review and performance improvements meetings to ensure high quality patient care. Our surgeons are affiliated with hospitals in Long Island, including Mercy Hospital, Mount Sinai South Nassau, and St. Joseph Hospital, and cooperate with many other doctors and specialists.

6.      I and the other surgeons at Long Island Surgical perform approximately 2,700 emergency consultations and surgical procedures each year for patients admitted to hospitals through their emergency departments.

7.      Around 78% of the patients that I and Long Island Surgical treat each year are covered by health insurance plans with whom we have no contractual relationship.  We are therefore "out-of-network" providers with respect to these insurers.


**Effects of The Federal No Surprises Act**

8.      A large majority of the out-of-network services I and my colleagues at Long Island Surgical provide are subject to the balance billing prohibition for patients with health insurance covered by the Act.  The Act applies to most emergency services, including those provided in hospital emergency rooms, inpatient settings and urgent care centers that are licensed to provide emergency care.  Other out-of-network services that I and Long Island Surgical provide are non-emergency medical services in which I or one of my colleagues is out-of-network, but the facility in which we are providing services is in-network for our patient.  The Act also broadly defines covered non-emergency services to include treatment, equipment and devices, and preoperative and postoperative services, all services that I and Long Island Surgical often render.  Under the Act, patients cannot consent to being balanced billed for either emergency services or many other services I and my Long Island Surgical colleagues provide, despite the fact that, because of our reputation, patients often seek us out for their emergency care.

9.      Since January 1, 2022, when the Act went into effect, I and the other providers at Long Island Surgical have provided out-of-network services subject to reimbursement through the

Act's independent dispute resolution ("IDR") process, and we will continue to provide out-of-network services that are subject to reimbursement through that process.

10.     I expect that the rates I and my Long Island Surgical colleagues submit to out-of-network health plans will generally not be the amount closest to the qualifying payment amount ("QPA") under the Act. I therefore do not expect that the issue of a reasonable reimbursement rate for out-of-network services provided by me and the other Long Island Surgical providers can in most cases be resolved solely by reference to the QPA. My level of training, and the level of training of my colleagues, all of whom are fellowship-trained, is well above-average, and the surgical services we provide are often highly complex due to the acuity of the patients. Therefore, the QPA will often be well below the true median contracted rate as paid in the marketplace because the QPA fails to account for the severity of the patient's condition(s) or the difficulty of the treatment(s). We at Long Island Surgical often operate on the most acute and sickest patients at the hospitals where we practice, and during all hours of the day, including nights, weekends, and holidays.

11.     Upon information and belief, now that the Act is in effect, providers will need to first find out the patient's insurance status and then submit the out-of-network bill directly to the health plan. Health plans must respond within 30 days, advising the provider of the applicable in-network amount for that claim, generally based on the median in-network rate the plan pays for the service. The health plan will send an initial payment or notice of denial to the provider and send the consumer a notice that it has processed the claim. Either side has 30 days to initiate a 30-day "open negotiation" period. If the parties cannot agree by the last day of the open negotiation period, either party may initiate the IDR process within four business days after the close of the open negotiation period. The parties may jointly select an IDR arbitration service provider or a

Case 2:23-cv-04033-DDP Document 13, 08/28/2023, 3562930, Page43 of 193

service provider will be selected for them, within 6 business days following the notice of IDR initiation. In IDR arbitration, each party must submit their best and final offer, and the independent arbitrator must select one of the offers, a so-called "baseball-style" process in which the IDR entity can only pick from one of two competing offers without modification. While the time deadlines in the act might seem like a good idea, they are unrealistic and will be difficult to keep track of and adhere to, especially since in our experience, the insurance companies do not have dedicated personnel to negotiate claims or even answer questions that providers may have in a timely fashion.

12.     As required by the Act, I and my colleagues at Long Island Surgical would engage in open negotiation with out-of-network insurers for a reasonable out-of-network reimbursement rate. However, as discussed above, because the rules implementing the Act default to the QPA, the bargaining power of the health plans has dramatically increased. Therefore, as a result of the Act, negotiation alone is less likely to resolve rate disputes. If negotiation does not succeed, I and my colleagues will work with Long Island Surgical administrative staff to submit claims under the Act's IDR process. An IDR arbitrator will then determine the reimbursement rate that Long Island Surgical receives, defaulting to the QPA.

13.     Based on my experience with the New York State Emergency Medical Services and Surprise Bill Act (the "New York Act"), I expect that Long Island Surgical will have to participate in tens of thousands, of IDRs under the Act in the coming years.

14.     In that regard, Long Island Surgical must navigate the new IDR program and the administrative burdens and costs associated with the program. We have started the process of hiring additional administrative staff to deal with the impending IDR arbitrations should the Act continue to go into effect without the Court's intervention. This problem is acute because, as discussed above, the deadlines provided for under the Act are strict.

5

15.    We must compete with other independent practices to hire individuals who are proficient with the new regulations and procedures of the Act, and who are in short supply, thereby making staffing difficult and expensive.  Our current administrative staff numbers nine, and we anticipate needing to hire at least six to ten more professionals.  It will therefore take up an enormous amount of my and Long Island Surgical staff's time and effort to properly prepare to meet the Act's requirements, and more importantly, to receive fair compensation for services provided.  As one example of severe underpayment, Long Island Surgical received $238 for a hernia repair surgery, which thus far has taken up two years of challenges and appeals.

16.    Another aspect of the Act's effects on our practice is that physicians are now required to make available to each patient who is enrolled in a health plan a disclosure regarding the Act's protections against balance billing.  Typically, when dealing with an out-of-network patient, the patient completes an assignment of benefits form ("AOB") requiring his or her health insurance provider to pay the provider directly.  In our experience, even with a signed AOB from the patient, the insurer still chooses to send payment checks to the patient as reimbursement instead of directly to the provider, causing additional burden on the practice and staff to obtain any payment at all for those services.  In addition, the AOB should allow the provider, such as my colleagues and me, with the opportunity to negotiate directly with the out-of-network insurer in a more efficient manner and increases the bargaining position of the provider with respect to the insurer.  I estimate that as many as 99% of Long Island Surgical's out-of-network patients provide AOBs when requested.  However, patients are becoming increasingly reluctant to sign an AOB with Long Island Surgical because they know that, under the Act, they cannot in any case be billed for any outstanding balance.  Should this trend continue and grow, the lack of AOBs will severely

limit our ability to negotiate directly with out-of-network insurers, further eroding our bargaining position.

17.     Similarly, the Act also requires disclosure to certain patients seeking non-emergency surgery as to how much in theory they would be billed for the procedure if their out-of-network provider does not pay the unnegotiated bill in full.   This disclosure is required notwithstanding that (a) the out-of-network non-emergency patient will in most cases have out-of-network benefits, (b) we are likely negotiating with the out-of-network insurer to obtain coverage for the procedure at an agreed upon rate, and (c) the patient will likely end up paying little if anything additional out-of-pocket.   It has been our experience recently that this mandated disclosure is scaring off out-of-network, non-emergency surgical patients and causing them to seek in-network providers, who may be less qualified or have worse clinical outcomes, but who do not have to make a similar disclosure, when the disclosure in any event does not reflect the reality of what that patient will in fact pay for our services.  Patients therefore elect and pay for increased coverage that allows them to utilize the services of out-of-network providers, but are now being unnecessarily dissuaded from exercising their contracted rights. This will cause me and my colleagues to lose out-of-network, non-emergency surgical patients at a rate that will be difficult to calculate.

18.     I declare under penalty of perjury that the foregoing is, to my knowledge and understanding, true and correct.

JA-43

Dr. Daniel Haller

Sworn to before me on this

24ᵗʰ day of March, 2022

Notary Public

DAVID REICH
Notary Public, State of New York
Registration No. 02RE4983171
Qualified in Queens County
Commission Expires February 15, 2026

8

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

DR. DANIEL HALLER and LONG ISLAND
SURGICAL PLLC,

                          Plaintiff,

    – against –

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, 200 Independence
Avenue SW, Washington, DC 20201, et al.,

                          Defendants.

Case No. 21-cv-7208-AMD-AYS

**NOTICE OF MOTION FOR
PRELIMINARY INJUNCTION**

Upon the Declaration of Dr. Daniel Haller, sworn to on March 25, 2022, and Plaintiffs' Memorandum of Law in Support of Their Motion for a Temporary Restraining Order and Preliminary Injunction, the Plaintiffs, Dr. Daniel Haller and Long Island Surgical PLLC ("Plaintiffs") hereby move pursuant to Federal Rule of Civil Procedure 65 against Defendants, the United States Department of Health and Human Services, Xavier Becerra in his official capacity as the Secretary of Health and Human Services, the United States Office of Personnel Management, Kiran Ahuja in her official capacity as the Director of the Office of Personnel Management, the United States Department of Labor, Martin J. Walsh in his official capacity as the Secretary of Labor, the United States Department of the Treasury, and Janet Yellen in her official capacity as the Secretary of the Treasury (collectively the "Defendants"), for a Preliminary Injunction enjoining Defendants, during the pendency of this action, from implementing, enforcing, or otherwise carrying out:

(1) the No Surprises Act, Pub. L. 116-260 (the "Act"), specifically: 42 U.S.C. § 300gg-111(c), 42 U.S.C. § 300gg-131 and 42 U.S.C. §300gg-132, and

(2) pursuant to the Administrative Procedure Act, provisions of the interim final rule implementing the Act, entitled "Requirements Related to Surprise Billing; Part II," 86 Fed. Reg. 55,980 (Oct. 7, 2021), specifically: 45 C.F.R. § 149.510(a)(2)(v); 45 C.F.R. § 149.510(a)(2)(viii); the second and third sentences of 45 C.F.R. § 149.510(c)(4)(ii)(A); the final sentence of 45 C.F.R. § 149.510(c)(4)(iii)(C); 45 C.F.R. § 149.510(c)(4)(iv); and 45 C.F.R. § 149. 510(c)(4)(vi)(B); 26 C.F.R. § 54.9816-8T(a)(2)(v); 26 C.F.R. § 54.9816-8T(a)(2)(viii); the second and third sentences of 26 C.F.R. § 54.9816-8T(c)(4)(ii)(A); the final sentence of 26 C.F.R. § 54.9816-8T(c)(4)(iii)(C); 26 C.F.R.; § 54.9816-8T(c)(4)(iv); and 26 C.F.R. § 54.9816-8T(c)(4)(vi)(B); 29 C.F.R. § 2590.716-8(a)(2)(v); 29 C.F.R. § 2590.716-8(a)(2)(viii); the second and third sentences of 29 C.F.R. § 2590.716-8(c)(4)(ii)(A); the final sentence of 29 C.F.R. § 2590.716-8(c)(4)(iii)(C); 29 C.F.R. § 2590.716-8(c)(4)(iv); and 29 C.F.R. § 2590.716-8(c)(4)(vi)(B).

Dated: White Plains, New York
       April 4, 2022

**ABRAMS FENSTERMAN, LLP**

By: */s/ Robert A. Spolzino*
    Robert A. Spolzino
    Edward A. Smith
    Justin Kelton
    Mordecai Geisler
    One Metrotech Center, Suite 1700
    Brooklyn, NY 11201
    (718) 215-5300
    *Attorneys for Plaintiffs*

2

JA-46

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

DR. DANIEL HALLER and LONG
ISLAND SURGICAL PLLC,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES *et al.,*

*Defendants.*

<u>Notice of Motion to Dismiss</u>
No. 21-cv-7208-AMD

<u>NOTICE OF DEFENDANTS' MOTION TO DISMISS</u>

Please take notice that, upon the Memorandum of Law, dated April 26, 2022, Defendants

in the above-captioned action will and hereby do move this Court before the Honorable Ann M.

Donnelly, United States District Judge, at the United States District Court for the Eastern District

of New York, located at 225 Cadman Plaza East, Brooklyn, New York 11201, to dismiss the

complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants will also and hereby

do brief their opposition to Plaintiffs' motion for a preliminary injunction under Rule 65(a). The

grounds for this motion and opposition are set forth more fully in the attached supporting brief.

Dated: April 26, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BREON PEACE
United States Attorney

ERIC B. BECKENHAUER
Assistant Branch Director

1

JOEL McELVAIN
Senior Trial Counsel

*/s/ Anna L. Deffebach*
ANNA L. DEFFEBACH (DC Bar No. 241346)
United States Department of Justice,
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 993-5182
Email: Anna.l.deffebach@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY 11201
Tel: (718) 254-6288
Fax: (718) 254-7489
Email: joseph.marutollo@usdoj.gov

*Counsel for Defendants*

JA-48

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                           :

**DR. DANIEL HALLER** and **LONG ISLAND**
**SURGICAL PLLC,**
                                           :

                             Plaintiffs,      :     **MEMORANDUM DECISION AND**
                                             :     **ORDER**

                 – against –           :     21-CV-7208 (AMD) (AYS)

                                             :

**U.S. DEPARTMENT OF HEALTH AND**
**HUMAN SERVICES, XAVIER BECERRA,** *in*
*his official capacity as Secretary of Health and*
*Human Services*, **U.S. OFFICE OF PERSONNEL**
**MANAGEMENT, KIRAN AHUJA,** *in her official*
*capacity as Director of the U.S. Office of Personnel*
*Management*, **U.S. DEPARTMENT OF LABOR,**
**MARTIN J. WALSH,** *in his official capacity as*
*Secretary of Labor*, **U.S. DEPARTMENT OF**
**THE TREASURY,** and **JANET YELLEN,** *in her*
*official capacity as Secretary of the Treasury*,

                                 Defendants.     :
------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

       On December 31, 2021, the plaintiffs filed this action against the defendants, challenging

the constitutionality of the No Surprises Act, Pub. L. 116-260 (the "Act"), and seeking an

injunction against its enforcement.[1]  Before the Court are the plaintiffs' motion for a preliminary

---

[1] The plaintiffs also sought to set aside, under the Administrative Procedure Act, specific provisions of an
interim final rule entitled "Requirements Related to Surprise Billing; Part II," 86 Fed. Reg. 55980 (Oct.
7, 2021) (the "Rule").  On February 23, 2022, the Honorable Jeremy D. Kernodle vacated the Rule in a
separate case, *Texas Medical Association v. U.S. Department of Health and Human Services*.  No. 21-
CV-425, 2022 WL 542879, at *14 (E.D. Tex. Feb. 23, 2022).  The defendants state that they are
engaging in notice-and-comment rulemaking, "have begun the preparation of a final rule that will
address the procedures for arbitrations under the Act, and that will address the provisions of the interim
final rules that were vacated by the Eastern District of Texas," and "anticipate that the final rule will be
issued by early summer of 2022."  (ECF No. 30 at 35.)  At oral argument, the parties agreed that in light
of Judge Kernodle's decision and the forthcoming regulation, there is no live controversy with respect to
the Rule.

injunction and the defendants' motion to dismiss.  For the reasons that follow, the motion for a preliminary injunction is denied, and the motion to dismiss is granted.

## BACKGROUND

The plaintiffs are Dr. Daniel Haller, a surgeon, and Long Island Surgical PLLC, Dr. Haller's private practice, which employs six physicians.  (ECF No. 23 at 3.)  Dr. Haller and the other surgeons do emergency consultations and perform surgical procedures on patients admitted to hospitals through their emergency departments.  (*Id.*)  The plaintiffs allege that approximately 78% of their patients are covered by health plans with which the plaintiffs have no contractual relationship.  (*Id.*)

On December 27, 2020, Congress enacted the No Surprises Act as part of the Consolidated Appropriations Act of 2021.  The law went into effect on January 1, 2021.  The defendants' July 13, 2021 interim final rule describes the background of the legislation.  "Most group health plans, and health insurance issuers offering group or individual health insurance coverage, have a network of providers and health care facilities (participating providers or preferred providers) who agree by contract to accept a specific amount for their services." Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36872, 36874 (July 13, 2021). "By contrast, providers and facilities that are not part of a plan or issuer's network [('out-of-network providers')] usually charge higher amounts than the contracted rates that plans and issuers have negotiated with participating providers and facilities [('in-network providers')]." *Id.* When an insured patient receives care from an out-of-network provider, "the individual's plan or issuer may decline to pay for the service or may pay an amount that is lower than the provider's billed charges, and may subject the individual to greater cost-sharing requirements than would have been charged had the services been furnished by [an in-network] provider." *Id.* "Prior to the No Surprises Act, the [out-of-network] provider could generally balance bill the individual

2

for the difference between the provider's billed charges and the sum of the amount paid by the

plan or issuer and the cost sharing paid by the individual, unless otherwise prohibited by state

law." *Id.*

      A balance bill may be a "surprise bill" for a patient.  The July 13, 2021 rule summarizes

the issue of surprise billing, and when it generally occurs:

> Surprise billing occurs both for emergency and non-emergency care.  In an
> emergency, a person usually goes (or is taken by emergency transport) to a nearby
> emergency department.  Even if they go to a participating hospital or facility for
> emergency care, they may receive care from nonparticipating [out-of-network]
> providers working at that facility.  For non-emergency care, a person may choose a
> participating [in-network] facility (and possibly even a participating provider), but
> not know that at least one provider involved in their care (for example, an
> anesthesiologist or radiologist) is a nonparticipating provider.  In either
> circumstance, the person might not be in a position to choose the provider, or to
> ensure that the provider is a participating provider.  Therefore, in addition to a bill
> for their cost-sharing amount, which tends to be higher for out-of-network services,
> the person might receive a balance bill from the nonparticipating provider or
> facility.

*Id.*

      The Act aims to prevent surprise bills in three ways relevant to this case.  First, for

patients who receive emergency services from out-of-network providers, or non-emergency

services from out-of-network providers in in-network facilities and for which patients do not

consent, the Act limits patients' cost sharing requirements to the "requirement that would apply

if such services were provided by a participating [in-network] provider or a participating

emergency facility."  42 U.S.C. § 300gg-111 ("Preventing surprise medical bills").  Second, the

Act prohibits out-of-network providers from balance billing patients for emergency services and

certain non-emergency services.  *See id.* § 300gg-131 ("[T]he health care provider shall not bill,

and shall not hold liable, such [patient] for a payment amount for an emergency service . . . that

is more than the cost-sharing requirement."); *id.* § 300gg-132.

3

Third, the Act establishes a procedure for resolving disputes between insurers and out-of-network providers over the payment amount for emergency and certain non-emergency services. If a state law sets the amount of payment for an out-of-network provider, the Act states that the insurer will make that payment. *Id.* § 300gg-111(a)(3)(K). Otherwise, the Act specifies that an insurer will issue a payment or deny payment to an out-of-network provider within 30 days after the provider submits its bill. *Id.* § 300gg-111(a)(1)(C)(iv), (b)(1)(C). If the out-of-network provider is not satisfied with the amount, it may initiate a 30-day period of negotiation with the insurer over the claim. *Id.* § 300gg-111(c)(1)(A). If those negotiations do not resolve the dispute, the parties may then proceed to an independent dispute resolution ("IDR") process. *Id.* § 300gg-111(c)(1)(B).

As part of the IDR process, the out-of-network provider and the insurer each submit a proposed payment amount with an explanation, and the IDR entity selects one offer as the amount for the relevant service. *Id.* §§ 300gg-111(c)(2), (5). The Act requires IDR entities to consider multiple factors. They must consider "the qualifying payment amount," which is the "median of the contracted rates recognized by the" insurer as of January 31, 2019 in the same insurance market for the "same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region," increased by inflation over the base year. *See id.* §§ 300gg-111(a)(3)(E)(i), (c)(5)(C)(i)(I). In addition, the entities must consider the following:

> (I) The level of training, experience, and quality and outcomes measurements of the provider or facility that furnished such item or service . . . .
>
> (II) The market share held by the nonparticipating provider or facility or that of the plan or issuer in the geographic region in which the item or service was provided.
>
> (III) The acuity of the individual receiving such item or service or the complexity of furnishing such item or service to such individual.

4

(IV) The teaching status, case mix, and scope of services of the nonparticipating facility that furnished such item or service.

(V) Demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or nonparticipating facility or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider or facility, as applicable, and the plan or issuer, as applicable, during the previous 4 plan years.

*Id.* § 300gg-111(c)(5)(C)(ii).  An IDR entity can request additional information from the parties, and each party can submit "any information relating to such offer submitted by either party, including information relating to any circumstance described" in the above five factors.  *Id.* § 300gg-111(c)(5)(B).  The Act, however, prohibits the IDR entity from considering the out-of-network provider's "usual and customary charges," the amount the provider would have billed in the absence of the Act, or the reimbursement rates for the service under public programs like Medicare, Medicaid or TRICARE.[2]  *Id.* § 300gg-111(c)(5)(D).  The IDR entity's decision is binding on the parties "in the absence of a fraudulent claim or evidence of misrepresentation of facts presented," and is subject to judicial review under the circumstances described in the Federal Arbitration Act.  *Id.* § 300gg-111(c)(5)(E).

States have enacted similar laws to prevent surprise billings.  For example, in 2014, New York enacted the New York State Emergency Medical Services and Surprise Bill Act (the "New York Surprise Bill Act").  Like the legislation at issue here, the New York law provides that patients pay only the usual cost-sharing amounts that they would have been charged had they seen an in-network provider, allows out-of-network providers to negotiate and recover their fees directly from insurers, and establishes an IDR process when those negotiations are unsuccessful.

---

[2] Congress considered and rejected other bills intended to address surprise medical billing, including the Protecting People from Surprise Medical Bills Act, which would have instructed IDR entities to consider "commercially reasonable rates for comparable services or items in the same geographic area" and the "usual and customary cost of the item or service involved."  Protecting People from Surprise Medical Bills Act, H.R. 3502, 116th Cong. § 2(c) (2019).

N.Y. Fin. Serv. L. §§ 601-08.  However, the New York statute applies only to plans regulated by the state and does not extend to self-funded health plans regulated under the Employee Retirement Income Security Act.  (ECF No. 1 ¶ 29; ECF No. 30 at 10-11.)  The plaintiffs have not challenged the constitutionality of the New York Surprise Bill Act, but explained at oral argument that under the New York law, out-of-network providers have no claim against beneficiaries of state-regulated plans, beyond their usual in-network cost-sharing amount.

The plaintiffs commenced this action on December 31, 2021.  (ECF No. 1.)  They moved for a preliminary injunction four months later on April 4, 2022.  (ECF No. 25.)  On April 26, 2022, the defendants filed their motion to dismiss the complaint for failure to state a claim, and opposed the plaintiffs' motion for preliminary injunction.  (ECF No. 29.)  On June 7, 2022, I heard oral argument on the parties' motions.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right," *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), and is intended to "preserve the relative positions of the parties until a trial on the merits can be held," *id.* (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  A decision to award preliminary injunctive relief is often based on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395.  "To obtain a preliminary injunction, the moving party must demonstrate (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of

granting an injunction."[3]  *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011)

(internal quotation marks and citations omitted).

Where a party seeks injunctive relief that "will affect government action taken in the

public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only

if the moving party meets the more rigorous likelihood-of-success standard." *Sussman v.*

*Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quoting *Wright v. Giuliani*, 230 F.3d 543, 547 (2d

Cir. 2000)); *cf. United States v. Siemens Corp.*, 621 F.2d 499, 505 (2d Cir. 1980) ("In litigation

among private parties, the party seeking preliminary relief must show . . . either (1) likelihood of

success on the merits or (2) sufficiently serious questions going to the merits to make them a fair

ground for litigation . . . .").  This heightened requirement "reflects the idea that governmental

policies implemented through legislation or regulations developed through presumptively

reasoned democratic processes are entitled to a higher degree of deference and should not be

enjoined lightly." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d

105, 110 (2d Cir. 2014) (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)).

In order to survive a motion to dismiss, a complaint must plead "enough facts to state a

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v.*

*Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

---

[3] According to the defendants, the plaintiffs must satisfy a more demanding standard—a "clear or
substantial likelihood of success on the merits"—because they seek "a mandatory injunction—that is, an
injunction that disrupts the status quo."  (ECF No. 30 at 17 (quoting *Am. Soccer League, LLC v. U.S.
Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018).)  But the plaintiffs do not seek to alter the status quo by
compelling some positive government action; rather, they want to enjoin enforcement of the Act.
Accordingly, the likelihood-of-success standard applies. *See Friends of the E. Hampton Airport, Inc. v.
Town of E. Hampton*, 152 F. Supp. 3d 90, 101 (E.D.N.Y. 2015), *aff'd in part, vacated in part*, 841 F.3d
133 (2d Cir. 2016).

(2009)) (internal quotation marks omitted).  While "detailed factual allegations" are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## DISCUSSION

In their complaint and in their motion for injunctive relief, the plaintiffs challenge the constitutionality of the Act.  First, they say that the Act's IDR process "deprives physicians of the right to a jury trial guaranteed to them by the Seventh Amendment."  (ECF No. 1 ¶ 3.)  Second, they claim that the Act "deprives those physicians of property without due process of law and is therefore unconstitutional under the Fifth and Fourteenth Amendments," because it "allow[s] insurers to define the standard by which the IDR will determine out-of-network physicians' claims for the reasonable value of their services, and by precluding the physicians from billing patients for the amounts insurers refuse to pay."   (ECF No. 23 at 2.)  The defendants oppose injunctive relief and move to dismiss the complaint.  (ECF No. 29.)

**I.**      **The Plaintiffs' Motion for a Preliminary Injunction**

In seeking injunctive relief, the plaintiffs focus exclusively on two factors—likelihood of success on the merits and irreparable harm.  They say that if enforced, the Act will violate their rights under "the Fifth, Seventh and Fourteenth Amendments," causing them irreparable injury.  (ECF No. 23 at 24-25); *see Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[I]t is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm." (emphasis in original)).  As explained below, the plaintiffs have not demonstrated irreparable harm or a

likelihood of success on the merits of their claims.  Nor have they established that the public interest weighs in favor of injunctive relief.

    a.    **The Plaintiffs' Seventh Amendment Claim**

The Seventh Amendment provides that in "suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."  U.S. Const. amend. VII.  The Supreme Court has "consistently interpreted the phrase 'Suits at common law' to refer to 'suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'"  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (citation omitted).  "The Seventh Amendment protects a litigant's right to a jury trial only if a cause of action is legal in nature and it involves a matter of 'private right.'"  *Id.* at 42 n.4.

The same is not true when a cause of action involves "public rights."  "[W]hen Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.'"  *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 455 (1977).  The Supreme Court has expanded the public rights exception beyond cases arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments."  *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quoting *Crowell v. Benson*, 285 U.S. 22, 50 (1932)); *see also id.* at 490; *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 586 (1985) ("Insofar as appellees interpret [*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)] and *Crowell* as establishing that the right to an Article III forum is absolute unless the Federal Government is a party of record, we cannot agree."); *Granfinanciera*, 492 U.S. at 54 ("[T]he Federal Government need not

9

be a party for a case to revolve around 'public rights.'" (citation omitted)).  Instead, the question is whether "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, has created a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary."  *Thomas*, 473 U.S. at 593-94; *see also Stern*, 564 U.S. at 490-91 ("The Court has continued . . . to limit the exception to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority.  In other words, it is still the case that what makes a right 'public' rather than private is that the right is integrally related to particular Federal Government action.").

The parties appear to agree that the question here is whether Congress created a new public right when it enacted the No Surprises Act.  The plaintiffs assert that Congress did not.  Rather, citing their private right under New York law to bring *quantum meruit* claims against patients for the value of out-of-network services (ECF No. 23 at 12), they maintain that "Congress has no authority to deny [] the physician the right to a jury trial *de novo* on state common law claims," and that "the Act requires the parties to a private billing dispute to submit themselves to final and binding arbitration [IDR], to which neither party agreed, and which would otherwise enjoy the right to a jury trial under the Seventh Amendment."  (*Id.* at 14.)  These arguments are unpersuasive.

The IDR entity does not adjudicate payment disputes between out-of-network doctors and their patients.  Rather, the IDR entity mediates between doctors and insurers, and determines what the out-of-network providers can get from insurers.  As the plaintiffs acknowledged at oral argument, out-of-network providers have no right of action under New York law to recover

10

directly from health insurers.  (*See* ECF No. 30 at 23); *see also Buffalo Emergency Assocs., LLP v. Aetna Health, Inc.*, 167 A.D.3d 461, 462 (1st Dep't 2018) (dismissing providers' suit against an insurer because "the New York Emergency Services and Surprise Bills Act . . . does not provide for a private right of action to enforce its provisions").  Thus, the Act does not compel providers to arbitrate state common law claims to which they had a right to a jury trial.  Instead, as the defendants point out, "[i]n cases where the federal law applies, it is the No Surprises Act itself that creates [an out-of-network] health care provider's right to recover payments directly from a health plan or insurer (and the corresponding legal obligation of the health plan or insurer to pay a provider with whom that plan had no contractual relationship)."[4]  (ECF No. 30 at 22-23.)

The plaintiffs also argue that the Act did not create a public right to recover from insurers because it "'replace[s]' an existing state law contract claim with substantively the same claim, also sounding in contract, between the provider and the patient's insurer."[5]  (ECF No. 31 at 6.)  Quoting the Supreme Court's decision in *Thomas*, the plaintiffs state that "[t]he public rights exception is limited to circumstances in which the 'right to compensation [under a regulatory scheme] does not depend on or replace a right to such compensation under state law.'"  (*Id.* (alteration in original) (quoting *Thomas*, 473 U.S. at 584).)

The plaintiffs cite no authority, and the Court is aware of none, to support the claim that a new federal cause of action—which creates a right to recover from an entity against which the

---

[4] The Act addresses surprise billing in two discrete situations: patients who because of their acute medical condition cannot consent to being treated by an out-of-network doctor, and patients who seek treatment from an in-network doctor, and unbeknownst to the patient, an out-of-network provider participates in the patients' care.  *See* 42 U.S.C. §§ 300gg-131, 300gg-132.  Presumably, the plaintiffs have recourse to state lawsuits against patients in cases not covered by the Act.

[5] "Under New York law, a quantum meruit claim is a claim in quasi-contract."  *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001).

plaintiff previously had no cause of action—replaces a similar but distinct state cause of action involving different parties.  As the Supreme Court held in *Granfinanciera*, "Congress may fashion causes of action that are closely analogous to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable."  492 U.S. 33 at 52; *see also Thomas*, 473 U.S. at 584 (holding that "[a]ny right to compensation from follow-on registrants under [the regulatory scheme] results from [the Federal Insecticide, Fungicide, and Rodenticide Act] and does not depend on or replace a right to such compensation under state law").

The plaintiffs conceded at oral argument that they have no state common law cause of action against insurers to recover payment for out-of-network services, but argued the Act replaces their state law cause of action because in practice, most of their *quantum meruit* cases were against insurers, since patients usually assigned their rights to benefits to the plaintiffs.  But that practice does not create a common law cause of action.  And Congress is not precluded from creating a distinct claim for out-of-network providers against insurers and assigning the adjudication to arbitration.  "To hold otherwise would be to erect a rigid and formalistic restraint on the ability of Congress to adopt innovative measures such as negotiation and arbitration with respect to rights created by a regulatory scheme."  *Thomas*, 473 U.S. at 594.

When Congress enacted the No Surprises Act, it permitted health care providers to recover payment directly from insurers for out-of-network services, which is a new public right.  Out-of-network providers' claims against insurers do not arise under state common law, but instead depend "upon the will of [C]ongress," *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856), and flow from a federal statutory scheme, *see Thomas*, 473 U.S. at 584-85 ("For purposes of compensation under FIFRA's regulatory scheme, however, it is the

12

'mandatory licensing provision' that creates the relationship between the data submitter and the follow-on registrant, and federal law supplies the rule of decision."). Indeed, a provider's right to recover payment directly from an insurer is "completely dependent upon" the adjudication of a claim created by the Act. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 856 (1986). The IDR process is "limited to a 'particularized area of the law,' as in *Crowell, Thomas,* and *Schor*," and the IDR entity does not have "substantive jurisdiction reaching any area of the *corpus juris*." *Stern*, 564 U.S. at 493 (citing *Northern Pipeline*, 458 U.S. at 85).

Finally, the Act provides for a certification process that ensures, among other things, that IDR entities have "sufficient medical, legal, and other expertise and sufficient staffing to make [payment] determinations . . . on a timely basis." 42 U.S.C. § 300gg-111(c)(4)(A)(i). For this reason, the process more closely resembles a "situation in which Congress devised an 'expert and inexpensive method for dealing with a class of questions of fact which are particularly suited to examination and determination by an administrative agency specially assigned to that task.'" *Stern*, 564 U.S. at 494 (quoting *Crowell*, 285 U.S. at 46). In light of these considerations, Congress's assignment of the IDR process to non-Article III tribunals does not violate the Seventh Amendment. *Cf. id.* at 493-94 (holding that the petitioner's claim did not fall within the public rights exception because it was a state common law claim between private parties, did not depend on the will of Congress, did not flow from a statutory scheme, was not limited to a particularized area of law, and dealt with a court with substantive jurisdiction).

Because the IDR process does not violate the plaintiffs' rights under the Seventh Amendment, they cannot show irreparable harm or a likelihood of success on the merits. *See Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 393 (E.D.N.Y. 2021). The plaintiffs' Seventh Amendment claim for injunctive relief is denied.

13

### b.      The Plaintiffs' Due Process Claim

The plaintiffs claim that the Act violates their right to due process.[6]  They argue that the

"Act deprives physicians, including Plaintiffs, of their property rights to the reasonable value of

the services they have rendered without due process of law by allowing health plans to determine

the standard by which the 'independent dispute resolution process' determines physicians'

claims."  (ECF No. 31 at 13.)[7]  "In order to assert a violation of procedural due process rights, a

plaintiff must 'first identify a property right, second show that the [government] has deprived

him of that right, and third show that the deprivation was effected without due process.'"

*DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 487 (E.D.N.Y. 2009)

(quoting *Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Huntington*, 31 F.3d 1191,

1194 (2d Cir. 1994)).

According to the plaintiffs, the property interest at issue is their "cognizable property

interest in being fully and fairly compensated for services they render to their patients, both in

state court under common law, and against third-party insurers within the confines of the

---

[6] The plaintiffs appear to make claims under both the Fifth and Fourteenth Amendments.  (*See* ECF No. 1 ¶ 3 (alleging that the Act "violates the Due Process Clause of the Fifth Amendment"); *id.* at 17 (alleging that it "deprives physicians, including Plaintiffs of property without due process of law in violation of the Fourteenth Amendment"); *see also* ECF No. 23 at 10 ("The Act also violates the out-of-network physicians' rights to due process of law under the Fifth and Fourteenth Amendments.").)  "The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"  *Dusenbery v. United States*, 534 U.S. 161, 167 (2002).  The plaintiffs assert due process claims against only federal government defendants.  Therefore, to the extent that the plaintiffs seek injunctive relief under the Fourteenth Amendment, they cannot show a likelihood of success on the merits.  *Cf. Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466 (S.D.N.Y. 2009) ("Because Plaintiff's lawsuit does not allege any deprivation of his rights by the federal government, any due process claim he has against the City is properly brought under the Due Process Clause of the Fourteenth Amendment, not under that of the Fifth Amendment.").

[7] The plaintiffs base their argument that the IDR process is "controlled by the insurers" (ECF No 23 at 1) on the Act's requirement that IDR entities consider the relevant qualifying payment amount.  But insurers do not unilaterally set these rates; they negotiate them with participating providers and facilities.  *See* Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36872, 36874 (July 13, 2021).

14

federally compelled IDR process."  (ECF No. 31 at 14.)  They cite a 1913 case, *McGuire v. Hughes*, 207 N.Y. 516 (1913), and *Ruppert v. Bowen*, 871 F.2d 1172 (2d Cir. 1989) for the proposition that health care providers are entitled to recover from patients the reasonable value of emergency services provided.  (ECF No. 23 at 15-16); *see McGuire*, 207 N.Y. at 522 (holding that "that a physician, in the absence of a special contract, may recover upon an implied agreement to pay for his services *quantum meruit,* when they have been rendered at the request of the patient"); *Ruppert*, 871 F.2d at 1178 ("Under New York law, an incompetent is liable under an implied agreement for the reasonable value of necessities.").  These cases do not support the plaintiffs' position that the Act must be invalidated.  *McGuire* stands for the unremarkable proposition that a doctor can sue a patient for the costs of her services "when they have been rendered at the request of the patient."  207 N.Y. at 521.  *Ruppert* had to do with the methods by which the Social Security Administration calculates benefits under the Supplemental Security Income program, not whether a provider could sue a patient for the value of emergency services to which the patient did not or could not consent.  871 F.2d at 1178.

In an effort to contrast the Act with New York's Surprise Bill Act, the plaintiffs say that providers are entitled under the New York Surprise Bill Act "to recover the 'usual and customary cost of the service.'"  (ECF No. 23 at 9 (quoting N.Y. Fin. Servs. L. § 604(f)).)  But the New York Surprise Bill Act does not create an entitlement to "the usual and customary cost of the service;" rather, it instructs IDR entities to consider it among five other factors.  *See* N.Y. Fin. Servs. L. § 604.  The plaintiffs also cite *Furlong v. Shalala*, 156 F.3d 384 (2d Cir. 1998) for the proposition that "professionals who provide services under a federal program such as Medicaid or Medicare have a property interest in reimbursement for their services at the 'duly promulgated reimbursement rate.'"  (ECF No. 31 at 14 (quoting *Furlong*, 156 F.3d at 393).)  However, in

*Furlong*, the Second Circuit focused on the providers' "property interest in being reimbursed at [Medicare's] fee schedule rate." 156 F.3d at 393. There is no similar fee schedule in this case.

Under the New York Surprise Bill Act, it is insurers, not patients, who must pay a "reasonable amount for the services of out-of-network emergency medical providers." *Emergency Physician Servs. of N.Y. v. UnitedHealth Grp., Inc.*, No. 20-CV-9183, 2021 WL 4437166, at *2 (S.D.N.Y. Sept. 28, 2021) (citing N.Y. Fin. Servs. L. § 605(a)). Finally, the plaintiffs cite no authority, and the Court is not aware of any, for the proposition that a health care provider's entitlement to "reasonable payment" is a cognizable property interest for the purposes of a due process claim.[8]

To the extent there is a cognizable property interest in the reasonable value of out-of-network services for the purposes of a due process claim—and that is far from clear—the plaintiffs' claim for injunctive relief is not ripe. "As the Second Circuit has recognized, '[r]ipeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority.'" *E. End Eruv Ass'n, Inc. v. Vill. of Westhampton Beach*, 828 F. Supp. 2d 526, 536 (E.D.N.Y. 2011) (quoting *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005)). "The 'basic rationale' of the ripeness doctrine 'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Id.* (quoting *Murphy*, 402 F.3d at 347). "Determining whether a case is ripe generally requires [the court] to 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Id.* (quoting *Murphy*, 402 F.3d at 347 and *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). "The 'fitness of issues for judicial review' requires 'a weighing of the

---

[8] The plaintiffs appear to claim that the standard for "reasonable payment" is what they customarily charge.

16

sensitivity of the issues presented and whether there exists a need for further factual

development,' whereas the 'hardship to the parties' requires the court to 'gauge the risk and

severity of injury to a party that will result if the exercise of jurisdiction is declined.'"  *E.*

*End Eruv Ass'n*, 828 F. Supp. 2d at 536 (quoting *Murphy*, 402 F.3d at 347).

     As the plaintiffs acknowledge, there is currently no live dispute about the regulations that

require arbitrators to give dispositive weight to the qualifying payment amount ("QPA").  That

provision of the governing regulations was vacated in *Texas Medical Association v. U.S.*

*Department of Health and Human Services.*  No. 21-CV-425, 2022 WL 542879 (E.D. Tex. Feb.

23, 2022).  As noted above, *see supra* note 1, the defendants are in the process of publishing a

new rule that will address the *Texas Medical Association* decision, and the parties agree that

there is no live dispute with respect to the Rule.

     Because there is no live dispute about the regulation, the plaintiffs' claim that the Act is

unconstitutional because it treats the QPA as the "general standard for determining the payment

to physicians" is also not ripe.[9, 10]  The plaintiffs speculate that they may suffer harm under the

yet-to-be-determined regulation, claiming that Dr. Haller "expect[s] that the rates [he] and [his]

Long Island Surgical colleagues submit to out-of-network health plans will generally not be the

amount closest to the [QPA] under the Act."  (ECF No. 22 ¶ 10.)  They also predict that their

payments under the IDR process will be less than the reasonable value of the services they

provide.  But speculation about what might happen does not establish irreparable harm.  *See*

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) ("To satisfy the

---

[9] As explained above, the QPA is just one of the factors that an IDR entity must consider.

[10] The plaintiffs also argue that the Act violates their due process rights because it "specifically excludes
consideration of [out-of-network providers'] 'usual and customary charges.'"  (ECF No. 31 at 25 (citing
42 U.S.C. § 300gg-111(c)(5)(D)).)  As discussed above, the plaintiffs have not established that for the
purposes of a due process claim, they have a cognizable property interest in recovering the usual and
customary cost of their services.  Accordingly, they cannot assert a due process violation on this basis.

irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent . . . ." (quotation marks and citation omitted)).  Because the challenged provision of the Rule has been vacated and the relevant portion of the Act cannot be enforced until the new rule's publication, it poses no hardship to the plaintiffs, and the plaintiffs face no risk of injury if the Court declines to exercise jurisdiction at this point.  Moreover, the existing record does not permit a court to determine whether the IDR process deprives the plaintiffs of due process.  At this stage, there is no evidence of IDR decisions about payment amounts, how those amounts compare to the parties' submitted offers, or the extent to which the IDR entities consider additional evidence submitted by the parties.  Accordingly, the plaintiffs' claim for injunctive relief on the basis of an alleged due process claim is not ripe.

    **c.**    **The Plaintiffs' Takings Claim**

    The Takings Clause of the Fifth Amendment provides that no private property "shall . . . be taken for public use, without just compensation."  U.S. Const. amend. V.  In the federal takings context, "to succeed in establishing a constitutional violation claimants must demonstrate: (1) that they have a property interest protected by the Fifth Amendment, (2) that they were deprived of that interest by the government for public use, and (3) that they were not afforded just compensation."  *Ganci v. N.Y.C. Transit Auth.*, 420 F. Supp. 2d 190, 195 (S.D.N.Y.), *aff'd*, 163 F. App'x 7 (2d Cir. 2005).

    "[A] party challenging governmental action as an unconstitutional taking bears a substantial burden," *Eastern Enters. v. Apfel,* 524 U.S. 498, 523 (1998) (plurality opinion), a burden made even more demanding here because the plaintiffs have not sufficiently alleged that the Act will violate their right to due process.  *See Concrete Pipe & Prods. of Calif. Inc. v. Constr. Laborers Pension Tr. for S. Calif.*, 508 U.S. 602, 641 (1993) ("Given that [the

18

petitioner's] due process arguments are unavailing, it would be surprising indeed to discover

[that] the challenged statute nonetheless violated the Takings Clause." (citation and quotation

marks omitted)); *see also In re Chateaugay Corp.*, 53 F.3d 478, 494 (2d Cir. 1995) ("Where

legislation adjusting the benefits and burdens of economic life withstands due process review, 'it

would be surprising indeed to discover' that Congress had thereby committed an unconstitutional

taking." (quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223 (1986))).  "It is

well settled that a taking may more readily be found when the interference with property can be

characterized as a physical invasion by government, than when interference arises from some

public program adjusting the benefits and burdens of economic life to promote the common

good."  *Chateaugay Corp.*, 53 F.3d at 496 (quoting *Keystone Bituminous Coal Ass'n v.*

*DeBenedictis*, 480 U.S. 470, 490 n.18 (1987) (internal quotation marks omitted)).  In this case,

the "[No Surprises] Act entails no physical invasion of property, nor any permanent confiscation

of [the plaintiffs'] assets for governmental use.  On the contrary, the [] Act squarely falls within

the category of legislation that serves to adjust the benefits and burdens of economic life on

behalf of the common good."  *Id.* (holding that the Coal Industry Retiree Health Benefit Act of

1992 did not violate the Takings Clause).

"Before the Supreme Court's [] decision in *Knick v. Township of Scott*, 139 S. Ct. 2162

(2019), the law in the Second Circuit provided that a takings claim was not ripe unless the

property owner could show 'that (1) the state regulatory entity has rendered a "final decision" on

the matter, and (2) the plaintiff has sought just compensation by means of an available state

procedure.'"  *Sagaponack Realty, LLC v. Vill. of Sagaponack*, 778 F. App'x 63, 64 (2d Cir.

2019) (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d

Cir. 2002)).  "*Knick* eliminated the state-exhaustion requirement as 'an unjustifiable burden on

JA-67

takings plaintiffs . . . .'" *Id.* (quoting *Knick*, 139 S. Ct. at 2167). "But *Knick* leaves undisturbed the first prong, that a state regulatory agency must render a final decision on a matter before a taking claim can proceed." *Id.* (quoting *Knick*, 139 S. Ct. at 2169). Moreover, the Court held that "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Knick*, 139 S. Ct. at 2176.

The plaintiffs argue that the Act "prohibits physicians from billing their patients for the reasonable value of their services that it is not paid by the patients' insurer," and "compels physicians to bear the societal burden of the increasing cost of health care, without imposing any corresponding burden on insurers or patients or the general public;" therefore, they say, the Act "violates the Fifth Amendment's proscription against taking private property without just compensation, and it must be struck down on that basis." (ECF No. 23 at 20-21.)

While the Act prohibits out-of-network providers from balance billing patients covered by the Act, it also gives providers a right to recover the value of the services provided directly from insurers and creates a process to adjudicate that right. Thus, it is not evident that the prohibition against balance billing constitutes a taking under the Fifth Amendment. "'There is no set formula to determine where [government] regulation'—as distinct from the 'paradigmatic taking' of 'direct government appropriation or physical invasion of private property,'—'ends and taking begins.'" *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 180 (D.C. 2008) (quoting *Goldblatt v. Hempstead*, 369 U.S. 590, 594 (1962) and *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005)).

The Court of Appeals for the District of Columbia addressed a similar issue in *District of Columbia v. Beretta U.S.A. Corporation*, in which the plaintiffs challenged the Protection of Lawful Commerce in Arms Act ("PLCAA"), which extinguished preexisting causes of action

20

under state or federal law by requiring dismissal of all actions against firearms manufacturers based on a third party's criminal use of a firearm. *See* 15 U.S.C. §§ 7901-03. The plaintiffs contended that the PLCAA effected an uncompensated taking by extinguishing their causes of action against firearms manufacturers. They argued that "just compensation" would be either the damages they could prove in a hypothetical suit against the defendants or an order enjoining application of the PLCAA to their action. *Beretta U.S.A. Corp.*, 940 A.2d at 180. The court rejected this argument, ruling that even though a plaintiff could have a protectible property interest in a cause of action, that interest does not vest until the cause of action is reduced to a final judgment. *Id.* ("The 'Takings Clause prevents the Legislature from depriving private persons of *vested* property rights' without just compensation." (emphasis in original) (quoting *Landgraf v. USI Film Prod.*, 511 U.S. 244, 266 (1994))); *see also id.* (collecting cases in which courts found no takings "in Congress's abrogation of pending—but not final—causes of action"). The court explained that "'causes of action' are inchoate and 'not fully vested interests until reduced to final judgments,' and thus 'the projected economic impact on [plaintiff] is not sufficiently concrete to establish a taking." *Id.* at 181 (quoting *In re Jones Truck Lines, Inc.*, 57 F.3d 642, 651 (8th Cir. 1995)); *see also Ileto v. Glock, Inc.*, 565 F.3d 1126, 1141 (9th Cir. 2009) (holding that the PLCAA did not constitute an unconstitutional taking because the plaintiffs' "property right in any cause of action does not vest until a final unreviewable judgment is obtained" (citation omitted)).

The court also observed that "Congress left intact means by which persons injured by firearms may yet pursue civil liability against sellers or manufacturers—recourse significant to measuring 'the severity of the economic impact of the [PLCAA],'" and explained that "while Congress unmistakably took away the specific cause of action the plaintiffs have alleged, that

interference cannot be viewed 'in a vacuum,' but must be considered in the context of what Congress both did and did not do." *Id.* (quoting *Connolly*, 475 U.S. at 225); *see also id.* at 181 n.11 ("Congress, that is to say, has not worked the equivalent of a 'total deprivation of beneficial use,' in regard to redress that persons injured by firearms may have against manufacturers or sellers." (quoting *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1017 (1992))).  The fact that there were alternative causes of action weighed against a finding that the PLCAA violated the plaintiffs' Fifth Amendment rights:

> The preservation of these causes of action marks an important limitation on Congress's interference with the interests of the plaintiffs (and others similarly situated) seeking redress from manufacturers or sellers for injuries from the discharge of firearms.  That limitation reinforces our conclusion that regulation did not "end" and taking "begin," when Congress abolished qualified civil liability actions, including the plaintiffs'.

*Id.* at 182 (quoting *Goldblatt*, 369 U.S. at 594); *see also Ileto*, 565 F.3d at 1141 (holding that the PLCAA did not violate the Takings Clause and other constitutional rights); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 390 (2d Cir. 2008) (affirming the PLCAA's constitutionality on other grounds); *Est. of Charlot v. Bushmaster Firearms, Inc.*, 628 F. Supp. 2d 174, 184 (D.D.C. 2009) (same).

For similar reasons, the Act's elimination of the plaintiffs' state common law cause of action against patients in the surprise billing context does not constitute an uncompensated taking.  The plaintiffs do not point to any *quantum meruit* claims against patients that have been dismissed because of the Act's prohibition against balance billing, and thus reduced to a final judgment.  And, they do not have a vested property interest in a future cause of action that might serve as the basis for a takings claim.  Even if there were a vested interest, Congress limited the economic impact on providers by giving them the right to recover the value of their services directly from insurers, and established the negotiation and IDR process to adjudicate that right.

22

Because the plaintiffs have an avenue to obtain payment for their services, "regulation did not end and taking begin" when Congress eliminated the plaintiffs' state common law cause of action against patients.[11]

In short, the Act does not constitute a taking under the Fifth Amendment, so the plaintiffs cannot show irreparable harm or a likelihood of success on the merits. The plaintiffs' takings claim for injunctive relief is denied.

    **d.**    **Balance of Hardships and the Public Interest**

The plaintiffs addressed the public interest factor in their reply brief.[12] They maintain that enforcement of an unconstitutional law is inherently contrary to the public interest. (ECF No. 31 at 32-33.) "The Second Circuit has concluded that, where a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite arguments that granting a preliminary injunction would cause financial or administrative burdens on the Government." *Sajous v. Decker*, No. 18-CV-2447, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) (citing *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984)); *see also Averhart v. Annucci*, No. 21-CV-383, 2021 WL 2383556, at *16 (S.D.N.Y. June 10, 2021). However, as discussed above, the plaintiffs have not sufficiently alleged that the Act violates their constitutional rights.

As the defendants point out, by enacting the No Surprises Act, Congress balanced the relevant interests; it "determined that protecting patients from surprise medical bills would greater serve the public interest than allowing [out-of-network] providers to sue their patients

---

[11] Indeed, the Act has formalized a practice that was already in existence. As noted above and as the plaintiffs explained at oral argument, it is routine for patients to assign their rights to benefits to providers, which negotiate payment amounts with the patients' insurers.

[12] The public interest and the balance of hardships factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

JA-71

directly for potentially ruinous medical bills," and created a method for out-of-network providers to recover directly from insurers.  (ECF No. 30 at 40.)  Accordingly, the plaintiffs have not shown that a preliminary injunction would be in the public's interest, and this factor weighs against injunctive relief.

**II.     The Defendants' Motion to Dismiss**

The Court denies the plaintiffs' motion for a preliminary injunction in part because the Act does not violate their constitutional rights.  For the same reasons, the defendants' motion to dismiss the plaintiffs' Seventh Amendment and takings claims is granted.  *See Evans v. Port Auth. of N.Y. & N.J.*, No. 15-CV-3942, 2017 WL 3396444, at *7 (E.D.N.Y. Aug. 8, 2017) ("den[ying] Plaintiffs' motion for a preliminary injunction for the same reason that it grant[ed] the [defendant's] motion to dismiss").

As explained above, *supra see* Section I.b, the plaintiffs' due process claim is not ripe. "To be justiciable, a cause of action must be ripe—it must present a real, substantial controversy, not a mere hypothetical question."  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (citation and quotation marks omitted).  "A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Id.* (quoting *Thomas*, 473 U.S. at 580).  "[R]ipeness overlaps with standing: the former is essentially 'a specific application of the actual injury aspect of Article III standing.'"  *SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 548 F. App'x 741, 742 (2d Cir. 2014) (quoting *Nat'l Org. for Marriage, Inc.*, 714 F.3d at 688).  Because the Rule was vacated in *Texas Medical Association*

24

## JA-72

and the new rule is forthcoming, there is no way to determine whether an IDR process deprives the plaintiffs' of the reasonable value of services provided.[13]

The plaintiffs do not allege that they have participated in an arbitration, much less that the IDR process resulted in a payment amount below the reasonable value.  At the time of oral argument—almost six months after the Act went into effect—the plaintiffs could not say whether they had participated in the IDR process.  They do not allege that the IDR process has caused any concrete harm, so their claims of constitutional injury are speculative.  Accordingly, they have no standing to assert the claim.  It must be dismissed for lack of subject matter jurisdiction.[14]

---

[13] As noted above, it is not clear that the plaintiffs have such a cognizable property interest.  However, because their due process claim is not ripe for judicial review, I do not decide this issue.

[14] At oral argument, the plaintiffs requested leave to file an amended complaint because they have provided out-of-network services since December 31, 2021.  The plaintiffs could not confirm, however, that they had participated in the IDR process.  Amending the complaint would be futile, in any case, because the defendants have not yet published the new rule governing the IDR process.  *See Bild v. Konig*, No. 09-CV-5576, 2014 WL 3015236, at *6 (E.D.N.Y. July 3, 2014) ("One appropriate basis for denying leave to amend is that the proposed amendment is futile.").

## CONCLUSION

The plaintiffs' motion for preliminary injunction is denied.  The plaintiffs' Seventh Amendment and takings claims are dismissed with prejudice.  Their due process claim is unripe and is dismissed for lack of subject matter jurisdiction without prejudice.


**SO ORDERED.**

                                          s/Ann M. Donnelly
                              _____
                              ANN M. DONNELLY
                              United States District Judge


Dated: Brooklyn, New York
          August 10, 2022

26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DR. DANIEL HALLER and LONG
ISLAND SURGICAL PLLC,

        Plaintiffs,       JUDGMENT

    v.             21-CV-7208 (AMD) (AYS)

U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES, XAVIER BECERRA, in his official
capacity as Secretary of Health and Human Services,
U.S. OFFICE OF PERSONNEL MANAGEMENT,
KIRAN AHUJA, in her official capacity as Director
of the U.S. Office of Personnel Management,
U.S. DEPARTMENT OF LABOR, MARTIN J.
WALSH, in his official capacity as Secretary of Labor,
U.S. DEPARTMENT OF THE TREASURY, and
JANET YELLEN, in her official capacity as
Secretary of the Treasury,

        Defendants.
-----------------------------------------------------------------X

  A Memorandum, Decision and Order of Honorable Robert M. Levy, United States

Magistrate Judge, having been filed on August 10, 2022, denying the plaintiffs' motion for

preliminary injunction; dismissing the plaintiffs' Seventh Amendment and takings claims with

prejudice; and dismissing their due process claim for lack of subject matter jurisdiction without

prejudice; it is

    ORDERED and ADJUDGED that the plaintiffs' motion for preliminary injunction is

denied; that the plaintiffs' Seventh Amendment and takings claims are dismissed with prejudice;

and that their due process claim is unripe and is dismissed for lack of subject matter jurisdiction

without prejudice.

**JA-75**

Dated: Brooklyn, New York
      August 11, 2022

Brenna B. Mahoney
Clerk of Court

By:   */s/Jalitza Poveda*
      Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

DR. DANIEL HALLER and LONG ISLAND
SURGICAL PLLC,

*Plaintiffs,*

v.                                                    No. 21-cv-7208-AMD

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES *et al.,*

*Defendants*

## <u>NOTICE OF APPEARANCE</u>

     To the clerk of the Court and all parties of record:

     Please take notice that NICK WILDER of the Wilder Law Firm enters his appearance in

the above-captioned case as counsel for the Plaintiffs in this matter. Undersigned counsel is

authorized to practice in this Court pursuant to Local Civil Rule 1.3(c) and hereby certifies that

he is personally familiar with the Local Rules of this Court.

Dated: October 31, 2022

                             Respectfully Submitted

                             */S/ Nick Wilder, Esq.*
                             The Wilder Law Firm
                             301 West 57 Street, Suite 19B
                             New York, NY 10019
                             (212) 951-0042
                             nick@wilder.law
                             *Counsel for plaintiffs*

JA-77

**NOTICE OF APPEAL**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DR. DANIEL HALLER and LONG ISLAND SURGICAL PLLC, | |
| *Plaintiffs,* | **NOTICE OF APPEAL** |
| v. | No. 21-cv-7208-AMD |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES *et al.,* | |
| *Defendants* | |

Notice is hereby given (in accordance with this Court's November 9, 2022 Scheduling Order) that  DR. DANIEL HALLER and LONG ISLAND SURGICAL PLLC, hereby appeal to the United States Court of Appeals for the Second Circuit from all parts of the Decision and Order of the Honorable Ann M. Donnelly, denying plaintiffs' motion for declaratory and injunctive relief concerning the "No Surprise Act" and  related "Administrative Procedure Act", denying a restraining order and injunction, and granting defendants' motion to dismiss all causes of action, including the seventh amendment claim, fifth amendment takings claim and due process claim, deprivation of common law claims, and claims the Regulations exceed authority by the Act, and entered as a judgment on August 11, 2022.

Dated: November 17, 2022

Respectfully Submitted

*/S/ Nick Wilder, Esq.*
The Wilder Law Firm
301 West 57 Street, Suite 19B
New York, NY 10019
(212) 951-0042
nick@wilder.law
*Counsel for plaintiffs*

JA-78

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. DANIEL HALLER and LONG ISLAND SURGICAL PLLC,<br><br>                              Plaintiff,<br><br>– against –<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, 200 Independence Avenue SW, Washington, DC 20201, et al.,<br><br>                              Defendants. | Case No. 21-cv-7208-AMD-AYS<br><br>**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION** |

Upon the Declaration of Dr. Daniel Haller, sworn to on March 25, 2022, and Plaintiffs' Memorandum of Law in Support of Their Motion for a Temporary Restraining Order and Preliminary Injunction, the Plaintiffs, Dr. Daniel Haller and Long Island Surgical PLLC ("Plaintiffs") hereby move pursuant to Federal Rule of Civil Procedure 65 against Defendants, the United States Department of Health and Human Services, Xavier Becerra in his official capacity as the Secretary of Health and Human Services, the United States Office of Personnel Management, Kiran Ahuja in her official capacity as the Director of the Office of Personnel Management, the United States Department of Labor, Martin J. Walsh in his official capacity as the Secretary of Labor, the United States Department of the Treasury, and Janet Yellen in her official capacity as the Secretary of the Treasury (collectively the "Defendants"), for a Preliminary Injunction enjoining Defendants, during the pendency of this action, from implementing, enforcing, or otherwise carrying out:

(1) the No Surprises Act, Pub. L. 116-260 (the "Act"), specifically: 42 U.S.C. § 300gg-111(c), 42 U.S.C. § 300gg-131 and 42 U.S.C. §300gg-132, and

**JA-79**

(2) pursuant to the Administrative Procedure Act, provisions of the interim final rule implementing the Act, entitled "Requirements Related to Surprise Billing; Part II," 86 Fed. Reg. 55,980 (Oct. 7, 2021), specifically: 45 C.F.R. § 149.510(a)(2)(v); 45 C.F.R. § 149.510(a)(2)(viii); the second and third sentences of 45 C.F.R. § 149.510(c)(4)(ii)(A); the final sentence of 45 C.F.R. § 149.510(c)(4)(iii)(C); 45 C.F.R. § 149.510(c)(4)(iv); and 45 C.F.R. § 149. 510(c)(4)(vi)(B); 26 C.F.R. § 54.9816-8T(a)(2)(v); 26 C.F.R. § 54.9816-8T(a)(2)(viii); the second and third sentences of 26 C.F.R. § 54.9816-8T(c)(4)(ii)(A); the final sentence of 26 C.F.R. § 54.9816-8T(c)(4)(iii)(C); 26 C.F.R.; § 54.9816-8T(c)(4)(iv); and 26 C.F.R. § 54.9816-8T(c)(4)(vi)(B); 29 C.F.R. § 2590.716-8(a)(2)(v); 29 C.F.R. § 2590.716-8(a)(2)(viii); the second and third sentences of 29 C.F.R. § 2590.716-8(c)(4)(ii)(A); the final sentence of 29 C.F.R. § 2590.716-8(c)(4)(iii)(C); 29 C.F.R. § 2590.716-8(c)(4)(iv); and 29 C.F.R. § 2590.716-8(c)(4)(vi)(B).

Dated: White Plains, New York
       April 4, 2022

ABRAMS FENSTERMAN, LLP

By: /s/ Robert A. Spolzino
    Robert A. Spolzino
    Edward A. Smith
    Justin Kelton
    Mordecai Geisler
    One Metrotech Center, Suite 1700
    Brooklyn, NY 11201
    (718) 215-5300
    Attorneys for Plaintiffs

**JA-80**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. DANIEL HALLER and LONG ISLAND SURGICAL PLLC, <br><br>          Plaintiff, <br><br> – against – <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, 200 Independence Avenue SW, Washington, DC 20201, et al., <br><br>          Defendants. | Case No. 21-cv-7208-AMD-AYS <br><br> **DECLARATION OF DR. DANIEL HALLER IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Dr. Daniel Haller, hereby declares pursuant to 28 U.S.C. § 1746:

1.      I am a Plaintiff in this action, and I am the President and 100% owner of Plaintiff Long Island Surgical PLLC ("Long Island Surgical"). I respectfully submit this Declaration in support of Plaintiffs' motion for a preliminary injunction prohibiting enforcement of the federal No Surprises Act, Pub. L. 116-260 (the "Act") and the regulations implementing the Act, and for a temporary restraining order prohibiting their enforcement while the motion is being heard and determined.

2.      This declaration is made upon my personal knowledge of the facts and circumstances set forth herein.

3.      I earned my medical degree in 2006 from the Technion – Israel Institute of Technology, Faculty of Medicine. I completed my residency in general surgery at Maimonides Medical Center, and my fellowship in surgical critical care at North Shore-Long Island Jewish Health System. I am board-certified in both general surgery and surgical critical care by the

JA-81

American Board of Surgery. I am a fellow of the American College of Surgeons and an Adjunct Clinical Associate Professor of Surgery, teaching both students and residents.

4.    I specialize in general surgery and acute care surgery, which includes general surgery, trauma and critical care surgery.  Among other things, as an acute care surgeon I perform a wide range of services and procedures for urgent medical conditions when patients require either short or long-term treatment for a severe illness or injury in addition to services provided during their recovery period. .  Critical care deals with the sickest patients in the hospital and requires 24 hour a day attention to meet their medical needs.  During the first wave of COVID-19 in March of 2020 we managed two intensive care units in two different hospitals, taking care of over 40 patients a day, while risking our lives during a time of extreme uncertainty on how to safely care for our patients, ourselves and our families.

5.    Long Island Surgical is a general and acute care surgical private practice in Rockville Centre, New York.  We provide individualized and high-quality services to each patient, whether a consult, surgery, and/or follow up.  Patients receive their provider's cell phone number with 24 hour, seven-days-a-week access to discuss their clinical needs.  Long Island Surgical employs six physicians who have over forty combined years of clinical experience.  The practice offers traditional, laparoscopic, and robotic services to best meet the needs of each patient. Additionally, our surgeons offer their time and effort to ensure the best possible patient outcomes. Our surgeons engage in high quality peer review and performance improvements meetings to ensure high quality patient care. Our surgeons are affiliated with hospitals in Long Island, including Mercy Hospital, Mount Sinai South Nassau, and St. Joseph Hospital, and cooperate with many other doctors and specialists.

2

JA-82

6.      I and the other surgeons at Long Island Surgical perform approximately 2,700 emergency consultations and surgical procedures each year for patients admitted to hospitals through their emergency departments.

7.      Around 78% of the patients that I and Long Island Surgical treat each year are covered by health insurance plans with whom we have no contractual relationship.   We are therefore "out-of-network" providers with respect to these insurers.

**Effects of The Federal No Surprises Act**

8.      A large majority of the out-of-network services I and my colleagues at Long Island Surgical provide are subject to the balance billing prohibition for patients with health insurance covered by the Act.   The Act applies to most emergency services, including those provided in hospital emergency rooms, inpatient settings and urgent care centers that are licensed to provide emergency care.   Other out-of-network services that I and Long Island Surgical provide are non-emergency medical services in which I or one of my colleagues is out-of-network, but the facility in which we are providing services is in-network for our patient.   The Act also broadly defines covered non-emergency services to include treatment, equipment and devices, and preoperative and postoperative services, all services that I and Long Island Surgical often render.   Under the Act, patients cannot consent to being balanced billed for either emergency services or many other services I and my Long Island Surgical colleagues provide, despite the fact that, because of our reputation, patients often seek us out for their emergency care.

9.      Since January 1, 2022, when the Act went into effect, I and the other providers at Long Island Surgical have provided out-of-network services subject to reimbursement through the

3

JA-83

Act's independent dispute resolution ("IDR") process, and we will continue to provide out-of-network services that are subject to reimbursement through that process.

10.     I expect that the rates I and my Long Island Surgical colleagues submit to out-of-network health plans will generally not be the amount closest to the qualifying payment amount ("QP A") under the Act. I therefore do not expect that the issue of a reasonable reimbursement rate for out-of-network services provided by me and the other Long Island Surgical providers can in most cases be resolved solely by reference to the QPA. My level of training, and the level of training of my colleagues, all of whom are fellowship-trained, is well above-average, and the surgical services we provide are often highly complex due to the acuity of the patients. Therefore, the QP A will often be well below the true median contracted rate as paid in the marketplace because the QPA fails to account for the severity of the patient's condition(s) or the difficulty of the treatment(s). We at Long Island Surgical often operate on the most acute and sickest patients at the hospitals where we practice, and during all hours of the day, including nights, weekends, and holidays.

11.     Upon information and belief, now that the Act is in effect, providers will need to first find out the patient's insurance status and then submit the out-of-network bill directly to the health plan. Health plans must respond within 30 days, advising the provider of the applicable in-network amount for that claim, generally based on the median in-network rate the plan pays for the service. The health plan will send an initial payment or notice of denial to the provider and send the consumer a notice that it has processed the claim. Either side has 30 days to initiate a 30-day "open negotiation" period. If the parties cannot agree by the last day of the open negotiation period, either party may initiate the IDR process within four business days after the close of the open negotiation period. The parties may jointly select an IDR arbitration service provider or a

JA-84

service provider will be selected for them, within 6 business days following the notice of IDR initiation. In IDR arbitration, each party must submit their best and final offer, and the independent arbitrator must select one of the offers, a so-called "baseball-style" process in which the IDR entity can only pick from one of two competing offers without modification. While the time deadlines in the act might seem like a good idea, they are unrealistic and will be difficult to keep track of and adhere to, especially since in our experience, the insurance companies do not have dedicated personnel to negotiate claims or even answer questions that providers may have in a timely fashion.

12.      As required by the Act, I and my colleagues at Long Island Surgical would engage in open negotiation with out-of-network insurers for a reasonable out-of-network reimbursement rate. However, as discussed above, because the rules implementing the Act default to the QPA, the bargaining power of the health plans has dramatically increased. Therefore, as a result of the Act, negotiation alone is less likely to resolve rate disputes. If negotiation does not succeed, I and my colleagues will work with Long Island Surgical administrative staff to submit claims under the Act's IDR process. An IDR arbitrator will then determine the reimbursement rate that Long Island Surgical receives, defaulting to the QPA.

13.      Based on my experience with the New York State Emergency Medical Services and Surprise Bill Act (the "New York Act"), I expect that Long Island Surgical will have to participate in tens of thousands, of IDRs under the Act in the coming years.

14.      In that regard, Long Island Surgical must navigate the new IDR program and the administrative burdens and costs associated with the program. We have started the process of hiring additional administrative staff to deal with the impending IDR arbitrations should the Act continue to go into effect without the Court's intervention. This problem is acute because, as discussed above, the deadlines provided for under the Act are strict.

JA-85

15.     We must compete with other independent practices to hire individuals who are proficient with the new regulations and procedures of the Act, and who are in short supply, thereby making staffing difficult and expensive.  Our current administrative staff numbers nine, and we anticipate needing to hire at least six to ten more professionals.  It will therefore take up an enormous amount of my and Long Island Surgical staff's time and effort to properly prepare to meet the Act's requirements, and more importantly, to receive fair compensation for services provided.  As one example of severe underpayment, Long Island Surgical received $238 for a hernia repair surgery, which thus far has taken up two years of challenges and appeals.

16.     Another aspect of the Act's effects on our practice is that physicians are now required to make available to each patient who is enrolled in a health plan a disclosure regarding the Act's protections against balance billing.  Typically, when dealing with an out-of-network patient, the patient completes an assignment of benefits form ("AOB") requiring his or her health insurance provider to pay the provider directly.  In our experience, even with a signed AOB from the patient, the insurer still chooses to send payment checks to the patient as reimbursement instead of directly to the provider, causing additional burden on the practice and staff to obtain any payment at all for those services.  In addition, the AOB should allow the provider, such as my colleagues and me, with the opportunity to negotiate directly with the out-of-network insurer in a more efficient manner and increases the bargaining position of the provider with respect to the insurer.  I estimate that as many as 99% of Long Island Surgical's out-of-network patients provide AOBs when requested.  However, patients are becoming increasingly reluctant to sign an AOB with Long Island Surgical because they know that, under the Act, they cannot in any case be billed for any outstanding balance.  Should this trend continue and grow, the lack of AOBs will severely

**JA-86**

limit our ability to negotiate directly with out-of-network insurers, further eroding our bargaining position.

17.    Similarly, the Act also requires disclosure to certain patients seeking non-emergency surgery as to how much in theory they would be billed for the procedure if their out-of-network provider does not pay the unnegotiated bill in full.  This disclosure is required notwithstanding that (a) the out-of-network non-emergency patient will in most cases have out-of-network benefits, (b) we are likely negotiating with the out-of-network insurer to obtain coverage for the procedure at an agreed upon rate, and (c) the patient will likely end up paying little if anything additional out-of-pocket.  It has been our experience recently that this mandated disclosure is scaring off out-of-network, non-emergency surgical patients and causing them to seek in-network providers, who may be less qualified or have worse clinical outcomes, but who do not have to make a similar disclosure, when the disclosure in any event does not reflect the reality of what that patient will in fact pay for our services.  Patients therefore elect and pay for increased coverage that allows them to utilize the services of out-of-network providers, but are now being unnecessarily dissuaded from exercising their contracted rights. This will cause me and my colleagues to lose out-of-network, non-emergency surgical patients at a rate that will be difficult to calculate.

18.    I declare under penalty of perjury that the foregoing is, to my knowledge and understanding, true and correct.

JA-87

Dr. Daniel Haller

Sworn to before me on this

2 4ᵗʰ day of March, 2022

Notary Public

DAVID REICH
Notary Public, State of New York
Registration No. 02RE4989171
Qualified in Queens County
Commission Expires February 15, 2026

**JA-88**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

DR. DANIEL HALLER and LONG ISLAND
SURGICAL PLLC,

Plaintiff,

– against –

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, 200 Independence
Avenue SW, Washington, DC 20201, et al.,

Defendants.

Case No. 21-cv-7208-AMD-AYS

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

ABRAMS FENSTERMAN, LLP
*Attorneys for Plaintiffs*
One Metrotech Center, Suite 1701
Brooklyn, New York 11201
Telephone: 718-215-5300

i

JA-89

**TABLE OF CONTENTS**

Preliminary Statement ............................................................................................1

Summary of Argument ............................................................................................1

Statement of Facts ..................................................................................................3

  A. The Plaintiffs ...................................................................................................3

  B. The Act and the Rule .......................................................................................4

  C. New York State Law ........................................................................................8

Argument ...............................................................................................................9

  I. The Act is Illegal and Unconstitutional .............................................................9

    A.  Congress Lacks Authority to Compel Physicians to Submit State Law Claims to Arbitration ...............................................................................10

    B.  The Act's Requirement that Physicians Submit their Disputes to Arbitration Deprives Physicians of their Right to a Jury Trial Guaranteed by the Seventh Amendment ..........................................................................11

      1.  A cause of action by physicians to recover the value of services provided without contract is a suit at law ....................................................12

      2.  By denying physicians the right to a trial de novo after the IDR, the Act and its enabling regulations deprive physicians of their Seventh Amendment right to a jury trial ........................................................................12

      3.  Congress lacks the authority to compel arbitration of a private dispute based on a common law claim ...............................................................14

    C.  Allowing Insurers to Define the Standard by Which the IDR Determines Out-of-Network Physicians' Claims Deprives Physicians of Property Without Due Process in Violation of the Fifth Amendment .....................................15

      1.  Physicians have a property right under New York law to be paid the fair value of the services they render to patients .......................................15

      2.  The Act unconstitutionally deprives physicians of their right to be paid for the fair value of their services as defined under New York law ...........18

    D.  The Act Deprives the Physician of Property Without Due Process of Law or Just Compensation ........................................................................19

  II. The Rule Must be Vacated Where it Exceeds the Authority Congress Granted to the Departments and Conflicts with the Act .......................................................21

  III. Plaintiffs are Entitled to a Preliminary Injunction .........................................23

    A.  Standard for a Preliminary Injunction ..........................................................23

    B.  Plaintiffs Are Likely to Succeed on the Merits ..............................................23

    C.  Plaintiffs Will be Irreparably Harmed .........................................................24

Conclusion ...........................................................................................................26

iii

JA-90

TABLE OF AUTHORITIES

**Cases**

*American Corn Growers Ass'n v. EPA*, 291 F.3d 1 (D.C. Cir. 2002) .......................................... 22

*Aniero Concrete Co., Inc. v. New York City Constr. Auth.*, 2000 WL 863208
    (S.D.N.Y. June 27, 2000)............................................................................................ 12

*Armstrong v. Manzo*, 380 U.S. 545 (1965)........................................................................ 18

*Armstrong v. United States*, 364 U.S. 40 (1960) ....................................................... 19, 20

*Athletes and Artists, Inc. v. Millen*, 1999 WL 587883 (S.D.N.Y. Aug. 4, 1999) ........................ 12

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442 (1977) .......... 11

*Averhart v. Annucci*, 2021 WL 2383556 (S.D.N.Y. June 10, 2021) ............................................ 23

*Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996)................................................................ 23

*Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558 (1990) .................. 11

*Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ............. 21, 22

*Cienega Gardens v. U.S.*, 331 F.3d 1319 (Fed. Cir. 2003)........................................... 19, 20, 21

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999)........................... 12

*D'Angelo v. Winter*, 403 Fed.Appx. 181 (9th Cir. 2010) ........................................................... 19

*Dayton Superior Corp. v. Marjam Supply Co., Inc.*, 2011 WL 710450
    (E.D.N.Y. Feb. 22, 2011)............................................................................................ 12

*Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144 (2d Cir.1999)........... 24

*Fuentes v. Shevin*, 407 U.S. 67 (1972)........................................................................ 18

*Germain v. Connecticut Nat. Bank*, 988 F.2d 1323 (2d Cir. 1993) ............................................ 14

*Gov't Emps. Ins. Co. v. SMK Pharmacy Corp.*, 2022 WL 541647 (E.D.N.Y. Feb. 23, 2022)..... 25

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) ............................................................. 14

*GSGSB, Inc. v. New York Yankees*, 1995 WL 507246 (S.D.N.Y. Aug. 28, 1995)...................... 12

*Huntington Hosp. v. Abrandt*, 4 Misc.3d 1, *3, 779 N.Y.S.2d 891 (App. Term 2004)........... 9, 15

*In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) ......................................................... 24

*In re Estate of Anderson*, 119 Misc.2d 248, 462 N.Y.S.2d 589 (Surr. Ct. Saratoga Cnty. 1983) 16

*Johnson v. Miles*, 355 Fed.Appx. 444 (2d Cir. 2009).............................................................. 24

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir.1996) ....................................................................... 24

*Kellman v. District Director, U.S. I.N.S.,* 750 F.Supp. 625 (S.D.N.Y. 1990) .............................. 19

iv

JA-91

*Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002) ............................................................ 18

*Long Island Jewish Medical Center v. Budhu*, 20 Misc.3d 131(A), 867 N.Y.S.2d 17
    (App. Term 2008) ................................................................................................ 9, 15

*Lutwin v. Thompson*, 361 F.3d 146 (2d Cir. 2004) ....................................................... 23

*Lynch v. United States*, 292 U.S. 571 (1934) ................................................................. 19

*Mastrovincenzo v. City of New York*, 435 F.3d 78 (2d Cir. 2006) ................................ 24

*McCord v. Papantoniou*, 316 B.R. 113 (E.D.N.Y. 2004) .............................................. 14

*McGuire v. Hughes*, 207 N.Y. 516 (1913) ................................................................ 9, 15

*Morton v. Ruiz*, 415 U.S. 199 (1974) ............................................................................. 21

*New York Bay Capital, LLC v. Cobalt Holdings, Inc.*, 456 F.Supp.3d 564 (S.D.N.Y. 2020) ...... 24

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) ............... 10

*Perez v. New York City Health and Hospitals Corp.*, 1987 WL 9673
    (E.D.N.Y. Apr. 13, 1987) .......................................................................................... 13

*Pernell v. Southall Realty*, 416 U.S. 363 (1974) ........................................................... 11

*Ruppert v. Bowen*, 871 F.2d 1172 (2d Cir. 1989) ...................................................... 9, 16

*RxUSA Wholesale, Inc. v. Department of Health and Human Servs.*, 467 F.Supp.2d 285
    (E.D.N.Y. 2006) ....................................................................................................... 23

*Seoane v. Ortho Pharmaceuticals, Inc.*, 660 F.2d 146 (5th Cir.1981) ......................... 13

*Statharos v. New York City Taxi and Limousine Comm'n*, 198 F.3d 317 (2d Cir.1999)............. 24

*Texas Medical Ass'n v. U.S. Dep't of Health and Human Services*, Case No. 21-cv-425-JDK,
    2022 WL 542879 (E.D. Tex. Feb. 23, 2022) ................................................. passim

*UBS Securities, LLC v. Voegeli*, 405 Fed.Appx. 550 (2d Cir. 2011).......................... 25

*Unicorn Crowdfunding, Inc. v. New Street Enterprise, Inc.*, 507 F. Supp.3d 547
    (S.D.N.Y. 2020) ....................................................................................................... 12

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ........................................................ 8

*Valler v. Lee*, 190 Ariz. 391, 949 P.2d 51 (Ariz. Ct. App. 1997) ................................. 13

*Wali v. Coughlin*, 754 F.2d 1015 (2d Cir.1984) ........................................................... 23

*Washington v. Kirksey*, 811 F.2d 561 (11th Cir. 1987) ................................................ 19

*West Virginia Investment Management Board v. Variable Annuity Life Ins. Co.*,
    241 W.Va. 148 (2018) ............................................................................................. 13

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131
    (2d Cir. 1991) ........................................................................................................... 11

v

**JA-92**

## Statutes

300gg-111(c)(5)(C)(ii) ................................................................................. 4

300gg-132(a) ................................................................................................ 4

42 U.S.C. § 300gg(a)(3)(H) ......................................................................... 4

42 U.S.C. § 300gg-111(c)(4)(A) ................................................................. 22

42 U.S.C. § 300gg-111(c)(5)(A) ............................................................. 5, 22

42 U.S.C. § 300gg-111(c)(5)(B) ................................................................. 4

42 U.S.C. § 300gg-111(c)(5)(C) ............................................................... 22

42 U.S.C. § 300gg-111(c)(5)(C)(i) ........................................................ 7, 17

42 U.S.C. § 300gg-111(c)(5)(C)(ii) .......................................................... 17

42 U.S.C. § 300gg-111(c)(5)(D) ............................................................... 17

42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) ............................................. 5, 13, 17

42 U.S.C. § 300gg-131(a) ........................................................................ 4, 9

9 U.S.C. § 10(a) ......................................................................................... 14

N.Y. Financial Services Law § 603(c) ....................................................... 16

N.Y. Financial Services Law § 605(a) .................................................... 9, 16

## Treatises

22A N.Y. Jur. 2d Contracts § 619 ............................................................. 16

## Regulations

45 C.F.R. § 149.510(a)(2)(v) ....................................................................... 6

45 C.F.R. § 149.510(c)(4)(ii) ................................................................. 6, 17

86 Fed. Reg. 55,980 (Oct. 7, 2021) ..................................................... passim

## Constitutional Provisions

U.S. Const. Amend. VII .............................................................................. 11

vi

JA-93

### PRELIMINARY STATEMENT

This is an action seeking a declaration that the No Surprises Act, Pub. L. 116-260 (the "Act"), is unconstitutional and for an injunction prohibiting its enforcement and, pursuant to the Administrative Procedure Act, setting aside specific provisions of an interim final rule promulgated by the Department of Health and Human Services, the Department of Labor, the Department of the Treasury, and the Office of Personnel Management (collectively, the "Departments") in violation of the authority given to them by the Act. The regulations were adopted on September 30, 2021, and the requirements of the Act generally went into effect on January 1, 2022.

This memorandum of law, and the accompanying Declaration of Plaintiff Dr. Daniel Haller ("Haller Decl."), are submitted in support of the plaintiffs' motion for a preliminary injunction prohibiting enforcement of specific provisions of the Act (as set forth in the Complaint) and the regulations and for a temporary restraining order prohibiting their enforcement while the motion is being heard and determined.

### SUMMARY OF ARGUMENT

Physicians are entitled under New York State law to be paid fairly for the critical services they provide to their patients. They are also entitled under State law to have the amount of their compensation determined by courts and juries based on the reasonable value of the services rendered. The Act and its implementing regulations deprive New York physicians of these rights.

The Act limits payments to "out-of-network" physicians to an amount established through the market power of self-interested insurance companies negotiating with "in-network" physicians and forces out-of-network physicians to participate in mandatory binding arbitration that, while referred to as an "independent dispute resolution process" (the "IDR"), is, in reality, not independent at all, since it is designed to end in a result controlled by the insurers. Worse, the out-of-network physicians are barred from seeking judicial review of that determination or presenting their claims to a jury, as

1

JA-94

is their constitutional right. And where the process results in a fee determination that is less than the reasonable value of the out-of-network physicians' services (as it invariably will), the physicians are prohibited by the Act from seeking to recover the balance from their patients.

Congress lacks the authority to require that state common law claims—such as out-of-network physicians' claims for the reasonable value of services they render—be determined by administrative tribunals created by Congress. The Seventh Amendment to the United States Constitution guarantees to out-of-network physicians the right to a jury trial for those claims. Therefore, the Act exceeds Congress' authority and violates the Seventh Amendment.  Further, by allowing insurers to define the standard by which the IDR will determine out-of-network physicians' claims for the reasonable value of their services, and by precluding the physicians from billing patients for the amounts insurers refuse to pay, the Act deprives those physicians of property without due process of law and is therefore unconstitutional under the Fifth and Fourteenth Amendments.

But even if the Act is constitutional, the rules promulgated by the Departments to implement the Act are *ultra vires* and illegal. The regulations go beyond the Act. They require that fee determinations made by the IDR be based on the amounts that health insurers pay to their participating providers (as opposed to any independent legal or fact-based standard). The Act makes no such provision, and, as at least one federal court has already held recently in striking down those regulations, the Departments were not entitled to enact rules that altered the Act by supplying terms that Congress omitted.

Physicians are as concerned as other Americans about the increasing cost of health care. But they are adamantly opposed to legislation that benefits insurers at the expense of the physicians who actually provide that care. Plaintiffs are physicians who are affected by the Act and the regulations. They will be irreparably harmed if they are forced to participate in the IDR process mandated by Act and the regulations. For the reasons that follow, Plaintiffs are entitled to a preliminary injunction

2

**JA-95**

prohibiting enforcement of the regulations and the offending provisions of the Act pending the determination of this action, and a temporary restraining order enjoining the Act and the regulations pending the Court's determination of the preliminary injunction motion.

### STATEMENT OF FACTS

**A.**   **The Plaintiffs**

Plaintiff Dr. Haller earned his medical degree from the Technion – Israel Institute of Technology, Faculty of Medicine, completed his residency in general surgery at Maimonides Medical Center, and his fellowship in surgical critical care at North Shore-Long Island Jewish Health System. (Haller Decl. at ¶ 3). Dr. Haller is board-certified in both surgery and surgical critical care by the American Board of Surgery. (*Id.*). He is President and 100% owner of Plaintiff Long Island Surgical PLLC ("Long Island Surgical"), a general and acute care surgical private practice in Rockville Centre, New York employing six physicians who have over forty combined years of clinical experience. (*Id.* at ¶¶ 1, 5). Notably, during the first wave of COVID-19 in March of 2020 Long Island Surgical managed two intensive care units in two different hospitals, treating over 40 patients a day. (*Id.* at ¶ 4).

Dr. Haller and the other surgeons of Long Island Surgical perform approximately 2,700 emergency consultations and surgical procedures each year on patients admitted to hospitals through their emergency departments. (Docket No. 1, Complaint at ¶ 12; Haller Decl. at ¶ 6). Approximately 78 percent of the patients that Dr. Haller and Long Island Surgical treat each year are covered by health plans with whom Dr. Haller and Long Island Surgical have no contractual relationship. (Complaint at ¶ 13; Haller Decl. at ¶ 7). With respect to those patients, Dr. Haller and Long Island Surgical are nonparticipating, or out-of-network, providers within the meaning of the Act whose fees will be determined by the Act and the procedures established under the Act and its implementing regulations. (Complaint at ¶ 13).

3

JA-96

**B.**      **The Act and the Rule**

The Act was passed on December 27, 2020, as part of the Consolidated Appropriations Act of 2021. Its requirements generally go into effect on January 1, 2022. (Complaint at ¶ 2).

The Act restricts the amount that out-of-network physicians are entitled to be paid for their services by patients and by insurers and delegates to an administrative tribunal the authority to determine the physicians' state common law claims. (Complaint at ¶ 3).  It deprives physicians of jury trials by requiring out-of-network physicians to adjudicate their claims against insurers in an "independent dispute resolution" process that is not actually independent, since the insurers define the standard by which the physicians' claims are determined, through negotiations with in-network physicians who lack market power and who, in any case, do not represent out-of-network physicians. (Complaint at ¶ 3).  And it prohibits physicians from recovering the balance of the reasonable value of their services from their patients by providing that an out-of-network provider "shall not bill, and shall not hold [the patient] liable" for any amount beyond what the patient's insurer pays the physician.  42 U.S.C. §§ 300gg-131(a), 300gg-132(a). (Complaint at ¶ 33).

The Act also disregards a New York physician's right under State law to be paid the reasonable value of his or her services. Under the Act, the fee for an out-of-network physician's services is determined in accordance with, *inter alia*, an IDR established by the Act, *i.e.*, by arbitration, when the physician and the insurer cannot agree upon the fee. 42 U.S.C. § 300gg(a)(3)(H). (Complaint at ¶ 35). The IDR is a "baseball-style" arbitration in which the provider and insurer each submit their best and final offers for the amount each considers to be reasonable payment. (Complaint at ¶ 36).  Once an arbitrator is selected, the provider and the insurer have ten days to submit (1) an offer for a payment amount, (2) any information requested by the arbitrator, and (3) any other information the party wishes the arbitrator to consider, including information relating to statutory factors the arbitrator must consider.  42 U.S.C. §§ 300gg-111(c)(5)(B), 300gg-111(c)(5)(C)(ii). (*Id.*).

4

JA-97

The arbitrator then reviews the offers and "shall . . . select one of the offers" after "taking into account the considerations in subparagraph (C)," which includes the qualifying payment amount ("QPA") defined as the "median of the contracted rates recognized by the" insurer as of January 31, 2019 in the same insurance market for "the same or similar item or service" provided by a provider "in the same or similar specialty and . . . geographic region," increased by inflation over the base year (*see* 42 U.S.C. § 300gg-111(a)(3)(E)(i))—for the applicable year for comparable services that are furnished in the same geographic region.  Subparagraph (C) also includes additional information that is submitted, including, *inter alia*, the level of training, experience, and quality and outcomes measurements of the physician, as well as the acuity of the individual receiving the service or the complexity of furnishing such service.  42 U.S.C. § 300gg-111(c)(5)(A) and (C)(i), (ii).  (Complaint at ¶¶ 37-38).

The Act requires that the arbitrator consider each of these factors in determining which offer to select and leaves it to the discretion and expertise of the arbitrator to decide how much weight to give each factor based on the facts and circumstances of a particular case.  (Complaint at ¶ 41).  The Act does not give presumptive weight to any single factor.  The determination made in the IDR is binding on the parties and is not subject to judicial review except in cases of fraud, bias, misconduct or where the arbitrator exceeded his or her authority.  42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). (Complaint at ¶ 40).

Congress did not authorize the Departments to determine how the statutory factors should be considered.  Nevertheless, the Departments adopted an interim final rule entitled "Requirements Related to Surprise Billing; Part II," 86 Fed. Reg. 55,980 (Oct. 7, 2021) (the "Rule"). (Complaint at ¶ 4).[1]  The Rule purports to implement provisions of the Act related to the rate at which physicians

---

[1]      The Complaint (at pp. 17-18) sets forth the specific provisions of the Rule that Plaintiffs seek to vacate in this action.

JA-98

must be paid by insurers. (Complaint at ¶ 5).  But various parts of the Rule effectively ignore the factors that the Act requires be used in setting the payment rate and, instead, creates a presumption in favor of just one of these factors—the QPA—which is determined solely by the insurers.  (*Id.*). Specifically, the Rule provides that the arbitrator "***must*** presume that the QPA is [the] appropriate" out-of-network rate and "***must*** select the offer closest to the [QPA]" unless the physician "clearly demonstrates" that the QPA is "materially different from the appropriate out-of-network rate." 45 C.F.R. § 149.510(c)(4)(ii)(A); 86 Fed. Reg. at 55,995 (emphasis added). (Complaint at ¶¶ 43-44). Pursuant to the Rule, the arbitrator then need not consider any factor beyond the QPA.  86 Fed. Reg. at 55,997-55,998 (entity "must consider" Congress's other five mandated factors only "to the extent credible information is submitted by a party") (Complaint at ¶ 45). There is, however, no such limitation in the Act.  The Rule defines "credible information" as "information that upon critical analysis is worthy of belief and is trustworthy." 45 C.F.R. § 149.510(a)(2)(v); 86 Fed. Reg. at 56,100. (Complaint at ¶ 46). There is, again, no such requirement in the Act. The Rule also affirmatively forbids the arbitrator from scrutinizing the QPA. It states, "it is not the role of the certified IDR entity to determine whether the QPA has been calculated by the [insurer] correctly[.]" See 86 Fed. Reg. at 55,996. (Complaint at ¶ 47).  Once again, there is no such requirement in the Act.

The Rule further provides that if the arbitrator does not choose the offer closest to the QPA, he or she must provide a "detailed explanation" as to why the QPA was found to be materially different from the appropriate rate, including a description of "the additional considerations relied upon, whether the information about those considerations submitted by the parties was credible, and the basis upon which the certified IDR entity determined that the credible information demonstrated that the QPA is materially different from the appropriate out-of-network rate." 86 Fed. Reg. at 56,000. (Complaint at ¶ 44).

This action is one of several actions pending in federal courts around the Nation seeking to

6

**JA-99**

invalidate the parts of the Rule at issue here.  In *Texas Medical Ass'n v. U.S. Dep't of Health and Human Services*, a case brought by a physician trade association and a physician who is a "nonparticipating provider" for certain medical services, the United States District Court for the Eastern District of Texas recently vacated the Rule on substantially the same grounds as are urged by Plaintiffs here. *See* Case No. 21-cv-425-JDK, 2022 WL 542879 (E.D. Tex. Feb. 23, 2022) (Memorandum Opinion and Order, Docket No. 113 and Final Judgment, Docket No. 114). Specifically, the court in *Texas Medical Ass'n* found, among other things, that:

- The Act "is unambiguous," and provides that arbitrators deciding which offer to select "shall consider . . . the qualifying payment amounts . . . and . . . information on any circumstance described in clause (ii)," citing 42 U.S.C. § 300gg-111(c)(5)(C)(i) (2022 WL 542879 at *7);

- "Nothing in the Act . . . instructs arbitrators to weigh any one factor or circumstance more heavily than the others" (*Id*. at * 8);

- "Nor does the Act impose a 'rebuttable presumption' that the offer closest to the QPA should be chosen—or suggest anywhere that the other factors or information is less important than the QPA" (*Id*.);

- "The Rule thus places its thumb on the scale for the QPA, requiring arbitrators to presume the correctness of the QPA and then imposing a heightened burden on the remaining statutory factors to overcome that presumption" (*Id.*);

- "If Congress had wanted to restrict arbitrators' discretion and limit how they could consider the other factors, it would have said so—especially here, where Congress described the arbitration process in meticulous detail" (*Id.*);

- "[T]he Rule adds several key words not in the statute. The Act instructs arbitrators to 'consider' the QPA and the five other factors in deciding which offer to accept. § 300gg-111(c)(5)(C). That's it.  The Rule, in contrast, requires arbitrators to 'select the offer closest to the [QPA]' and deviate from that number only if 'credible information' 'clearly demonstrates' that the QPA is 'materially different from the appropriate out-of-network rate.' 45 CFR § 149.510(c)(4)(ii).  The Rule thus impermissibly 'rewrite[s] statutory language by ascribing additional, material terms'" (*Id*. at * 9); and

- "[T]he Rule treats the QPA—an insurer-determined number—as the default payment amount and imposes on any provider attempting to show otherwise a heightened burden of proof that appears nowhere in the statute. This is why the Departments themselves repeatedly touted the Rule as establishing a 'rebuttable presumption' in favor of the QPA when they presented the Rule for public viewing" (*Id*.).

In granting summary judgment to the plaintiffs, the court in *Texas Medical Ass'n* held that "[b]ecause the Rule 'rewrites clear statutory terms,' it must be 'h[e]ld unlawful and set aside' on this

**JA-100**

basis alone." *Id*. (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014)); 5 U.S.C. §

706(2)(A).  As a result, the court vacated the relevant provisions of the Rule altogether, rejecting the

Departments' request that the holding apply only to the named plaintiffs.  *Id*. at *15.

**C.**     **New York State Law**

Under New York law, a physician who treats a patient is entitled to be paid for his or her

services.  Where there is an agreement between the physician and the patient about the physician's

fee, the physician is entitled to be paid the agreed upon fee. (Complaint at ¶ 23). If the patient is

covered by an insurer and the physician has contracted with the insurer to treat the patient for a

particular fee, or for a fee to be determined in accordance with a particular formula, *i.e.*, the physician

is "in network," the physician is entitled under New York law to be paid the fee agreed upon and

customarily agrees to waive recovery of the balance of the fee from the patient. (Complaint at ¶ 24).

When the patient is covered by an insurer and the physician does not have an agreement with

that insurer, *i.e.*, the physician is "out-of-network" or "nonparticipating," and the patient assigns to

the physician his or her right to benefits, the physician is entitled under New York law to be paid by

the insurer the amount required by the insurer's contract with the patient, and the patient must pay the

balance of the amount due pursuant to the agreement between the physician and the patient.

(Complaint at ¶ 25). When a patient requires emergency services and has not agreed with the

physician on the physician's fee, and may not have even spoken with the physician before the services

are rendered, the physician is entitled under New York law to be paid for the services rendered based

on an implied contract with the patient. (Complaint at ¶ 26). The amount of the fee under an implied

contract is determined under New York common law in *quantum meruit*, based on the reasonable

value of the services provided. (Complaint at ¶ 27).

In October 2014, the New York State Legislature adopted the New York State Emergency

Medical Services and Surprise Bill Act (the "New York Act").  (Complaint at ¶ 29). The New York

8

JA-101

Act applies when the patient is covered by an insurer regulated by the State, the physician is an out-of-network provider, and the patient has assigned his or her benefits to the physician.  N.Y. Financial Services Law § 605(a).  (*Id.*). The New York Act prohibits an out-of-network physician from billing a patient who receives emergency care (and certain post-stabilization care) for the balance of the physician's fee that the patient's insurer will not pay, but, as under common law, the physician remains entitled under the New York Act to recover the "usual and customary cost of the service," N.Y. Financial Services Law § 604(f). (Complaint at ¶ 30).  As a result, under current New York law (including the New York Act), out-of-network physicians providing services to patients who require emergency services and have not agreed with the physician on the physician's fee are entitled to be paid the reasonable value of the services. (Complaint at ¶ 31). The Act deprives these physicians, including Plaintiffs here, of this right under New York law.

ARGUMENT

## I.      The Act is Illegal and Unconstitutional

Under New York law, where a physician does not have an express contractual relationship with a patient about the physician's fee, the physician is entitled to recover the reasonable value of his or her services by bringing a claim for *quantum meruit*. *See McGuire v. Hughes*, 207 N.Y. 516, 521 (1913); *Ruppert v. Bowen*, 871 F.2d 1172, 1178 (2d Cir. 1989); *see also Long Island Jewish Medical Center v. Budhu*, 20 Misc.3d 131(A), *1, 867 N.Y.S.2d 17 (App. Term 2008); *Huntington Hosp. v. Abrandt*, 4 Misc.3d 1, *3, 779 N.Y.S.2d 891, 892 (App. Term 2004); *United Healthcare Servs., Inc. v. Asprinio*, 16 N.Y.S.3d 139, 49 Misc. 3d 985, 993 (Sup. Ct. Westchester Cnty. 2015).

The Act deprives the out-of-network physician of that right by requiring the physician to adjudicate his or her claim against an insurer through an IDR established by the Act and by prohibiting the physician altogether from collecting from the patient any amount above the amount found to be the insurer's responsibility. 42 U.S.C. § 300gg-131(a). The Act thus effectively requires out-of-

9

**JA-102**

network physicians, such as the Plaintiffs here, to arbitrate their state-created right to be paid on a *quantum meruit* basis. Congress lacks the authority to do that. It cannot force physicians to submit these claims to mandatory binding arbitration, without recourse to a jury, and doing so violates the physicians' right to a jury trial guaranteed by the Seventh Amendment. The Act also violates the out-of-network physicians' rights to due process of law under the Fifth and Fourteenth Amendments by permitting the insurer to define the standard by which the dispute will be adjudicated.  In addition, the Act takes the out-of-network physician's property without just compensation by depriving the physician of the right to collect from the patient the amount that the insurer is not required to pay.  As detailed below, the relevant provisions of the Act at issue must be set aside as unconstitutional.

**A.     Congress Lacks Authority to Compel Physicians to Submit State Law Claims to Arbitration**

The Supreme Court has held that Congress lacks the authority to require that state law contract claims be heard before a tribunal not established under Article III of the Constitution. *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982). In *Northern Pipeline*, the tribunal was a bankruptcy court established under Article I of the Constitution. The Court reasoned that while Congress can define the forum for adjudication of a right that Congress has created, it cannot require that rights created by state law be adjudicated by a non-Article III tribunal: "[W]hen Congress creates a statutory right, it clearly has the discretion, in defining that right, to . . . provide that persons seeking to vindicate that right must do so before particularized tribunals created to perform the specialized adjudicative tasks related to that right. . . No comparable justification exists, however, when the right being adjudicated is not of congressional creation."  458 U.S. at 83-84.

Here, the out-of-network physicians' claims for the reasonable value of their services was not created by Congress. It is based on New York State common law. But the Act effectively requires that physicians arbitrate those claims, in direct contravention of *Northern Pipeline.* Specifically, the

10

JA-103

Act bars physicians from recovering from patients any amount beyond what is determined by the IDR to be the insurer's responsibility. Because Congress did not create the physicians' New York State *quantum meruit* claims, and the physicians have not consented to submit those claims to arbitration, the Act's mandatory arbitration provision exceeds the authority of Congress and must be set aside.

**B.**     **The Act's Requirement that Physicians Submit their Disputes to Arbitration Deprives Physicians of their Right to a Jury Trial Guaranteed by the Seventh Amendment**

The Seventh Amendment preserves the right to a jury in "suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. Amend. VII.  To be sure, "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law." *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 455 (1977). Here, however, the out-of-network physicians' claims for the fair value of their services are not created by Congress. As explained above, it is a state common law right entitled to be brought as a "suit at common law." By prohibiting physicians from bringing that suit and requiring that the physician's claim be adjudicated through the IDR, the Act deprives physicians of their Seventh Amendment right to a jury trial.

The constitutional right to a trial by jury attaches to an action involving "rights and remedies of the sort traditionally enforced in an action at law, rather than an action in equity or admiralty." *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 135 (2d Cir. 1991) (quoting *Pernell v. Southall Realty*, 416 U.S. 363, 375 (1974)).  "In determining whether a particular action is one at law or in equity, it is necessary to examine 'both the nature of the issues involved and the remedy sought.'"  *Id.* (citing *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990)).

11

JA-104

1.      **A cause of action by physicians to recover the value of services provided without contract is a suit at law.**

Suits for monetary relief are suits at law, requiring a trial by jury.  *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710, 723 (1999) (Kennedy, J. and Scalia, J., concurring).  *Quantum meruit* claims specifically are actions at law.  *Aniero Concrete Co., Inc. v. New York City Constr. Auth.*, 2000 WL 863208, *10 (S.D.N.Y. June 27, 2000) ("under New York law the correct characterization of a quasi contract quantum meruit claim is that of an action at law"); *Dayton Superior Corp. v. Marjam Supply Co., Inc.*, 2011 WL 710450, *19 (E.D.N.Y. Feb. 22, 2011) (same); *see also Unicorn Crowdfunding, Inc. v. New Street Enterprise, Inc.*, 507 F. Supp.3d 547, 577 n.22 (S.D.N.Y. 2020) ("New York courts treat actions for quantum meruit or unjust enrichment as actions at law"). Therefore, quantum meruit claims, such as lawsuits by an out-of-network physician against patients with whom the physician has no contract to recover the value of services rendered, require a jury trial.  *See Athletes and Artists, Inc. v. Millen*, 1999 WL 587883, *8 n.16 (S.D.N.Y. Aug. 4, 1999) ("It now seems settled that an action for quantum meruit must be deemed an action at law. Accordingly, A&A's jury demand as to their quantum meruit claim must be honored."); *GSGSB, Inc. v. New York Yankees*, 1995 WL 507246, *5-6 (S.D.N.Y. Aug. 28, 1995) (collecting cases).

2.      **By denying physicians the right to a trial de novo after the IDR, the Act and its enabling regulations deprive physicians of their Seventh Amendment right to a jury trial.**

Unlike other federal arbitration mandates, the Act does not provide for a trial *de novo* following the arbitration. The Act's requirement that an out-of-network physician's claim for the fair value of his or her services be determined by arbitration therefore violates the physician's Seventh Amendment right to a jury trial.

Arbitration requirements do not violate the Seventh Amendment where they preserve the right to a jury trial. Indeed, in States that have mandated arbitrations, "appeal by trial *de novo* is a

12

**JA-105**

constitutional prerequisite to such mandatory arbitration so as to preserve the right to a jury trial."

*West Virginia Investment Management Board v. Variable Annuity Life Ins. Co.*, 241 W.Va. 148, 159

(2018) (noting that various States have court mandated arbitration, but, as Arizona courts have

declared: "[t]he right to trial *de novo* is essential to the constitutionality of *compulsory* arbitration,

since both the United States and Arizona Constitutions guarantee the right to trial by jury") (emphasis

in original) (citing *Valler v. Lee*, 190 Ariz. 391, 949 P.2d 51, 53 (Ariz. Ct. App. 1997)).

For example, in *Perez v. New York City Health and Hospitals Corp.*, 1987 WL 9673 (E.D.N.Y.

Apr. 13, 1987), the court held that, because the plaintiff had the right to demand a trial *de novo*

following an arbitration, but her attorney failed to timely request one, the arbitration rules did not

"impinge on plaintiff's seventh amendment rights, for the core of the right is to have a 'jury ultimately

determine the issues of fact if they cannot be settled by the parties or determined as a matter of law.'"

1987 WL 9673 at \*3 (quoting *Seoane v. Ortho Pharmaceuticals, Inc.*, 660 F.2d 146, 149 (5th

Cir.1981)). The court reasoned that "[b]y permitting the parties to request a trial *de novo* after the

arbitration procedure is completed, the arbitration in the instant case did not deprive plaintiff of her

right to a jury trial." *Id*. *See also Kimbrough v. Holiday Inn*, 478 F.Supp. 566, 571, 573 (E.D. Pa.

1979) (holding that a Department of Justice requirement that civil suits in the District Court for less

than $50,000 had to be arbitrated did not violate the Seventh Amendment, reasoning that after the

arbitration, both parties had the right to demand a jury trial).

The critical factor in each of these cases was that the arbitration was preliminary to—*and not

a substitute for*—the plaintiff's right to a jury trial. Here, however, the Act contains no such

protection. To the contrary, the Act does not permit a jury trial post-arbitration, but, rather, provides

for relief from the arbitrator's determination *only* in the same manner as provided by the Federal

Arbitration Act.  42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).  That means that the determination may be

set aside only in cases of fraud, bias, misconduct or where the arbitrator exceeded his or her authority.

13

**JA-106**

9 U.S.C. § 10(a).  Importantly, however, the Federal Arbitration Act, unlike the Act at issue here, applies where parties have expressly consented, in advance, to arbitration.

> **3.**      **Congress lacks the authority to compel arbitration of a private dispute based on a common law claim.**

In *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), the Supreme Court made it clear that Congress cannot deprive a private party of its right to a jury trial for a private contractual dispute: "Congress may devise novel causes of action involving public rights free from the strictures of the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders.  But it lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury." 492 U.S. at 51–52.  The Court defined the distinction between a "public right" and a "private right," stating that a private right is "the liability of one individual to another under the law." 492 U.S. at 51, n. 8.

Under this definition, an out-of-network physician's right to recover the fair value of the services the physician has rendered to a patient is clearly a private right.  Congress cannot require that a private contractual claim be adjudicated without a jury. *See Germain v. Connecticut Nat. Bank*, 988 F.2d 1323, 1331 (2d Cir. 1993) (Chapter 7 trustee's state law causes of action demanding monetary relief and sounding in contract and tort "are paradigmatic private rights" under *Granfinanciera* that were required to be tried by a jury); *McCord v. Papantoniou*, 316 B.R. 113, 122, n.13 (E.D.N.Y. 2004) (claims seeking monetary relief must be tried before a jury because such claims were legal in nature, and thus concerned "paradigmatic private rights" under *Granfinanciera*).

Here, the Act requires the parties to a private billing dispute to submit themselves to final and binding arbitration, to which neither party agreed, and which would otherwise enjoy the right to a jury trial under the Seventh Amendment. Congress has no authority to deny to the physician the right to a jury trial *de novo* on state common law claims.

**JA-107**

C.  **Allowing Insurers to Define the Standard by Which the IDR Determines Out-of-Network Physicians' Claims Deprives Physicians of Property Without Due Process in Violation of the Fifth Amendment**

The Due Process Clause of the Fifth Amendment prohibits the United States from depriving persons of property without due process of law. The Fifth Amendment also prohibits the government from taking private property without just compensation. The Act violates both constitutional provisions.  Under New York law, physicians have a property right to be paid the reasonable value of the services they render to their patients. The Act deprives them of that right without due process of law. The Act and the Rule also take the physicians' property without just compensation by depriving them of the reasonable value of those services and restricting the amount they can recover for those services to the amount determined in an arbitration in which the other party to the dispute—the insurer—effectively determines the outcome.

1.  **Physicians have a property right under New York law to be paid the fair value of the services they render to patients.**

It has long been established in New York that, absent a contract, a physician "may recover upon an implied agreement to pay for his services *quantum meruit*, when they have been rendered at the request of the patient" or a person authorized to act on behalf of the patient. *McGuire*, 207 N.Y. at 521; *see also Budhu*, 20 Misc.3d at *1 ("The performance by plaintiff and acceptance of the services by defendant gave rise to an inference that an implied contract to pay for the reasonable value of such services existed."); *Abrandt*, 779 N.Y.S.2d at 892 ("an agreement to pay for medical services may be implied" and "[t]he performance and acceptance of services can give rise to an inference of an implied contract to pay for the reasonable value of such services"); *Asprinio*, 49 Misc. 3d at 993 ("it is well recognized that, even in the absence of an express contractual agreement, a physician may recover upon an implied agreement to pay for services *quantum meruit*, when the services have been rendered at the request of the patient").

15

**JA-108**

The common law right to receive payment for medical services applies even when a patient cannot consent to receive the services because of her condition, provided that the services are necessary to prevent serious bodily harm. *See, e.g.*, *Ruppert v. Bowen*, 871 F.2d 1172, 1178 (2d Cir. 1989) ("Under New York law, an incompetent is liable under an implied agreement for the reasonable value of necessities.") (citing *In re Estate of Anderson*, 119 Misc.2d 248, 254, 462 N.Y.S.2d 589 (Surr. Ct. Saratoga Cnty. 1983) (stating that under most circumstances a physician would have a right to payment for necessary treatment provided to a comatose patient unable to consent)).[2]   Thus, the physician is entitled to recover in *quantum meruit* the reasonable value of the services she provided.

This generally applicable common law right of a physician to recover in *quantum meruit* for services rendered at the request of a patient, or when the patient could not consent, but treatment was necessary to prevent serious harm, is codified for certain patients in the New York Act, which Act applies to health insurance policies regulated by the State of New York.  N.Y. Financial Services Law § 603(c) (defining "health care plans" subject to the law). It prohibits an out-of-network physician from billing patients who receive emergency care (and certain post-stabilization care) for an amount greater than the out-of-pocket costs the insured would have incurred with a participating physician. N.Y. Financial Services Law § 605(a).  Under the statute, just as under the common law, the physician remains entitled to a reasonable fee, which is determined through an independent dispute resolution mechanism that must consider, among other factors, the "usual and customary cost of the service." N.Y. Financial Services Law § 604(f).  One court has described the New York Act's approach to determining a reasonable fee as "akin to the common law approach" of determining an appropriate recovery in *quantum meruit*.  *Asprinio*, 49 Misc. 3d at 1001.

---

[2] New York courts have adopted four criteria to establish the right to restitution when the patient cannot consent: (i) that the provider of services intended to charge for its services; (ii) that the services were necessary to prevent the person from suffering serious bodily harm or pain; (iii) that the provider of services had no reason to know the recipient of the services would not consent to receiving them, if competent; and (iv) that it was impossible for the recipient to give consent.  22A N.Y. Jur. 2d Contracts § 619; *Estate of Anderson*, 119 Misc.2d at 254.

**JA-109**

In contrast, the Act at issue here negates the common law right to recover in *quantum meruit*. It expressly prohibits the IDR from considering the "usual and customary charges" for services provided by the physician or the amount she would have billed had the federal law not existed (*i.e.*, under common law). 42 U.S.C. § 300gg-111(c)(5)(D). Instead, the Act provides that the physician's fee will be determined under the IDR by the QPA, 42 U.S.C. § 300-gg-111(c)(5)(C)(i), which it defines as "the median of the contracted rates recognized by the plan or issuer," § 300gg-111(a)(3)(E)(i), subject to considering five other factors.[3]

The Rule implementing the Act goes even further. It establishes a *presumption* that the QPA is the appropriate fee, regardless of the other considerations established by the Act. *See* 45 CFR § 149.510(c)(4)(ii); *Texas Medical Ass'n,* 2022 WL 542879 at *9 ("the Rule treats the QPA—an insurer-determined number—as the default payment amount"). Indeed, the Departments themselves "repeatedly touted the Rule as establishing a 'rebuttable presumption' in favor of the QPA" (86 Fed. Reg. at 56,056–61), and have argued that vacating the Rule "would result in higher reimbursement payments to providers." *Texas Medical Ass'n,* 2022 WL 542879 at *9.

Under the Act, therefore, the general standard for determining the payment to physicians, and

---

[3]     The five factors as set forth in 42 U.S.C. §300gg-111(c)(5)(C)(ii)(I)-(V) are:

(I)     The level of training, experience, and quality and outcomes measurements of the provider or facility that furnished such item or service (such as those endorsed by the consensus-based entity authorized in section 1890 of the Social Security Act [42 U.S.C. 1395aaa]).

(II)    The market share held by the nonparticipating provider or facility or that of the plan or issuer in the geographic region in which the item or service was provided.

(III)   The acuity of the individual receiving such item or service or the complexity of furnishing such item or service to such individual.

(IV)    The teaching status, case mix, and scope of services of the nonparticipating facility that furnished such item or service.

(V)     Demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or nonparticipating facility or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider or facility, as applicable, and the plan or issuer, as applicable, during the previous 4 plan years.

17

**JA-110**

under the Rule, the presumptive standard for determining such payment, is not the reasonable value of the services the physicians have rendered under New York law. It is, rather, the median contract rate that the insurers have agreed to pay to other physicians that reflects the insurers' decisions about what to pay based on their market power, not on the amount that would be reasonable and recoverable in *quantum meruit* under common law.

> 2. **The Act unconstitutionally deprives physicians of their right to be paid for the fair value of their services as defined under New York law.**

The Act prohibits out-of-network physicians recovering anything for their services other than the amount determined by the IDR, in which the standard of decision is, effectively, the rate determined by insurers in their negotiations with in-network physicians. However, in these negotiations, to which out-of-network physicians are not parties, the insurers have outsized negotiating power and the in-network physicians have no authority, interest, or incentive to act on behalf of out-of-network physicians.

"A fundamental requirement of procedural due process is 'the opportunity to be heard'" in a "meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). The purpose of due process and an opportunity to be heard in a meaningful manner is "to minimize substantively unfair or mistaken deprivations of property." *Krimstock v. Kelly*, 306 F.3d 40, 52 (2d Cir. 2002) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972)).

By predetermining the QPA as the presumptive, default amount owed to the out-of-network physicians, and defining that amount based on what an insurer has previously agreed to pay in-network physicians without any input by the out-of-network physicians, the Act and the Rule effectively deprive the out-of-network physicians a meaningful opportunity during the IDR to challenge the deprivation of their rights to a reasonable fee under New York law, thus depriving out-of-network physicians of procedural due process. *See Kellman v. District Director, U.S. I.N.S.,* 750

18

**JA-111**

F.Supp. 625, 628 n.4 (S.D.N.Y. 1990) ("procedural due process cannot be satisfied merely by the opportunity for a hearing where the result of that hearing is statutorily predetermined"); *accord D'Angelo v. Winter*, 403 Fed.Appx. 181, 182 (9th Cir. 2010) ("A hearing with a predetermined outcome does not satisfy due process."); *Washington v. Kirksey*, 811 F.2d 561, 564 (11th Cir. 1987) ("Due process of law does not allow the state to deprive an individual of property where the state has gone through the mechanics of providing a hearing, but the hearing is totally devoid of a meaningful opportunity to be heard."). Accordingly, the IDR scheme set forth in the Act as implemented by the Rule must be struck down as unconstitutional.

D.      **The Act Deprives the Physician of Property Without Due Process of Law or Just Compensation**

The takings clause of the Fifth Amendment prohibits the United States from taking private property for public use without just compensation. *Armstrong v. United States*, 364 U.S. 40, 49 (1960).  Fundamentally, the Fifth Amendment protects valid contract rights. *See Lynch v. United States*, 292 U.S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States."); *Cienega Gardens v. U.S.*, 331 F.3d 1319, 1334 (Fed. Cir. 2003) (agreements between private parties "give rise to protected property interests, irrespective of whether the subject matter of the contracts is under the government's regulatory jurisdiction").

*Cienega Gardens* is particularly instructive. There, the plaintiffs were real estate developers who received loans from private lenders to construct low-income housing projects administered by the Department of Housing and Urban Development. 331 F.3d at 1325.  HUD provided the participants with mortgage insurance, which facilitated low-interest mortgages, and in return, each participant entered into a regulatory agreement with HUD, which placed restrictions on the owners,

19

**JA-112**

including prohibiting the sale or further mortgage of the property without HUD approval.  *Id*.  The regulatory agreements and their restrictions were to remain in effect for at least 20 years, at which point the owners would have the option of prepaying the mortgages and thereby dissolving the restrictive agreements with HUD.  *Id*. at 1326.  Congress became concerned that too many owners would prepay their mortgages and remove their properties from the low-income housing pool.  Congress thus enacted an additional statute that, even after twenty years, all housing program participants had to obtain HUD approval in order to prepay their mortgages.  *Id*.

The Court of Appeals for the Federal Circuit held the new statute was a taking of the plaintiffs' property interests in violation of the Fifth Amendment that must be compensated.  *Id*. at 1338.  The court found that "[u]nquestionably, Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing), but just as clearly, the expense was placed disproportionately on a few private property owners."  *Id*.  The court held that Congress' objective "in preserving low-income housing—and method—forcing some owners to keep accepting below-market rents—is the kind of expense-shifting to a few persons that amounts to a taking.  This is especially clear where, as here, the alternative was for all taxpayers to shoulder the burden." *Id*. at 1338-1339.

Here, the Act prohibits physicians from billing their patients for the reasonable value of their services that it is not paid by the patients' insurer.  42 U.S.C. § 300gg-132.  As in *Cienega Gardens*, the Act thus compels physicians to bear the societal burden of the increasing cost of health care, without imposing any corresponding burden on insurers or patients or the general public.  *See also Armstrong*, 364 U.S. at 49 ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.").  Because the Act does not compensate physicians for benefitting insurers and the taxpayer at the expense of physicians, it violates the Fifth Amendment's proscription against taking

**JA-113**

private property without just compensation, and it must be struck down on that basis. *Cienega Gardens*, 331 F.3d at 1334 ("abrogation by legislation of clear, unqualified contract rights requires a remedy, even in a highly regulated industry . . . because the contracts embodied the commitments of the contracting parties").

## II.   The Rule Must be Vacated Where it Exceeds the Authority Congress Granted to the Departments and Conflicts with the Act

Congress legislates and administrative agencies implement the legislation adopted.  The Supreme Court has cautioned that "agency power to make rules that affect substantial individual rights and obligations carries with it the responsibility not only to remain consistent with the governing legislation, but also to employ procedures that conform to the law."  *Morton v. Ruiz*, 415 U.S. 199, 232 (1974).  Thus, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress," and it is the judiciary that is "the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."  *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 and n.9 (1984).

Here, the relevant provisions of the Rule sought to be vacated (Complaint at pp. 17-18) do not conform to the Act.  As stated above, the Act defines the factors that must be considered in the IDR. 42 U.S.C. § 300gg-111(c)(5)(C).  It does not give any one of those factors priority or otherwise dictate how the arbitrator should weigh the factors, providing instead for the arbitrator to exercise his or her discretion, based on the arbitrator's "medical, legal, and other expertise," in determining the appropriate out-of-network rate considering the facts and circumstances of a particular case.  42 U.S.C. § 300gg-111(c)(4)(A).  The Rule conflicts with the statute.  It *requires* that the arbitrator in the IDR select the offer closest to the QPA, unless a party "clearly demonstrates that the QPA is materially different from the appropriate out- of-network rate." 86 Fed. Reg. at 55,995. As the

**JA-114**

Departments explained when issuing the Rule, it creates a "rebuttable presumption" that the amount closest to the QPA is the proper payment amount. *See* 86 Fed. Reg. at 56,060-61.

This implementation contradicts the plain meaning of the Act. The Act instructs the arbitrator to consider *every* Subparagraph C Factor "[i]n determining which offer" to select, not just in determining whether the QPA is materially different from the appropriate out-of-network rate. 42 U.S.C. § 300gg-111(c)(5)(A) ("the certified IDR entity shall . . . taking into account the [Subparagraph C Factors]" select one of the offers). Where the regulations depart from the legislation, the regulations are invalid. *See American Corn Growers Ass'n v. EPA*, 291 F.3d 1, 6 (D.C. Cir. 2002) (where "no weights were assigned" to statutory factors, "treat[ing] one of the five statutory factors in such a dramatically different fashion distorts the judgment Congress directed"). As the court in *Texas Medical Ass'n* ruled, the Act does not "impose a 'rebuttable presumption' that the offer closest to the QPA should be chosen—or suggest anywhere that the other factors or information is less important than the QPA." *Texas Medical Ass'n*, 2022 WL 542879, at *8.

Nor can Defendants defend their "interpretation" of the Act under *Chevron*. Because Congress spoke clearly on the issue relevant here, the Departments' interpretation of the statute is owed no *Chevron* deference. *See id.* (citing *Chevron*, 467 U.S. at 843); *see also Lutwin v. Thompson*, 361 F.3d 146, 156 (2d Cir. 2004) ("Because we find the statutory language to be clear and unambiguous, deference to the Secretary's interpretation under *Chevron* is not appropriate.").

The Departments' attempt to override the language of the Act and upset the balanced approach that Congress required the IDR to follow when making payment determinations is *ultra vires* and contrary to the law passed by Congress. As did the court in *Texas Medical Ass'n*, the Court should vacate those provisions of the Rule requiring the IDR to employ a presumption in favor of the offer closest to the QPA. *See Texas Medical Ass'n,* 2022 WL 542879 at *14-15; Complaint at pp. 17-18.

22

**JA-115**

### III.   Plaintiffs are Entitled to a Preliminary Injunction

#### A.   Standard for a Preliminary Injunction

Where, as here, the moving party seeks to stay governmental action purportedly taken in the public interest pursuant to a statutory or regulatory scheme, the moving party must show "irreparable injury and a likelihood of success on the merits." *RxUSA Wholesale, Inc. v. Department of Health and Human Servs.*, 467 F.Supp.2d 285, 300 (E.D.N.Y. 2006) (citing *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir. 1996)). A court "need not find with 'absolute certainty' that Plaintiffs will succeed on the merits of their claims," but rather that Plaintiffs have "more than a fifty-fifty chance of succeeding." *Id*. at 288-89 (citing *Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1984) ("A movant . . . need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt.")).

#### B.   Plaintiffs Are Likely to Succeed on the Merits

With respect to the level of persuasion required to satisfy a likelihood to succeed on the merits, courts have distinguished between motions seeking a prohibitory injunction as opposed to those seeking a mandatory injunction. *Averhart v. Annucci*, 2021 WL 2383556, *8 (S.D.N.Y. June 10, 2021). Where, as here, the requested injunction seeks to enjoin government enforcement of a regulation "such an injunction is considered prohibitory rather than mandatory," and the party moving for a preliminary injunction must show a "likelihood of success" on the merits of the case, rather than the more rigorous "clear" or "substantial" likelihood of success on the merits. *Id*. (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006)).

Here, for all the reasons discussed above, Plaintiffs' claims under the Seventh, Fifth and Fourteenth Amendments to the United States Constitution are likely to succeed on the merits. Moreover, the District Court in *Texas Medical Ass'n* has already vacated the Rule requiring the IDR to employ a presumption in favor of the offer closest to the QPA, which is a substantial part of the

23

**JA-116**

underlying relief sought by Plaintiffs.  To be sure, that decision is not binding on this Court, but its thorough and correct analysis is certainly persuasive and indicates a likelihood of success on the merits.  *See, e.g., In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (affirming preliminary injunction and finding a "strong likelihood" that debtors could successfully reorganize when another district court had confirmed that finding in a separate adversary proceeding).

**C.**     <u>**Plaintiffs Will be Irreparably Harmed**</u>

"Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."  *New York Bay Capital, LLC v. Cobalt Holdings, Inc.*, 456 F.Supp.3d 564, 573 (S.D.N.Y. 2020) (quoting *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir.1999)).

It is well established that "an alleged violation of a constitutional right 'triggers a finding of irreparable harm,'" and "no separate showing of irreparable harm is necessary." *Johnson v. Miles*, 355 Fed.Appx. 444, 446 (2d Cir. 2009) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996) ("The district court therefore properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights.") and *Statharos v. New York City Taxi and Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir.1999)).

Furthermore, "as a matter of law, there is irreparable harm when a party is compelled to arbitrate without having agreed to arbitration because that party is forced to expend time and resources arbitrating an issue that is not arbitrable." *New York Bay Capital, LLC*, 456 F.Supp.3d at 573; *UBS Securities, LLC v. Voegeli*, 405 Fed.Appx. 550, 552 (2d Cir. 2011) (finding "irreparable harm" and "lack of adequate remedy at law" where the moving party may not be legally obligated to arbitrate, and the lack of an injunction would result in it effectively being required to do so).

In addition, "Courts in this district have routinely found that the risk of inconsistencies between arbitrations and a court's ruling establishes irreparable harm." *Gov't Emps. Ins. Co. v. SMK*

24

**JA-117**

*Pharmacy Corp.*, 21-CV-3247 (AMD)(RLM), 2022 WL 541647, *5 (E.D.N.Y. Feb. 23, 2022) (Donnelly, J.) (collecting cases).

For at least three reasons, Plaintiffs will suffer irreparable harm if a temporary restraining order and preliminary injunction staying enforcement of the Act and the Rule are not issued.

**First**, Plaintiffs' claims alleging Constitutional violations under the Fifth, Seventh and Fourteenth Amendments alone establish irreparable harm as a matter of law.

**Second**, while large parts of the Rule have already been vacated by the court in *Texas Medical Ass'n*, that decision did not stay commencements of IDRs under the Act. If an injunction does not issue in this proceeding, Plaintiffs will still be subject to the IDR process provided for in the Act, and will be forced to expend considerable time and resources preparing for, and participating in, that process while the Court is considering whether that process is Constitutional in the first place.

In that regard, Dr. Haller and his colleagues at Long Island Surgical expect that they will have to participate in potentially thousands of IDRs under the Act in the coming years. (Haller Decl. at ¶ 13). Dr. Haller and Long Island Surgical have therefore started the process of hiring as many as nine additional staff members, doubling their administrative staff, to deal with the impending IDR arbitrations should the Act continue to go into effect without the Court's intervention. (Haller Decl. at ¶ 15). They must compete with other independent practices to hire individuals who are proficient with the new regulations and procedures of the Act, and who are in short supply, thereby making staffing difficult and expensive. (*Id.*). It will therefore take up an enormous amount of Plaintiffs' time and effort to properly prepare to meet the Act's requirements should the Court not enjoin implementation of the Act and the Rule.

**Finally**, the risk of inconsistent judgments is manifest. Plaintiffs could be subject to multiple adverse rulings in the IDR process only to have that entire process and those rulings invalidated as a result of an eventual decision in the instant proceeding striking down the Act and/or the Rule.

25

JA-118

### CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that their motion for a temporary restraining order and a preliminary injunction be granted.


Dated: White Plains, New York
       March 31, 2022


**ABRAMS FENSTERMAN, LLP**

By: /s/ Robert A. Spolzino
    Robert A. Spolzino
    Edward A. Smith
    Justin Kelton
    Mordecai Geisler
    One Metrotech Center, Suite 1700
    Brooklyn, NY 11201
    (718) 215-5300
    *Attorneys for Plaintiffs*

26

JA-119

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

DR. DANIEL HALLER and LONG ISLAND
SURGICAL PLLC,

                              Plaintiffs,

– against –

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, 200 Independence
Avenue SW, Washington, DC 20201, et al.,

                              Defendants.

Case No. 21-cv-7208-AMD-AYS

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND IN FURTHER SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

---

ABRAMS FENSTERMAN, LLP
*Attorneys for Plaintiffs*
One Metrotech Center, Suite 1701
Brooklyn, New York 11201
Telephone: 718-215-5300

JA-120

## TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

Preliminary Statement...................................................................................................... 1

Argument .......................................................................................................................... 2

    A. Standard on a Motion to Dismiss .............................................................................. 2

    B. The Act's arbitration requirement deprives Plaintiffs of their Seventh Amendment right to a jury trial. ........................................................................................................................ 3

        1. Plaintiffs' claims to be paid for their services are legal in nature and the Seventh Amendment right to a jury therefore attaches to those claims. ...................................... 3

        2. The Act does not fall within the "Public Rights" Exception to Article III. ................... 4

            a. The Act does not create a new "Public Right." ......................................................... 5

            b. The IDR process is not a part of a "public regulatory scheme" ............................... 7

            c. Article III requires that compulsory non-consensual arbitration be reviewable by a court of record ........................................................................................................... 9

    C. Arbitration requires consent. .................................................................................... 11

    D. The Act violates the Fifth Amendment by depriving Plaintiffs of property without just compensation. ........................................................................................................... 13

        1. Plaintiffs have cognizable property interests. ....................................................... 13

        2. The Act deprives Plaintiffs of procedural due process. ......................................... 17

        3. Plaintiffs' Fifth Amendment claim is ripe. ............................................................. 21

    E. The Act does not preempt Plaintiffs' state common law claims. ............................. 22

    F. Plaintiffs are entitled to a preliminary injunction. .................................................... 28

        1. Standard for a preliminary injunction. .................................................................... 28

        2. Plaintiffs will be irreparably harmed. ..................................................................... 29

        3. Plaintiffs are likely to succeed on the merits. ........................................................ 32

        4. The balance of equities is in Plaintiffs' favor and an injunction is in the public interest. ................................................................................................................... 32

Conclusion ...................................................................................................................... 35

i

JA-121

**TABLE OF AUTHORITIES**

**Cases**

*Airday v. City of New York*, 310 F. Supp. 3d 399, 420 (S.D.N.Y. 2018) ..................................... 15

*Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914, 926 (S.D. Cal. 2020) ................................................ 29

*American Soc. of Composers, Authors, and Publishers v. Pataki*, 930 F. Supp. 873, 878 (S.D.N.Y. 1996)................................................................................................................................ 28

*Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) ......................................................................... 17

*Arthritis and Osteoporosis Clinic of East Texas, P.A. v. Azar*, 450 F. Supp. 3d 740, 749 (E.D. Tex. 2020)................................................................................................................................ 14

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ................................................................................ 3

*Ass'n of Air Med. Services v. U.S. Dep't of Health and Human Servs.*, 21-cv-03031 (D.D.C.) .. 31

*AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648 (1986) ....... 11

*Athletes & Artists, Inc. v. Millen*, No. 96 CIV. 9996 (KTD), 1999 WL 587883, at *8 (S.D.N.Y. Aug. 4, 1999).................................................................................................................... 3

*Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 455 (1977) ........................................................................................................................................ 11

*Aureus Asset Managers, Ltd. v. United States*, 121 Fed.Cl. 206, 213 (Fed. Cl. 2015)................. 15

*Averhart v. Annucci*, 2021 WL 2383556, *8 (S.D.N.Y. June 10, 2021) ...................................... 28

*Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 388-89 (6th Cir. 2022) ............................ 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 583 (2007) .................................................................. 3

*Bowsher v. Synar*, 478 U.S. 714, 736 (1986)............................................................................... 23

*Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)................................................................... 15

*Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2070, 2072-73 (2021) .................................... 22

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004)................................................................................................................................ 33

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) .......................................... 9

*Costello v. Town of Fairfield*, 811 F.2d 782,784 (2d Cir. 1987) ................................................. 16

*Crowell v. Benson*, 285 U.S. 22, 51-52 (1932) ............................................................................. 6

*D'Angelo v. Winter*, 403 Fed.Appx. 181, 182 (9th Cir. 2010).................................................... 20

*DeMartino v. New York State Department of Lab.*, 167 F. Supp. 3d 342, 358-59 (E.D.N.Y. 2016) .................................................................................................................................... 14, 15

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir.2010)................................................ 3

*Emergency Grp. of Ariz. Pro. Corp. v. United Healthcare, Inc.*, 838 F.App'x 299, 300 (9th Cir. 2021).................................................................................................................................. 27

*Emergency Physician Servs. of New York v. UnitedHealth Grp., Inc.*, 2021 WL 4437166 (S.D.N.Y. Sept. 28, 2021) .................................................................................................... 26, 27

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir.2005) .......................................... 28

*Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972) .............................................................................. 17

*Furlong v. Shalala*, 156 F.3d 384, 393 (2d Cir. 1998) .................................................................. 14

*Gebin v. Mineta*, 239 F. Supp. 2d 967, 968 (C.D. Cal. 2002) ...................................................... 34

*Gen. Elec. Co. v. New York State Dep't of Lab.*, 936 F.2d 1448, 1453) (2d Cir. 1991) ......... 14, 16

*Germain v. Conn. Nat. Bank*, 988 F.2d 1323 (2d Cir. 1993)................................................... 10, 11

*Gerosa v. Savasta & Co.*, 329 F.3d 317, 327 n.8 (2d Cir. 2003)............................................. 26, 27

*Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) .......................................................... 32, 33

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 60-63 (1989)............................................... passim

*Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 12–13, (1979) ............................................................................................................................................ 17

*GSGSB, Inc. v. New York Yankees*, No. 91 CIV. 1803 (SWK), 1995 WL 507246, at *5 (S.D.N.Y. Aug. 28, 1995)............................................................................................................................ 3

*Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991) .............................. 12

*Hillsborough County v. Automated Med. Lab. Inc.*, 471 U.S. 707, 719 (1985) .......................... 25

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 123 S. Ct. 588, 589, 154 L. Ed. 2d 491 (2002) ............................................................................................................................................ 11

*In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110 (D.C. Cir. 2008)..... 23, 24

*Jarkesy v Sec. and Exch. Comm'n*, 2022 WL 1563613, at *4 (5th Cir. May 18, 2022)............. 5, 7

*John E. Andrus Memorial, Inc. v. Daines*, 600 F. Supp. 2d 563, 570 (S.D.N.Y. 2009)............... 28

*Johnson v. Miles*, 355 Fed.Appx. 444, 446 (2d Cir. 2009) .......................................................... 29

*Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996) ...................................................................... 29

*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 375 (2004) ................................................... 6

*Kellman v. District Director, U.S. I.N.S.*, 750 F.Supp. 625, 628 n.4 (S.D.N.Y. 1990) ............... 20

*King v. New York City Employees Retirement System*, 212 F.Supp.3d 371, 396 (E.D.N.Y. 2016) 2

*Knick v. Township of Scott*, 139 S.Ct. 2162, 2172 (2019) ...................................................... 21, 22

**JA-123**

*Koreska v. Perry-Sherwood Corp.*, 253 F. Supp. 830, 831 (S.D.N.Y. 1965), *aff'd sub nom. Matter of Koreska*, 360 F.2d 212 (2d Cir. 1966) ................................................................. 12

*Krimstock v. Kelly*, 306 F.3d 40, 52 (2d Cir. 2002) ....................................................... 17

*Lanier v. BATS Exch., Inc.*, 105 F. Supp. 3d 353 (S.D.N.Y. 2015) ....................................... 23, 24

*LifeNet, Inc. v. U.S. Dep't of Health and Human Services*, 22- cv-00162-JDK (E.D. Tex.) ....... 31

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) .......................................... 15

*Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 27 (2d Cir. 1994)................................ 16

*Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006).......................... 28

*Med. Soc. of N.Y. v. Cuomo*, 976 F.2d 812, 816 (2d Cir.1992) ............................ 25, 26

*Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 332 (2d Cir. 2011) ..................... 27

*Morgan Guar. Tr. Co. of New York v. Republic of Palau*, 680 F. Supp. 99, 105 (S.D.N.Y. 1988) ............................................................................................................ 15

*Munn v People of State of Illinois*, 94 U.S. 113, 122 (1876) ........................................ 6

*New York Bay Capital, LLC v. Cobalt Holdings, Inc.*, 456 F. Supp. 3d 564, 573 (S.D.N.Y. 2020) ............................................................................................................ 30

*New York City Health and Hospitals Corp. v. WellCare of New York, Inc.*, 801 F. Supp. 2d 126, 141 (S.D.N.Y. 2011) ............................................................................. 25

*New York SMSA Ltd. Partnership v. Town of Clarkstown*, 612 F.3d 97, 106 (2d Cir. 2010) ...... 26

*New York State Nat. Org. for Women v. Pataki*, 261 F.3d 156, 163 (2d Cir. 2001)................... 15

*New York State Telecommunications Association, Inc. v. James*, 544 F. Supp. 3d 269, 288 (E.D.N.Y. 2022) ............................................................................................ 29

*New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 n.38 (2d Cir. 2020) ......... 29

*Northern Pipeline Construction Co.*, 458 U.S. 50, 84 (1982) ....................................... 5

*Oil States Energy Services, LLC v Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018).... 6

*Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Union*, 359 F.2d 598, 603 (2d Cir. 1966)......................................................................................................... 12

*Pakdel v. City and Cnty. of San Francisco*, 141 S.Ct. 2226, 2228 (2021) ................................ 21

*Pernell v. Southall Realty*, 416 U.S. 363, 375 (1974).................................................... 3

*Perry v. Sindermann*, 408 U.S. 593, 601–03 (1972)...................................................... 15

*R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54 (2d Cir. 1997)................................................ 4

iv

**JA-124**

*Regeneron Pharmaceuticals, Inc. v. United States Dep't of Health and Hum. Servs.*, 510 F. Supp. 3d 29, 38 (S.D.N.Y. 2020) ........................................................................................ 29

*Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 774 (7th Cir. 2021) .......... 14, 17, 19, 20

*RxUSA Wholesale, Inc. v. Dep't of Health and Hum. Servs.*, 467 F. Supp. 2d 285, 300 (E.D.N.Y. 2006)........................................................................................................ 28

*Skepnek v. Roper & Twardowsky, LLC*, 2015 WL 5178054, *2-3 (D. Kan. Sept. 4, 2015)........... 3

*Speedfit LLC v. Woodway USA, Inc.*, 2020 WL 3051511 (E.D.N.Y. June 8, 2020) ..................... 4

*Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)......................................... 11

*Stern v. Marshall*, 564 U.S. 462, 490 (2011) ............................................................................. 5

*Texas Medical Ass'n v. U.S. Dep't of Health and Human Servs.*, 2022 WL 542879, *9 (E.D. Tex. Feb. 23, 2022)........................................................................................... 19, 20, 30, 31

*Texas Oral and Facial Surgery, PA v. United Healthcare Dental, Inc.*, 2018 WL 3105114, *8 (S.D. Tex. June 25, 2018) ................................................................................ 27

*Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568, 584 (1985) ....................... 5, 6, 8, 10

*Transit Mix Concrete Corp. v. Local Union No. 282*, 809 F.2d 963, 967 (2d Cir. 1987) ........... 11

*UBS Securities, LLC v. Voegeli*, 405 Fed.Appx. 550, 552 (2d Cir. 2011)................................... 30

*United Food & Com. Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 364 n.11 (6th Cir. 1998) ........................................................................... 34

*Vera v. Saks & Co.*, 335 F.3d 109, 116 (2d Cir. 2003) ............................................................ 11

*Walentas v. Lipper*, 862 F.2d 414, 418 (2d Cir. 1988) ............................................................ 16

*Washington v. Kirksey*, 811 F.2d 561, 564 (11th Cir. 1987) .................................................... 20

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 135 (2d Cir. 1991)............................................................................................................. 3


**Statutes**

42 U.S.C. § 300gg-111(a)(3)(E)(i) ............................................................................ 18

42 U.S.C. § 300gg-111(c)(5)(C) ............................................................................... 17

42 U.S.C. § 300gg-111(c)(5)(D) ............................................................................... 18

42 U.S.C. § 300gg-131 ........................................................................................... 21

42 U.S.C. § 300gg-132 ........................................................................................... 21

Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.* ................ 8

v

JA-125

**Regulations**

45 CFR § 149.510(c)(4)(ii) ................................................................................... 20

86 Fed. Reg. 36,872 .......................................................................................... 25

86 Fed. Reg. at 36,946 ...................................................................................... 26

**Constitutional Provisions**

U.S. Const. Amend. VII.......................................................................................... 4

vi

JA-126

### PRELIMINARY STATEMENT

Plaintiffs, Dr. Daniel Haller and Long Island Surgical PLLC ("Plaintiffs"), respectfully submit this memorandum of law in opposition to the motion to dismiss filed by Defendants, the Department of Health and Human Services, the Department of Labor, the Department of the Treasury, the Office of Personnel Management, Xavier Becerra in his official capacity as the Secretary of Health and Human Services, Janet Yellen in her official capacity as the Secretary of the Treasury, Martin J. Walsh in his official capacity as the Secretary of Labor, and Kiran Ahuja in her official capacity as the Director of the Office of Personnel Management (collectively, "Defendants"), and in further support of Plaintiffs' motion for a preliminary injunction.

Dr. Haller is a critical care surgeon, certified by the American Board of Surgery. (*See* Haller Declaration, Dock. No. 22, ¶ 3). He is President of Long Island Surgical PLLC, a general and acute care surgical private practice in Rockville Centre, New York employing six physicians who have over forty combined years of clinical experience. (*Id*. at ¶¶ 1, 5). Dr. Haller and the other surgeons of Long Island Surgical perform approximately 2,700 emergency consultations and surgical procedures each year on patients admitted to hospitals through their emergency departments. (Dock. No. 1, Complaint at ¶ 12; Haller Decl. at ¶ 6). During the first wave of COVID-19 in March of 2020, Long Island Surgical managed two intensive care units in two different hospitals, treating over 40 patients a day. (Haller Decl. at ¶ 4). Approximately 78 percent of the patients that Dr. Haller and Long Island Surgical treat each year are covered by health plans with whom Dr. Haller and Long Island Surgical have no contractual relationship. (Complaint at ¶ 13; Haller Decl. at ¶ 7). With respect to those patients, Dr. Haller and Long Island Surgical are nonparticipating, or out-of-network, providers within the meaning of the No Surprises Act (the "Act").

Emergency physicians and surgeons such as Plaintiffs—at whose fees the Act was largely directed—work at all hours of the day and night to perform life-saving procedures on patients they

1

**JA-127**

do not know and with whom they have no prior relationship. These physicians have a right to be paid a fair fee for the critical work they do. While they have a right under state common law to be paid by their patients, emergency physicians cannot depend on this right because they may not ask about the patient's financial circumstances before beginning treatment. What they depend on is that most of their patients will have some form of medical insurance and that the insurer will pay the physician because the patients have likely assigned their insurance claim to the physician. The Act seeks to reduce costs by protecting insurance companies through the imposition of the insurer's own price caps on out-of-network physicians with whom the insurer has no prior contractual relationship. This gift to the health insurance industry comes at the cost of the physician being compensated for the fair value of her services.

This action, however, is not about the wisdom of reducing health care costs at the expense of physicians. It is about the legality and constitutionality of doing so in the manner provided by the Act. Congress certainly has the right to legislate to reduce the cost of health care, but not by depriving physicians of their constitutional right to a jury trial, by requiring that their claims for payment be adjudicated in an arbitration to which they did not agree, by denying them due process of law in fixing the standards for the arbitration to favor insurers and, ultimately, by taking, without compensation, physicians' common law right to be paid by patients. For these reasons, the Act, however well intentioned, must be set aside.

ARGUMENT

**A.     <u>Standard on a Motion to Dismiss</u>**

On a motion to dismiss for failure to state a claim, a court must accept the plaintiff's "factual allegations as true, drawing all reasonable inferences in plaintiff's favor." *King v. New York City Employees Retirement System*, 212 F.Supp.3d 371, 396 (E.D.N.Y. 2016). "[A] complaint

2

**JA-128**

must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

on its face." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The issue is not whether a

plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the

claims." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 583 (2007) (citation omitted)). It

is the "legal feasibility of the complaint," and not the weight of the evidence, that must be assessed.

*Id.* (citing *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir.2010)).

      For the reasons set forth below, Defendants' motion to dismiss should be denied.

**B.**    **The Act's arbitration requirement deprives Plaintiffs of their Seventh Amendment right to a jury trial.**

    **1.**    **Plaintiffs' claims to be paid for their services are legal in nature and the Seventh Amendment right to a jury therefore attaches to those claims.**

      Defendants do not dispute that the constitutional right to a trial by jury attaches to an action

involving claims "traditionally enforced in an action at law." *Wm. Passalacqua Builders, Inc. v.*

*Resnick Developers South, Inc.*, 933 F.2d 131, 135 (2d Cir. 1991) (quoting *Pernell v. Southall*

*Realty*, 416 U.S. 363, 375 (1974)). While Defendants contend they see "good reasons to doubt"

that suits in *quantum meruit* for monetary relief (like the claims at issue) are actions at law (Def.

Br. at 27), the weight of authority leaves little reason to doubt. *See* Pls. Opening Br. at 12 (citing

cases); *Athletes & Artists, Inc. v. Millen*, 1999 WL 587883, at *8 (S.D.N.Y. Aug. 4, 1999) ("In the

past, there had been confusion concerning the nature of quantum meruit proceedings—whether

they are actions at equity (where a jury is not permitted) or at law (where a jury demand must be

honored). It now seems settled that an action for quantum meruit must be deemed an action at

law."); *GSGSB, Inc. v. New York Yankees*, 1995 WL 507246, at *5 (S.D.N.Y. Aug. 28, 1995)

(holding that "since quantum meruit is an action at law, numerous federal courts have allowed

actions for quantum meruit to be tried before a jury," and collecting cases). Other federal courts

agree. *See Skepnek v. Roper & Twardowsky, LLC*, 2015 WL 5178054, *2-3 (D. Kan. Sept. 4, 2015)

**JA-129**

(collecting cases, holding that "plaintiffs' *quantum meruit* claim is an action at law and seeks legal relief [and] is therefore triable to a jury," stating that "[q]uantum meruit is a form of quasi-contract that enables [a] performing party to recover the reasonable value of [their] services rendered," and "[i]n federal courts, actions in quasi-contract grew out of the common law writ of assumpsit and, therefore, are actions at law"). Cases cited by Defendants are not to the contrary.[1]

Since *quantum meruit* claims are suits at law, the Seventh Amendment's right to a jury trial attaches to those claims. U.S. Const. Amend. VII. Defendants' argument that "Plaintiffs' congressionally created public rights may be properly delegated to an administrative tribunal shorn of a jury right" (Def. Br. at 27) misses the point. Claims by out-of-network physicians for the fair value of their services are *not* created by Congress. They are preexisting state common law rights. Nor are they public rights. The Seventh Amendment, therefore, requires that those rights be adjudicated by a court. Congress cannot bypass the Seventh Amendment by relabeling an existing state law right, and then claiming that no jury trial is required because it has created a new right.

**2. The Act does not fall within the "Public Rights" Exception to Article III.**

The compulsory arbitration process defined by the Act does not create a new "public right," nor is the statute a "public regulatory scheme" as that term has long been understood by the courts. Defendants' arguments to the contrary (Def. Br. 21 – 25) rest on a fundamental mischaracterization of both the "public rights" exception and the nature of Plaintiffs' claims.

Plaintiffs' common law claims are against the recipient of the medical treatment, not the insurer. The Act improperly seeks to contort these existing common-law contract claims against

---

[1] *See* Def. Br. at 27, citing *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54 (2d Cir. 1997), which did not examine whether a *quantum meruit* claim is entitled to a jury trial, and *Speedfit LLC v. Woodway USA, Inc.*, 2020 WL 3051511 (E.D.N.Y. June 8, 2020), where the plaintiffs argued that they had a right to a jury for their claim for unjust enrichment, because, they argued, it was synonymous with *quantum meruit,* warranting a jury trial, a position the court rejected.

**JA-130**

the patient into an action against the insurer alone in order to force physicians into a truncated

adjudication process before a private arbitrator, a scheme without precedent in our laws.

### a. The Act does not create a new "Public Right."

The public rights exception is limited to circumstances in which the "right to compensation

[under a regulatory scheme] does not depend on or replace a right to such compensation under

state law." *Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568, 584 (1985) (citing *Northern*

*Pipeline Construction Co.*, 458 U.S. 50, 84 (1982)) ("Rather, such inroads suggest unwarranted

encroachments upon the judicial power of the United States, which our Constitution reserves for

Art. III courts."). In determining whether an assignment of a claim to a non-Article III tribunal is

permissible, the first question that must be addressed, therefore, is whether "Congress 'creat[ed] a

new cause of action, and remedies therefor, unknown to the common law,' because traditional

rights and remedies were inadequate to cope with a manifest public problem." *Jarkesy v Sec. and*

*Exch. Comm'n*, 2022 WL 1563613, at *4 (5th Cir. May 18, 2022) (quoting *Granfinanciera, S.A.*

*v. Nordberg*, 492 U.S. 33, 60-63 (1989)).

Formerly confined to "matter[s] of public rights [which] must at a minimum arise 'between

the government and others,'" *Northern Pipeline,* 458 U.S. at 69, the definition of "public rights"

has expanded to include cases where the federal government is not a party, but where "the claim

at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert

Government agency is deemed essential to a limited regulatory objective within the agency's

authority." *Stern v. Marshall*, 564 U.S. 462, 490 (2011). That exception does not apply here.

The compulsory arbitration mandated by the Act clearly does not fall within the more

limited definition of the "public rights" exception embraced prior to *Northern Pipeline*, as the

federal government was never a party to the controversies the Act purports to resolve by

arbitration. These are purely actions to determine "the liability of one individual to another under

5

**JA-131**

the law as defined," *Northern Pipeline*, 458 U.S. at 69-70, *citing Crowell v. Benson*, 285 U.S. 22, 51-52 (1932), neither dependent upon nor arising from a federal statutory scheme. Rather than the claims "'arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it,'" *Oil States Energy Services, LLC v Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (citations omitted), the claims at issue are purely private claims between individuals, and neither involve nor implicate the federal government, nor any new right, privilege, or franchise granted by the government. *Id*.

The Act is unprecedented precisely because it does not create a new right as an adjunct to a larger regulatory scheme. Instead, the primary object of the scheme is to "replace" an existing state law contract claim, *Thomas*, 473 U.S. at 584, with substantively the same claim, also sounding in contract, between the provider and the patient's insurer, a claim which the Act does not permit to be heard before or even reviewed by an Article III tribunal. This is a power that the states might exercise, *see, e.g.*, *Munn v People of State of Illinois*, 94 U.S. 113, 122 (1876), but that Congress may not exercise without encroaching upon the judiciary's powers under Article III.

Plaintiffs' common law claims at issue do not "arise" from the Act, because "a case arises under federal law for purposes of Article III jurisdiction whenever federal law 'forms an ingredient of the original cause.'" *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 375 (2004). The "original cause" in this case has no federal law "ingredient." Rather, Congress has merely assigned "traditional legal claims" to a non-Article III tribunal. *Granfinanciera*, 492 U.S. at 52. The fact that Congress has put a new label on a pre-existing common-law claim and diverted it into what amounts to a summary extra-agency arbitration does not change the nature of the analysis, for the "ingredients" are the same. "Congress cannot convert any sort of action into a 'public right' simply by finding a public purpose for it and codifying it in federal statutory law." *Jarkesy*, 2022 WL

6

JA-132

1563613, at *6.

The Fifth Circuit's recent decision in *Jarkesy* is instructive.  There, the plaintiff challenged the constitutionality of Congress's delegation of securities fraud claims to the SEC's in-house adjudication process, which deprived the plaintiff of the right to a jury trial.  The SEC argued that the legal interests at issue vindicated "public rights," and that Congress therefore could properly delegate such actions to agency proceedings without juries. 2022 WL 1563613 at *2. The Fifth Circuit rejected this argument and held that "[t]he Seventh Amendment guarantees Petitioners a jury trial because the SEC's enforcement action is akin to traditional actions at law to which the jury-trial right attaches.  And Congress, or an agency acting pursuant to congressional authorization, *cannot assign the adjudication of such claims to an agency because such claims do not concern public rights alone*." *Id*. (emphasis added).[2]  Thus, the court ruled that the mandatory adjudication process was unconstitutional as violative of the Seventh Amendment.  It is respectfully submitted that this case presents an even clearer constitutional violation, where Plaintiffs seek to preserve their right to a jury trial of state common law claims between physicians and patients, and where the federal government traditionally has had more limited involvement (*see* Section E, *infra*), unlike in the securities industry.  Moreover, the claims here, like the claims in *Jarkesy*, are classic actions at law, to which the jury-trial right attaches.

### b.  The IDR process is not a part of a "public regulatory scheme"

The operative inquiry for determining whether Congress acts within its power in assigning an adjudicative function to a non-Article III court is whether Congress "create[d] a seemingly

---

[2] In reaching this decision, the Fifth Circuit noted that "[s]urely Congress believes that the securities statutes it passes serve the public interest and the U.S. economy overall, not just individual parties." *Id*. at *6.  But the court rejected this argument, holding that Congress cannot convert any action into a "public right" simply by finding a public purpose for it.  *Id*. (citing *Granfinanciera*).

JA-133

'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Thomas*, 473 U.S. at 594. Here, Congress did not create a "public regulatory scheme."

The public regulatory scheme at issue in *Thomas* is illustrative: the Court addressed itself to the 1978 amendments to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.*, which is a general act for the regulation of pesticides. The challenged statutory arbitration at issue in *Thomas* was not dissimilar to the one in the Act—in the event of a dispute over "follow-on registrations" concerning the safety of registered pesticide products which were FIFRA's primary object, the parties were first obliged to negotiate their relative liability for sharing of costs related to FIFRA's data collection requirements and, if such negotiations were fruitless, would then face binding arbitration to resolve the dispute.7 U.S.C. § 136a(c)(1)(F)(iii).]

Unlike the Act, however, the "public regulatory scheme" at issue in *Thomas* did not have as its sole, or even primary, object the resolution of these follow-on registration cost sharing disputes. FIFRA's object was the collection of data concerning pesticide products' health, safety, and environmental impact, of which the binding arbitration scheme was an essential part, but even so, only a part. *Thomas*, 473 U.S. at 573

The Act, however, has as its primary (and seemingly *sole*) objective an attempt to extinguish claims by providers against private individuals who use their services. In so doing, Congress did not "create" a private right. *Thomas*, 473 U.S. at 594. Indeed, no right was created at all. Instead, Congress barred state-based common law claims against the patient and substituted a right of action against the insurer alone, which is then shunted into a dead-end venue: mandatory binding arbitration before a private arbitrator to which the provider never consented, and over which no meaningful judicial review may be had. Rather than create a new right, "Congress simply

8

JA-134

reclassified a pre-existing, common-law cause of action, […] a purely taxonomic change," *Granfinanciera*, 492 U.S. at 60-61, which cannot act to strip Article III courts of jurisdiction to hear the dispute. The Act, therefore, does not "create a private right" in any meaningful sense, nor is the attempt to extinguish these claims "closely integrated into a public regulatory scheme." Here, the Act's "independent dispute resolution" process ("IDR"), for all practical purposes, *is* the regulatory scheme. Defendants thus rely on circular logic, seeking to justify an otherwise impermissible Article III violation by reference to itself.

Even the authorities cited by Defendants make clear that such a law is without precedent. Non-Article III adjudicatory measures have passed constitutional muster when the regulatory scheme of which they are a part deal with, for example, comprehensive regulation of commodities brokers, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986), comprehensive regulation of workplace safety, *Atlas Roofing Co. Inc. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 422 (1977), and registration of hazardous products, *Thomas*. Here, however, Defendants have cited no examples where the sole object of the purported "regulatory scheme" is the adjudicatory component itself, presumably because no such examples exist. Despite the characterization of the Act as "highly technical" or "comprehensive" (Def. Br. at 22), the complexity of a "regulatory scheme" that nonetheless has as its primary objective an otherwise impermissible violation of Article III cannot be sufficient to bring the Act within the limited and narrow exception of the public rights doctrine. Otherwise, Article III would be rendered meaningless; Congress would be free to assign any claim to a private arbitrator provided that the statute doing so was sufficiently byzantine.

### c. Article III requires that compulsory non-consensual arbitration be reviewable by a court of record

Even if the Court were to hold that Plaintiffs' common law claims were closely integrated

**JA-135**

into a public regulatory scheme, recourse to a court would still be required.

Indeed, in *Granfinanciera*, upon which Defendants rely, the Supreme Court recognized that *some* involvement by the Article III judiciary is necessary, even where the right at issue is closely integrated into a public regulatory scheme. Specifically, the Court held that "[t]he crucial question, in cases not involving the Federal Government, is whether 'Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, [has] create[d] a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with **limited** involvement by the Article III judiciary." *Granfinanciera*, 492 U.S. at 54 (quoting *Thomas*, 473 U.S. at 593-94) (emphasis added). The Court further noted that "district courts may presently set aside clearly erroneous factual findings by bankruptcy courts." *Id*. at 50. Thus, the non-Article III tribunal at issue in *Granfinanciera*, a bankruptcy court, was materially different from the arbitrations required by the Act, which does not provide for even "limited involvement by the Article III judiciary." Rather, the Act completely bars healthcare providers from ever seeking recourse to any court, at any stage. *Granfinanciera* thus does not shield the Act from the requirement that Plaintiffs be permitted some access to the judiciary.

Defendants' reliance on *Germain v. Conn. Nat. Bank*, 988 F.2d 1323 (2d Cir. 1993) is also misplaced. In *Germain*, the Second Circuit held that "Congress may decline to provide jury trials for cases 'involving statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to . . . a specialized court of equity,' because such rights are 'public.'" 988 F.2d at 1331. This holding is inapposite for at least four reasons. First, the rights at issue are not "public rights," nor are they "integral parts of a public regulatory scheme" as discussed above in Sections (B)(2)(a) and (b). Second, Plaintiffs' claims for payment were not

10

**JA-136**

newly created by Congress; they were preexisting claims that Congress simply sought to relabel and modify. Third, *Germain* did not permit the government to relegate claims to arbitration that is mandatory, binding, and final. Rather, in *Germain*, the Second Circuit was asked to decide whether the Seventh Amendment applied to a bankruptcy trustee's claims for tortious interference, breach of contract and other common law claims. The court held that the Seventh Amendment did apply, and that the right to a jury trial was not barred by the public rights doctrine. 988 F.2d at 1332. Finally, the arbitral panels required by the IDR process are not "specialized courts of equity."

     *Atlas Roofing* also does not support Defendants' position. In that case, the Supreme Court held that Congress could create new statutory "public rights" and assign their adjudication to an administrative agency. *Atlas Roofing Co.*, 430 U.S. at 455. But even if Plaintiffs' rights to payment were public rights (which they are not), Congress has not assigned them to an administrative agency. Rather, it has assigned them to private arbitrators, without any of the rules or safeguards that apply to administrative agency adjudicatory proceedings.

     Accordingly, Congress may not force Plaintiffs to forgo jury trials in favor of the Act's mandatory arbitration scheme without recourse to any court.

**C.    Arbitration requires consent.**

     The Supreme Court has emphasized that voluntariness is the "first principle" of arbitration. *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648 (1986). The Supreme Court has thus recognized that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 123 S. Ct. 588, 589 (2002) (citing *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)); *see also Vera v. Saks & Co.*, 335 F.3d 109, 116 (2d Cir. 2003) (affirming that "'arbitration is a matter of contract,' and therefore 'a party cannot be required to submit to arbitration any dispute which [it] has not so agreed to submit'") (quotation omitted).  It is therefore well-

**JA-137**

established that without an explicit statement, or conduct implying an agreement to arbitrate, arbitration will not be compelled. *Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Union*, 359 F.2d 598, 603 (2d Cir. 1966); *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991).

There are many good reasons for the policy against forcing parties to arbitrate absent any agreement to do so. Congress has therefore strongly cautioned *against* mandatory arbitration schemes on legal as well as public policy grounds:

> Congress found that '[m]andatory arbitration undermines the development of public law because there is inadequate transparency and inadequate judicial review of arbitrators' decisions' and noted '[a]rbitration can be an acceptable alternative when consent to the arbitration is truly voluntary, and occurs after the dispute arises." The mandatory arbitration clause in GEICO's policies, prescribed by Section 5106(b) of New York Insurance Law, does not result in arbitrations that are 'truly voluntary' because it is mandated by statute and not by voluntary agreement of the parties. Further, unlike a bargained-for arbitration clause, the parties here are not permitted to choose where the arbitrations take place, who will serve as the arbitrators, or any other procedural components of the arbitration.

*Gov't Emps. Ins. Co. v. Mayzenberg*, 2018 WL 6031156, *3 (E.D.N.Y. Nov. 16, 2018) (emphasis in original) (granting preliminary injunction staying all pending and future no-fault collections arbitrations).

Those same concerns are implicated here. Unlike a contractual arbitration agreement, the Act requires healthcare providers to go to mandatory, binding, and final arbitration against a party with whom they have no contractual relationship, and where they have no practical ability to choose the "procedural components of the arbitration." Moreover, Plaintiffs here are not "merely the instrumentality" of a party bound by an arbitration agreement. *Koreska v. Perry-Sherwood Corp.*, 253 F. Supp. 830, 831 (S.D.N.Y. 1965), *aff'd sub nom. Matter of Koreska*, 360 F.2d 212 (2d Cir. 1966). Instead, the Act creates a forced arbitration scheme unprecedented in its scope and constraint. It covers emergency physicians who, by the nature of their roles, must regularly treat

12

**JA-138**

patients they do not know and did not choose, and who may be covered by insurers with which the physicians have no relationship, nor any desire for any relationship. The physicians are forced to give up any right to payment from the recipient of their treatment, and instead, are forced into an arbitration scheme with those insurers that lacks critical due process safeguards (*see infra* Section (D)(2)), and which is based on rates they never negotiated. And the arbitration is final, with no recourse to any court of law, except in the most egregious cases of fraud, bias or misconduct.

Therefore, the Act violates the most basic and well-settled principles of arbitration.[3]

**D.    The Act violates the Fifth Amendment by depriving Plaintiffs of property without just compensation.**

**1.    Plaintiffs have cognizable property interests.**

Defendants argue that "Plaintiffs' due process and takings claims both turn on whether or not Plaintiffs possess a protected property interest, of which the Act deprives them. Both claims also fail because Plaintiffs have not yet been deprived of any property interest." (Def. Br. at 32). Although Defendants contend that it is "unclear" what property interest of Plaintiffs' is being deprived, Plaintiffs clearly allege that the Act deprives physicians, including Plaintiffs, of their "property rights to the reasonable value of the services they have rendered without due process of law by allowing health plans to determine the standard by which the 'independent dispute resolution process' determines physicians' claims." (Complaint ¶¶ 71, 72). Plaintiffs also allege the Act amounts to a taking of their property without just compensation "by prohibiting physicians

-----

[3] Defendants argue that any "problematic" provisions of the Act should be severed and the remainder left intact because courts "apply a presumption in favor of severability." (Def. Br. at 29). However, Defendants are incorrect in claiming that the offending portions of the Act can effectively be severed. As discussed above, the Act's entire purpose and focus is the transmutation of physicians' state common law claims for payment into claims relegated to binding arbitration against insurers. *See* Section (B)(2)(a). The unconstitutional arbitration process cannot be severed from the rest, as doing so would leave physicians without any avenue for payment whatsoever. This result would be unconstitutional, unworkable, and unsustainable, and it would have ruinous consequences for the emergency medical services industry as we know it.

13

**JA-139**

from recovering the balance of the fair value of their services from their patients." (Complaint ¶¶ 3, 77, 78).

Defendants also argue that compensation for the treatment of future patients is not a recognized property right, "[n]or do providers hold a property interest in any asserted common law right to sue for the value of services rendered to patients." (Def. Br. At 32-33). Not so. "Property interests derive not from the Constitution, but from 'existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims.'" *DeMartino v. New York State Department of Lab.*, 167 F. Supp. 3d 342, 358-59 (E.D.N.Y. 2016) (quoting *Gen. Elec. Co. v. New York State Dep't of Lab.*, 936 F.2d 1448, 1453) (2d Cir. 1991)).

Here, physicians providing emergency care services, such as Plaintiffs, have a cognizable property interest in being fully and fairly compensated for services they render to their patients, both in state court under common law, and against third-party insurers within the confines of the federally compelled IDR process. For example, courts have consistently held that "professionals who provide services under a federal program such as Medicaid or Medicare have a property interest in reimbursement for their services at the 'duly promulgated reimbursement rate.'" *Furlong v. Shalala*, 156 F.3d 384, 393 (2d Cir. 1998); *accord Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 774 (7th Cir. 2021) ("Providers possess a legitimate entitlement to be paid for services rendered"); *Arthritis and Osteoporosis Clinic of East Texas, P.A. v. Azar*, 450 F. Supp. 3d 740, 749 (E.D. Tex. 2020) (Medicare provider had "a valid property interest in receiving Medicare payments for services rendered."). So too, here, Plaintiffs have a cognizable right to compensation for services rendered by them in an emergency setting. Thus, to the extent that Defendants rely on cases dealing generally with the right of "doing business" or about a property

14

JA-140

interest to reimbursement "at any specific [Medicaid] rate" or participation in the Medicaid

program (Def. Br. at 32), they are irrelevant to the facts presented here.

Further contrary to Defendants' assertion, "[t]here is no dispute that a legal cause of action

constitutes a 'species of property protected by the Fourteenth Amendment's Due Process Clause.'"

*New York State Nat. Org. for Women v. Pataki*, 261 F.3d 156, 163 (2d Cir. 2001) (quoting *Logan*

*v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)). In that regard, "an implied contract,

recognized under state law"—such as an implied agreement to pay for services *quantum meruit*—

provides the basis for a property interest that would be given constitutional protection. *Branum v.*

*Clark*, 927 F.2d 698, 705 (2d Cir. 1991) (citing *Perry v. Sindermann*, 408 U.S. 593, 601–03

(1972)); *Airday v. City of New York*, 310 F. Supp. 3d 399, 420 (S.D.N.Y. 2018) ("[t]he law of

contracts, including the rules governing implied contract, can establish the required property

interest"). Similarly, a party has a cognizable property interest in "getting paid for work properly

performed." *DeMartino*, 167 F. Supp. 3d at 361.

If, as is the case here, a statute "flatly preclude[s]" a claimant from pursuing her claim, due

process is "implicated" and "a deprivation would have occurred." *New York State Nat. Org. for*

*Women*, 261 F.3d at 163. Thus, it is clear that:

> [E]xtinguishing [the plaintiff's] right to enforce its contract claim ... in the United
> States courts constitute[s] a taking. Valid contracts ... and the rights arising out of
> such contracts are property and protected by the Fifth Amendment.... When the
> right to enforce a contract in the United States courts is taken away or materially
> lessened, the contract and the rights thereunder are taken within the meaning of the
> Constitution.

*Morgan Guar. Tr. Co. of New York v. Republic of Palau*, 680 F. Supp. 99, 105 (S.D.N.Y. 1988)

(citation omitted); *see also Aureus Asset Managers, Ltd. v. United States*, 121 Fed.Cl. 206, 213

(Fed. Cl. 2015) ("Plaintiffs have alleged sufficient facts to show a property interest in the insurance

contracts they sought to protect with a legal claim against Libya, which the United States

**JA-141**

subsequently extinguished."). Moreover, the Act, by purporting to create a new claim to be adjudicated in the IDR process, itself implicitly recognizes the existence of Plaintiffs' property interest in their common law claims even as it attempts to extinguish them. *See Gen. Elec. Co*, 936 F.2d at 1453 ("GE's property interest is implicit in § 220 itself, which both creates an entitlement to payment of the full contract price . . . and provides for a hearing to determine if cause exists to deprive a contractor of the full contract price.").

Plaintiffs hold a cognizable interest in their New York common law *quantum meruit* claims to be paid for services rendered to patients. Plaintiffs' right to their claims, and their right to a fair adjudication of those claims, are property interests protected by their right to due process under the Fifth and Fourteenth Amendments, and they have the right to be compensated under the Fifth Amendment for the government's taking of such claims.

The authority relied on by Defendants (Def. Br. at 33) is inapposite because those cases considered whether a contract *dispute* between a private party and a governmental body may give rise to a due process claim, rather than whether a party's right to the *existence* of his claim that has been extinguished by the government constitutes a protected property interest.[4] Plaintiffs allege no contractual dispute with Defendants, and do not seek to adjudicate any contractual term. Rather, Plaintiffs seek relief from Defendants' unconstitutional taking of their state law claims, done for Defendants' stated purpose of creating another claim altogether within the confines of an unconstitutional IDR process.

---

[4] *See Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 27 (2d Cir. 1994) ("Village's alleged breach of a contract with Martz in not paying her for professional services rendered did not constitute a deprivation of a property interest protected by the Fourteenth Amendment"); *Walentas v. Lipper*, 862 F.2d 414, 418 (2d Cir. 1988) ("There is a distinction between the breach of an ordinary contract right and the deprivation of a protectible property interest within the meaning of the due process clause."); *Costello v. Town of Fairfield*, 811 F.2d 782,784 (2d Cir. 1987) ("Clearly, it is the interpretation of a contract term that is at issue here and the appellants have pursued this contract dispute in the district court under the guise of a due process violation.").

JA-142

### 2. The Act deprives Plaintiffs of procedural due process.

"A fundamental requirement of procedural due process is 'the opportunity to be heard'" in a "meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). The purpose of procedural due process is "to minimize substantively unfair or mistaken deprivations of property." *Krimstock v. Kelly*, 306 F.3d 40, 52 (2d Cir. 2002) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972)). "The concept of due process is a flexible one which calls for such procedural protections as are necessary for a particular situation for the purpose of minimizing the risk of erroneous decisions." *Rock River Health Care, LLC*, 14 F.4th at 776 (citing *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 12–13, (1979)).

Defendants argue, first, that Plaintiffs fail to recognize that the qualified payment amount ("QPA") "is defined by reference to the 'contracted rates' recognized by the plan or insurer" and these "contracted" rates are "negotiated at arms-length *between* the plan or insurer and another party—typically the health care provider," and the Act thus treats the QPA as a "reasonable proxy for what the agreed-upon payment rate between a provider and a plan or insurer would have been for a given out-of-network service." (Def. Br. at 30). Defendants' description of the Act is, however, incomplete and does not respond to Plaintiffs' allegations.

The Act prohibits out-of-network physicians, such as Plaintiffs, from recovering anything for their services other than the amount determined by the IDR process—they are effectively captive to that process. The Act requires that the IDR determine the amount to which an out-of-network physician is entitled on the basis of the QPA "for the applicable year for comparable services," with the potential to also consider additional circumstances, such as the physician's level of training or experience; acuity of the individual receiving treatment; market share of the physician or health plan; and demonstrations of good faith efforts to enter into network agreements. 42 U.S.C. § 300gg-111(c)(5)(C). (Complaint at ¶ 68). The Act defines the QPA as the "median of

**JA-143**

the contracted rates recognized by the" insurer as of January 31, 2019 in the same insurance market for "the same or similar item or service" provided by a provider "in the same or similar specialty and . . . geographic region," increased by inflation over the base year. 42 U.S.C. § 300gg-111(a)(3)(E)(i). (Complaint at ¶ 69). The Act, however, specifically excludes consideration of "usual and customary charges," which would be the amount the provider would have charged had the Act not applied, or the amounts payable under Medicare or Medicaid. 42 U.S.C. § 300gg-111(c)(5)(D). (Complaint at ¶ 68). The Act thus defines the amount to which every physician, including out-of-network physicians such as Plaintiffs, are entitled to be paid for their services by the amount the insurer has agreed to pay in-network physicians through negotiations with those physicians, subject to the potential consideration of a handful of additional circumstances. But the Act expressly *excludes* consideration of the amount an out-of-network physician would customarily charge in determining the QPA.

Therefore, even if the QPA is based upon fees agreed to between an insurer and its in-network physicians, the out-of-network physicians subject to the IDR process are not parties to those negotiations. The in-network physicians have no authority, interest, or incentive to act on behalf of out-of-network physicians during those negotiations, and whether such negotiations are "arms-length," as Defendants contend, is wholly irrelevant. In determining the QPA, the Act effectively compels out-of-network physicians to accept what an insurer has previously agreed to pay in-network physicians without *any* input of evidence or data by the out-of-network physicians. Specifically, in determining the QPA, out-of-network physicians are prohibited by the Act from submitting data on the amount an out-of-network physician would customarily charge. Indeed, as one court has already found, the Rule implementing the Act treats the QPA as "an insurer-determined number," and makes it the default payment amount under the IDR process. *Texas*

18

JA-144

*Medical Ass'n v. U.S. Dep't of Health and Human Servs.*, 2022 WL 542879, *9 (E.D. Tex. Feb. 23, 2022). The Act thus denies the out-of-network physician a meaningful opportunity to be heard during the IDR process, thereby depriving them of procedural due process.

A recent Seventh Circuit decision is instructive. In *Rock River Health Care, LLC v. Eagleson*, the Court of Appeals reversed a decision of the lower court dismissing a procedural due process claim brought by nursing care providers against the state department administering the state's Medicaid program. 14 F.4th at 770-71. The provider plaintiffs alleged that, in conducting audits of the providers and recalculating reimbursement rates, the defendant failed to provide the plaintiffs with preliminary results and did not identify missing or deficient documents to give the plaintiffs an opportunity to respond. *Id.* at 772. The plaintiff providers also alleged that the procedure was inadequate to provide due process because it "prohibits the submission of any evidence not provided to the auditors at the initial stage." *Id.* The Court of Appeals held that "[a]t this early stage in the litigation, the allegations are sufficient to allege a violation of procedural due process," noting that "[e]ven in cases involving relatively-minimal property interests, courts have recognized that due process at a minimum requires an opportunity to ascertain and confront the evidence in opposition." *Id.* at 778, 780. The court reasoned that:

> The Providers, then, are not made aware of the evidence against them before the decision is made to recalculate the reimbursement rates. And at that point, the Providers have no further opportunity to present documents or other evidence. That omission is consequential because, in the absence of an opportunity to respond to new evidence gathered by the auditors, the Providers would have no opportunity to address all of the facts upon which the recalculation is based. In that way, the procedures followed by the auditors gave the Providers an opportunity to present a legal challenge to the decision, but denied them any practical opportunity to mount a factual challenge to it. What is lacking in the procedures allegedly followed is a fundamental part of any due process inquiry, which is the opportunity to be presented with the evidence against the entity and an opportunity to respond.

*Id.* at 778 (emphasis in original).

Here, too, Plaintiffs are not aware of, and have no input in, the makeup of the QPA which

19

**JA-145**

is largely based upon fees agreed to between an insurer and its in-network physicians. They are precluded by the Act from submitting any data or evidence, at any stage, regarding the amount an out-of-network physician would customarily charge, thus limiting their ability to submit realistic data to calculate their fees. As was the case with the providers in *Rock River Health Care*, *LLC,* here Plaintiffs have no opportunity to address all of the facts upon which the QPA calculation is based. In that way, the Act's procedures give Plaintiffs "an opportunity to present a legal challenge to the [arbitrator's] decision, but den[y] them any practical opportunity to mount a factual challenge." *Id.* at 778. *See also Kellman v. District Director, U.S. I.N.S.*, 750 F.Supp. 625, 628 n.4 (S.D.N.Y. 1990) ("procedural due process cannot be satisfied merely by the opportunity for a hearing where the result of that hearing is statutorily predetermined"); *accord D'Angelo v. Winter*, 403 Fed.Appx. 181, 182 (9th Cir. 2010) ("A hearing with a predetermined outcome does not satisfy due process."); *Washington v. Kirksey*, 811 F.2d 561, 564 (11th Cir. 1987) ("Due process of law does not allow the state to deprive an individual of property where the state has gone through the mechanics of providing a hearing, but the hearing is totally devoid of a meaningful opportunity to be heard."). Accordingly, the IDR scheme set forth in the Act as implemented by the Rule denies Plaintiffs their procedural due process and must be struck down as unconstitutional.

Defendants also argue that the QPA does not alone determine the outcome of the IDR process (Def. Br. at 31), but that position is belied by the Rule providing that the QPA is the *default rate* that must be considered by the arbitrator. *See* 45 CFR § 149.510(c)(4)(ii); *Texas Medical Ass'n*, 2022 WL 542879, *9. To the extent that part of the Rule has been vacated by the Eastern District of Texas court, as discussed below, Defendants have indicated an intent to appeal that ruling. In any event, by Defendants' own admission, a new governing rule has yet to be issued by Defendants, making this defense premature.

20

**JA-146**

### 3.   Plaintiffs' Fifth Amendment claim is ripe.

Defendants argue that any claim by Plaintiffs for the deprivation of a property interest is "at this juncture premature" because "it is entirely premature to speculate whether an arbitration under the Act will actually result in Plaintiffs obtaining anything less than the fair value of the services they provide." (Def. Br. at 33-34).

Defendants, however, misunderstand Plaintiffs' position. Plaintiffs do not premise their takings claim on the outcome of future IDR proceedings. Rather, Count IV of the Complaint asserts a claim under the Fifth Amendment because the Act prohibits out-of-network physicians, who are primarily emergency care providers such as Plaintiffs, the right to bill and hold liable patients for the reasonable value of services rendered in excess of the amount determined by the IDR, without the physicians receiving just compensation. (Complaint ¶ 33, 78; 42 U.S.C. § 300gg-131 and 132). To the extent Defendants argue that Plaintiffs' takings claim, properly construed, is still unripe, the Court should reject that position.

A property owner acquires a right to compensation immediately upon an uncompensated taking, by regulation or otherwise, because the taking without compensation "violates the self-executing Fifth Amendment at the time of the taking, [and] the property owner can bring a federal suit at that time." *Knick v. Township of Scott*, 139 S.Ct. 2162, 2172 (2019). "When a plaintiff alleges a regulatory taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has reached a 'final' decision." *Pakdel v. City and Cnty. of San Francisco*, 141 S.Ct. 2226, 2228 (2021). The finality requirement is "relatively modest," requiring "nothing more than *de facto* finality," and "[a]ll a plaintiff must show is that 'there [is] no question ... about how the 'regulations at issue apply to the particular [property] in question.'" *Id.* at 2230. Once "the government is committed to a position," the dispute is "ripe for judicial resolution." *Id.* Thus, a claim for injunctive relief is ripe if the government has reached a final decision that will

**JA-147**

enable a future taking. *See Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 388-89 (6th Cir. 2022) (citing *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2070, 2072-73 (2021)) ("As the Supreme Court made clear, plaintiffs may sue for injunctive relief even before a physical taking has happened.").

Here, Defendants concede that the federal government has made a final decision to preclude out-of-network physicians, such as Plaintiffs, from balance billing and seeking to hold liable patients receiving emergency care from those physicians. Accordingly, Plaintiffs' taking claim and request for injunctive relief precluding the Act's implementation is ripe for adjudication. A holding to the contrary would be senseless. If Plaintiffs' future *quantum meruit* claims have been extinguished by the Act *ab initio*, such claims would never "ripen." Undoubtedly, at some later date, Defendants would argue that a taking has not occurred because the Act extinguished Plaintiffs' claims in the first place. The law does not countenance such a result. For example, in *Knick*, the Supreme Court authorized property owners to seek damages for unconstitutional takings in federal court without first resorting to state law remedies. *Knick*, 139 S. Ct. at 2172–73. In so holding, the Chief Justice explained that, under prior precedent, plaintiffs had found themselves in a "Catch-22": they could not go to federal court without going to state court first, but if they went to state court and lost, their claims would be barred in federal court, such that the "federal claim dies aborning." *Id.* at 2167. Here, too, Plaintiffs need not wait until some point in the future to assert a taking claim when the Act *in fact* extinguishes Plaintiffs' property rights *now*, creating an actionable taking cause of action. Plaintiffs cannot be compelled to wait until a point in the future when Defendants will seek to trap Plaintiffs and others similarly situated in a "Catch-22."

**E.    The Act does not preempt Plaintiffs' state common law claims.**

Defendants rely on *Granfinanciera* for the proposition that "Congress can 'supplant a common law cause of action' with a statutory right adjudicated by an administrative tribunal."

**JA-148**

(Def. Br. p. 28). Defendants' quotation of *Granfinanciera*, is, however, truncated. The Court's full statement is as follows:

> In *Atlas Roofing*, supra, 430 U.S., at 458, 97 S.Ct., at 1270, we noted that Congress may effectively supplant a common-law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial right *if that statutory cause of action inheres in, or lies against, the Federal Government in its sovereign capacity.*

*Granfinanciera*, 492 U.S. at 53 (emphasis added). The Court continued that the class of "public rights" which Congress may assign to administrative agencies or courts of equity sitting without juries may be more "expansive," and the federal government need not be a party.

However, as discussed *supra,* Sections (B)(2)(b) and (C), the Act neither created a new "public right," nor was the "right" at issue a component of an otherwise permissible federal regulatory scheme.  As the Court in *Granfinanciera* concluded, while providing jury trials in some actions may "impede swift resolution" and increase the expense of bankruptcy proceedings, "these considerations are insufficient to overcome the clear command of the Seventh Amendment." *Id.* at 63 (citing *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.")).

Defendants' reliance on *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110 (D.C. Cir. 2008) and *Lanier v. BATS Exch., Inc.*, 105 F. Supp. 3d 353 (S.D.N.Y. 2015) is similarly misplaced. In *In re Series 7 Broker Qualification Exam Scoring*, the court held that the state law claims at issue based on breach of contract and negligence stemming from errors in the scoring of the plaintiffs' standardized tests administered by the National Association of Securities Dealers ("NASD") could only have arisen from the NASD's duties under the Securities and Exchange Act of 1934 ("Exchange Act"). 548 F.3d at 115. The court found that "[w]ere it not for the regulations that flow from the Exchange Act, NASD would not be administering the Series 7

23

**JA-149**

examination," and thus "[t]hese duties arise only under the Exchange Act, and they are not open to suit under state common law theories." *Id.* The court therefore held that such common law claims were preempted, and Congress could adopt a specific process against SEC regulators and those operating in their stead which did not provide for monetary relief and could "displace[] claims for monetary relief based on state common law." *Id.* at 114-115. Here, to the contrary, the state common claims possessed by out-of-network physicians pre-date the Act, were not created by the Act, and are not dependent on any provision of the Act for their existence.

Likewise, in *Lanier*, where the plaintiff sued certain securities exchanges for breach of contract under state law in connection with the exchanges' provision of market data to the plaintiff under a subscriber agreement, the court ruled that awarding the plaintiff relief on his breach of contract claim would require the court to determine that the defendants were violating plans adopted by the exchanges for the processing and dissemination of market data that had been reviewed and approved by the SEC. 105 F. Supp. 3d at 366. Thus, "success for [plaintiff] on his breach of contract claims would create a conflict between federal law (as interpreted by the SEC) and state law (as interpreted by this Court)." *Id.* The court found that the plaintiff had effectively "convert[ed] claims that are ultimately based on a violation of federal regulations into state law breach of contract claims." *Id.* Thus, the court concluded, the plaintiff's claims were preempted. *Id.* Here, however, it cannot be argued that Plaintiffs' claims are in any way based on a violation of federal regulations. To the contrary, Plaintiffs' claims are preexisting, state common law claims, and it is not Plaintiffs who seek to convert those claims into federal ones, but, rather, it is the Act that purports to do precisely that.

Defendants further argue that "Congress has clearly expressed an intent to occupy the field exclusively when it comes to the practice of surprise medical billing of patients not otherwise

**JA-150**

protected by a specified state law. Allowing providers to continue to balance bill their patients and sue them in state or federal court to recover the value of the medical care provided would 'stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (Def. Br. at 29).

"Field preemption occurs 'where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law.'" *New York City Health and Hospitals Corp. v. WellCare of New York, Inc.*, 801 F. Supp. 2d 126, 141 (S.D.N.Y. 2011). "The presumption against preemption applies in any field in which there is a history of state law regulation, even if there is also a history of federal regulation." *Id.* Significantly, "[t]he regulation of public health and the cost of medical care are virtual paradigms of matters traditionally within the police powers of the state." *Id.* (quoting *Med. Soc. of N.Y. v. Cuomo*, 976 F.2d 812, 816 (2d Cir.1992) (citing *Hillsborough County v. Automated Med. Lab. Inc.*, 471 U.S. 707, 719 (1985) ("the regulation of health and safety matters is primarily and historically a matter of local concern")). Thus, "[w]hile the battery of federal laws addressing healthcare is robust and growing, Congress has not demonstrated an intent to exclusively dominate the field." *Id.* Contrary to Defendants' contention, Plaintiffs' state common law *quantum meruit* claim arises independently of the Act or any other federal law, and is not preempted by the Act.

Indeed, on July 13, 2021, an interim final rule to implement certain of the Act's surprise medical billing requirements was published; this regulation became effective on September 13, 2021. 86 Fed. Reg. 36,872 (July 13, 2021). The interim rule makes clear that Congress did not intend to occupy the entire field concerning health care and medical billing:

> A number of states currently have laws related to surprise medical bills. The Departments are of the view that Congress did not intend to supplant state laws regarding balance billing, but rather to supplement such laws. The provisions in these interim final rules are consistent with the statute's general approach of

JA-151

> supplementing state law. In addition, the No Surprises Act and these interim final
> rules recognize states' traditional role as the primary regulators of health insurance
> issuers, providers, and facilities.

86 Fed. Reg. at 36,946. This admission that Congress did not intend to "supplant state laws regarding balance billing" precludes a finding that Congress intended to occupy that entire field. *See Med. Soc. of N.Y.*, 976 F.2d at 819 (holding state statute not preempted where plaintiffs had "failed to show that Congress has expressed a clear and manifest intent to occupy the field of balance billing"). Authority cited by Defendants is not to the contrary. *See New York SMSA Ltd. Partnership v. Town of Clarkstown*, 612 F.3d 97, 106 (2d Cir. 2010) (holding that federal statute did preempt town law that implicated telecommunications technical and operational standards over which the FCC had exclusive authority, rather than the authority of local governments over land use and zoning decisions, which were preserved by the federal statute).

The recent decision in *Emergency Physician Servs. of New York v. UnitedHealth Grp., Inc.*, 2021 WL 4437166 (S.D.N.Y. Sept. 28, 2021) is instructive. There, the plaintiffs were physician practice groups who staffed emergency rooms of hospitals in New York and who were out-of-network providers with respect to the insurer defendants. 2021 WL 4437166, *1. The plaintiffs alleged that the defendants failed to compensate them at a reasonable rate, enriching the defendants, all while the insureds continued to use the plaintiffs' services, which the plaintiffs are obligated to provide. *Id.* at *4. Among other claims, the plaintiffs asserted New York state claims for breach of an implied-in-fact contract and for unjust enrichment. *Id.* The defendants argued that the state law claims were completely preempted by the Employment Retirement Income Security Act of 1974 ("ERISA"). *Id.* at *8. The court disagreed, first noting that "the Second Circuit has warned against a 'very broad view of preemption.'" *Id.* (citing *Gerosa v. Savasta & Co.*, 329 F.3d 317, 327 n.8 (2d Cir. 2003)). And despite ERISA expressly preempting "any and all State laws" that "relate to any employee benefit plan," the court stated that "'[c]ourts are reluctant to find that

26

JA-152

Congress intended to preempt state laws that do not affect the relationships among' 'the core ERISA entities: beneficiaries, participants, administrators, employers, trustees and other fiduciaries, and the plan itself.'" *Id.* at *8 (citing *Gerosa*, 329 F.3d at 324).

The court first concluded that the plaintiffs' state-law claims were not expressly preempted because the defendants' alleged liability "does not 'derive' from 'the particular rights and obligations established by any benefit plan,'" nor did the plaintiffs allege a violation of any plan provision. *Id.* Rather, the court stressed, the defendant insurer's "obligation to compensate Plaintiffs comes from, among other authorities, New York state law." *Id.* The court held that the plaintiffs' state law claims were not subject to "complete preemption," because, among other things, the court found that the plaintiffs' claims against the insurer "arise 'not from an alleged violation of some right contained in the plan, but rather from a freestanding state-law duty,'" and the plaintiffs "had no preexisting relationship with" the insurer. *Id.* at *10 (quoting *Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 332 (2d Cir. 2011)). Thus, because "Plaintiffs 'assert legal duties arising under an implied-in-fact contract' and unjust enrichment, and would exist 'whether or not an ERISA plan existed, the claims are 'based on independent legal duties,' avoiding preemption." *Id.* (citing *Emergency Grp. of Ariz. Pro. Corp. v. United Healthcare, Inc.*, 838 F.App'x 299, 300 (9th Cir. 2021)).

Here, Plaintiffs are out-of-network providers and their claims do not arise from a preexisting contractual relationship with insurers. Rather, Plaintiffs' claims in *quantum meruit* against patients arise from a "freestanding state-law duty," under New York law. Thus, there can be no preemption since Plaintiffs' rights arise from an implied-in-fact contract and such rights exist independent of the Act or any other federal statute. *See also Texas Oral and Facial Surgery, PA v. United Healthcare Dental, Inc.*, 2018 WL 3105114, *8 (S.D. Tex. June 25, 2018) (holding

**JA-153**

plaintiff's breach of contract claim against insurer was not subject to complete preemption because it was based on a representation independent of an insurance plan, and independent of ERISA.

**F.** **Plaintiffs are entitled to a preliminary injunction.**

    **1.** **Standard for a preliminary injunction.**

As Plaintiffs have established, when a party seeks to stay governmental action purportedly taken in the public interest under a statutory or regulatory scheme, the moving party must show (i) irreparable harm and (ii) a likelihood of success on the merits. (Pl. Opening Br. at 23, *RxUSA Wholesale, Inc. v. Dep't of Health and Hum. Servs.*, 467 F. Supp. 2d 285, 300 (E.D.N.Y. 2006)); *see also John E. Andrus Memorial, Inc. v. Daines*, 600 F. Supp. 2d 563, 570 (S.D.N.Y. 2009) (citing *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir.2005)). Furthermore, on a motion seeking a prohibitory (as opposed to a mandatory) preliminary injunction, such as enjoining enforcement of a government statute and regulation, the moving party must show a "likelihood of success" on the merits of the case, rather than the more rigorous "clear" or "substantial" likelihood of success on the merits. (Pl. Opening Br. at 23, *Averhart v. Annucci*, 2021 WL 2383556, *8 (S.D.N.Y. June 10, 2021), citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006)).

Defendants urge the Court to apply a higher standard of "clear" or "substantial" likelihood of success on the merits, because, they contend, Plaintiffs seek a mandatory injunction "that disrupts the status quo." (Def. Br. at 17). Although Plaintiffs have established a likelihood of success even under the more rigorous standard, that is not the standard to be applied here. Plaintiffs here request a prohibitory, rather than a mandatory, injunction, where they seek to "prevent defendants from enforcing the new [statutory] provisions, rather than mandate that defendants affirmatively take action." *American Soc. of Composers, Authors, and Publishers v. Pataki*, 930 F. Supp. 873, 878 (S.D.N.Y. 1996); *accord Al Otro Lado v. Wolf*, 497 F. Supp. 3d 914, 926 (S.D.

28

**JA-154**

Cal. 2020) ("Preliminary injunctions 'that prohibit enforcement of a new law or policy ... [are] prohibitory,' not mandatory."). Moreover, contrary to Defendants' contention, a preliminary injunction here would maintain the status quo because it will preserve the law as it existed before the recent implementation of the Act. *See id*. at 926 ("Actions required to reinstate the status quo ante litem do not convert prohibitive orders into mandatory relief.").

Defendants further argue that Plaintiffs must also show that the balance of equities tips in Plaintiffs' favor and that an injunction is in the public interest. (Def. Br. p. 17). Whether or not Plaintiffs are required to make these two additional showings, a preliminary injunction may be "'warranted on the strength of the first two factors alone,' i.e., without considering the 'balance of the equities' and the 'public interest.'" *New York State Telecommunications Association, Inc. v. James*, 544 F. Supp. 3d 269, 288 (E.D.N.Y. 2022) (quoting *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 n.38 (2d Cir. 2020)); *Regeneron Pharmaceuticals, Inc. v. United States Dep't of Health and Hum. Servs.*, 510 F. Supp. 3d 29, 38 (S.D.N.Y. 2020) (same). Moreover, the third and fourth factors "merge when the Government is the opposing party." *Id.*

## 2.  Plaintiffs will be irreparably harmed.

First, Plaintiffs have established, and Defendants do not dispute, that the government's violation of a constitutional right "triggers a finding of irreparable harm," and "no separate showing of irreparable harm is necessary." (Def. Br. at 24, citing *Johnson v. Miles*, 355 Fed.Appx. 444, 446 (2d Cir. 2009) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996) ("The district court therefore properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights.")). As set forth above, Plaintiffs' claims alleging violations under the Fifth, Seventh, and Fourteenth Amendments establish irreparable harm as a matter of law.

Second, "as a matter of law, there is irreparable harm when a party is compelled to arbitrate without having agreed to arbitration because that party is forced to expend time and resources

JA-155

arbitrating an issue that is not arbitrable." (Pl. Opening Br. at 24, citing *New York Bay Capital, LLC v. Cobalt Holdings, Inc.*, 456 F. Supp. 3d 564, 573 (S.D.N.Y. 2020); *UBS Securities, LLC v. Voegeli*, 405 Fed.Appx. 550, 552 (2d Cir. 2011) ("Being forced to arbitrate a claim one did not agree to arbitrate constitutes an irreparable harm for which there is no adequate remedy at law.")).

Defendants argue that there is currently no "imminent" arbitration and that Plaintiffs "theorize about a general fear of unspecified, indeterminate future arbitrations." (Def. Br. at 27). However, it cannot be seriously disputed that out-of-network physicians such as Plaintiffs will be compelled to participate in the IDR process provided for in the Act, as that will be the only way those physicians will be able to be compensated for their services. Plaintiff Dr. Haller has submitted a Declaration attesting in detail to Plaintiffs' inevitable participation in the IDR process, and this point was also resolved by the District Court for the Eastern District of Texas. *See* Haller Declaration, Dock. No. 22, ¶¶ 9-10, 12-13; *see also Texas Medical Ass'n*, 2022 WL 542879 at \*5 (rejecting Defendants' argument that plaintiffs had failed to establish injury-in-fact as a result of the Act and that the plaintiffs there were merely speculating, relying on plaintiffs' affidavits that their injuries would be inevitable as a result of their future participation in the IDR process).

Having argued—incorrectly—that Plaintiffs' allegation of irreparable harm is premature, Defendants next contradict themselves and assert that Plaintiffs waited *too long* to commence this action and bring their motion for a preliminary injunction and thus cannot establish imminent irreparable harm. (Def. Br. at 38). There can be no doubt, however, that if Plaintiffs had commenced this lawsuit and brought this motion in early 2021, as Defendants suggest, Defendants would have been arguing prematurity and lack of ripeness—as they do throughout their papers here. As discussed in Section (D)(3), *supra,* Defendants' effort to trap Plaintiffs in an unwinnable Catch-22 must be rejected.

30

JA-156

In any event, Defendants are hard-pressed to complain about Plaintiffs' purported delay in commencing this action and filing this motion for preliminary relief when the Act only went into effect in January 2022, and arbitration of payment disputes under it was only supposed to have begun in April 2022, both *after* Plaintiffs commenced this action. (*See* Def. Br. at 2). Moreover, the parts of the Rule relating to the IDR process, which Plaintiffs seek to vacate, were recently vacated by the Texas federal court, with similar cases around the nation still pending. *See Texas Medical Ass'n*, 2022 WL 542879 at *15; *see also Ass'n of Air Med. Services v. U.S. Dep't of Health and Human Servs.*, 21-cv-03031 (D.D.C.); *LifeNet, Inc. v. U.S. Dep't of Health and Human Services*, 22- cv-00162-JDK (E.D. Tex.). Because of the vacatur of much of the Rule, Defendants concede that they have only *now* "begun the preparation of a final rule that will address the procedures for arbitrations under the Act, and that will address the provisions of the interim final rules that were vacated by the Eastern District of Texas. The Departments anticipate that the final rule will be issued by early summer of 2022." (Def. Br. at 35). Thus, the continued implementation of Act remains an unsettled question, underscoring as unsupportable Defendants' contention that Plaintiffs' request for injunctive relief is untimely.

Furthermore, while Defendants contend that, because of the *Texas Medical Ass'n* decision there is no live dispute over the relevant provisions of the Rule sought to be vacated by Plaintiffs (Def. Br. at 34), on April 22, 2022, three weeks *after* Plaintiffs moved for injunctive relief, and four days *before* Defendants moved to dismiss here, Defendants filed a Notice of Appeal in the Eastern District of Texas stating their intention to appeal that decision. *See Texas Medical Ass'n v. U.S. Dep't of Health and Human Servs.*, 21-cv-00425-JDK, Dock. No. 116. As a result of Defendants' own strategic choices, therefore, they have apparently committed to defending the

**JA-157**

Rule as it currently exists, making the Act's future implementation even more uncertain.[5]

### 3.  Plaintiffs are likely to succeed on the merits.

For the reasons discussed above in Sections (B), (C), and (D), Plaintiffs' claims under the Seventh, Fifth and Fourteenth Amendments to the United States Constitution are likely to succeed on the merits.

### 4.  The balance of equities is in Plaintiffs' favor and an injunction is in the public interest.

Defendants argue that a preliminary injunction would "impose substantial harms on the execution of and compliance with the nation's health insurance laws" because an "order striking key provisions of the Act and preventing IDR proceedings from taking place would disrupt the health care and health insurance industries . . . and it would sow confusion in the face of providers' and health plans' and insurers' efforts to adjust their billing practices to comply with the Act's new legal regime." Defendants further urge that "[t]he balance of the equities and the public interest strongly counsel in favor of leaving in place the carefully crafted legal landscape that private parties and government agencies have worked hard to implement and have come to rely on." (Def. Br. at 39-40).

To the contrary, a preliminary injunction would "acknowledge the obvious: enforcement of an unconstitutional law is *always* contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (emphasis added) ("It may be assumed that the Constitution is the ultimate expression of the public interest.") (citations omitted); *see also Chabad of S. Ohio &*

---

[5] To the extent the Court finds, contrary to Defendants' contention, that Plaintiffs' request to vacate the specific provisions of the Rule, as set forth in the Complaint (at pp. 17-18), is still a live issue, Plaintiffs incorporate their arguments set forth in their opening memorandum concerning that issue. *See* Pl. Opening Mem., Dock. 23 at 4-8, 17-18, 21-22.

JA-158

*Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) ("No substantial harm can be shown in the enjoinment of an unconstitutional policy."). Indeed, Defendants' appeal to the purported policy implications of a preliminary injunction do not overcome enjoining the Act's constitutional violations while this case proceeds. *Gordon*, 721 F.3d at 653 ("The Constitution does not permit Congress to prioritize any policy goal over the Due Process Clause.").

On a practical level, as discussed above, Defendants' arguments regarding disruption and confusion in the healthcare industry and the Act's supposed "carefully crafted legal landscape" ring hollow when large portions of the Act's regulations implementing the IDR process have been vacated as conflicting with the terms of the Act. In truth, the only confusion now being sewn is by Defendants. On the one hand, they advise the Court that the dispute here with respect to the parts of the Rule implementing the Act sought to be vacated by Plaintiffs is no longer a live issue as a result of the Texas federal court's vacatur of those provisions. Instead, Defendants advise the Court that new regulations will be published at some point this summer. On the other hand, Defendants have sought to appeal the Texas ruling, seemingly indicating that the issues raised by Plaintiffs about the Rule are still live. This confusion exists not only this case, but also in a similar proceeding pending in the D.C. District Court.[6]

By the same token, Defendants' concern about the purported disruptive effects of a preliminary injunction on the healthcare industry and its various stakeholders is simply not credible. The IDR process was only set to become active in April of this year, *after* the main Rules governing that process were vacated. Indeed, Defendants concede that they are still formulating

---

[6] *See Ass'n of Air Med. Services v. U.S. Dep't of Health and Human Servs.*, 21-cv-03031 (D.D.C.), Dock No. 64, where the plaintiffs filed a Notice of the Departments' Decision to Appeal, advising the court that the Defendants' decision to appeal the Eastern District of Texas's decision "confirms that a live controversy remains in this case," and asking the court to enter an order holding that the presumption in favor of the QPA is unlawful, and vacating the entire Rule challenged by the plaintiffs there.

33

JA-159

rules to replace those that have been vacated and cannot say exactly when new rules will be published. Meanwhile, the industry awaits Defendants' new regulations, with IDR arbitrations having barely begun, if at all. And, if Defendants proceed with their appeal of the Texas decision, they will continue to add confusion as the rules of the IDR process may change yet again. Thus, any disruption has been caused by the flawed structure of the Act's regulations as drafted, and a preliminary injunction temporarily enjoining the unconstitutional Act while this case is *sub judice* will simply maintain the *status quo* that existed a few short weeks ago when the IDR process was not in place at all. *See, e.g.*, *Gebin v. Mineta*, 239 F. Supp. 2d 967, 968 (C.D. Cal. 2002) ("Preliminarily enjoining the enforcement of the citizenship requirement will maintain the status quo pending a determination of its constitutionality and would merely delay the implementation of a new statute, while the denial of a preliminary injunction will result in the termination of plaintiffs' employment. As such, the balance of hardships tips decidedly in plaintiffs' favor. Moreover, because the termination of plaintiffs' employment could constitute a constitutional deprivation, the public interest will be advanced by granting the preliminary relief.").

Finally, although Defendants assert arguments about the harm that purportedly would be caused by "striking" provisions of the Act, a preliminary injunction would merely further delay its implementation—having already stalled before it began—and can, if Defendants ultimately prevail, be reversed. *See United Food & Com. Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 364 n.11 (6th Cir. 1998) (affirming preliminary injunction when the district court considered the merits of the plaintiff's claims solely to determine whether it demonstrated a likelihood of success on the merits of its First Amendment claims, noting that "[s]hould [plaintiff] fail to prevail after a full trial on the merits, the preliminary injunction will be vacated").

34

| JA-160 |

1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - X
 3                                  :
 4   DANIEL HALLER,                 : 21-CV-7208 (AMD)
                                    :
 5            Plaintiff,            :
                                    :
 6                                  : United States Courthouse
          -against-                : Brooklyn, New York
 7                                  :
                                    : June 7, 2022, Tuesday
 8                                  : 10:00 a.m.
     DEPARTMENT OF HEALTH AND       :
 9   HUMAN SERVICES,                :
                                    :
10            Defendants.           :
                                    :
11
12   - - - - - - - - - - - - - - - X
13        TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
            BEFORE THE HONORABLE ANN M. DONNELLY
14           UNITED STATES DISTRICT COURT JUDGE
15
                   A P P E A R A N C E S:
16
     For the Plaintiff:   ABRAMS FENSTERMAN, LLP
17                             One MetroTech Center, Suite 1701
                               Brooklyn, New York 11201
18                        BY:  ROBERT SPOLZINO, ESQ.
                               JUSTIN KELTON, ESQ.
19
     For the Defendant:   UNITED STATES DEPARTMENT OF JUSTICE
20                        CIVIL DIVISION, FEDERAL PROGRAMS BRANCE
                               1100 L Street, NW
21                             Washington, D.C. 20005
                          BY:  ANNA DEFFEBACH
22                        BY:  JOSEPH MARUTOLLO, ESQ.
                          BY:  JOEL MCELVAIN
23
     Court Reporter:  Michele D. Lucchese, Official Court Reporter
24       E-mail:    MLuccheseEDNY@gmail.com
     Proceedings recorded by computerized stenography.  Transcript
25   produced by Computer-aided Transcription.
```

**JA-161**

Proceedings                                                              2

1          THE COURTROOM DEPUTY:  This is civil cause for a

2    motion hearing, Docket number 21-CV-7208, Haller, et al.

3    versus U.S. Department of Health and Human Services, et al.

4          Counsel, state your appearance, plaintiff first.

5          MR. SPOLZINO:  For the plaintiffs, Your Honor,

6    Robert Spolzino and Justin Kelton from Abrams Fensterman, LLP.

7          THE COURT:  Good morning.  I just want to make sure

8    that your microphone is on.

9          MR. SPOLZINO:  Sorry.

10          THE COURT:  That's okay.  It's also fine to stay

11    seated because it is much easier to use the microphone if you

12    are sitting down.  Go ahead.

13          MR. SPOLZINO:  I don't think it is working.

14          THE COURT:  You have to push the button.

15          MR. SPOLZINO:  Got it, thanks.

16          THE COURT:  Much better.  Thanks.

17          MS. DEFFEBACH:  Good morning, Your Honor.  Anna

18    Deffebach and I'm here with my colleagues Joel McElvain and

19    Joe Marutollo with the Department of Justice for the

20    defendants.

21          THE COURT:  Good morning.

22          So this is I guess an oral argument on the

23    Plaintiff's application for preliminary injunction, and so I

24    will hear argument.

25          I just want to get a few things out of the way so we

Proceedings                                                    3

1    can focus on what I think is the issue.

2              I mean, at the moment, at least in terms of the --

3    in terms of the rule, Judge Kernodel has already vacated it,

4    and the defendants are in the process of, I guess, changing

5    the rule.  So I'm not sure that that's an appropriate subject

6    for an injunction.

7              MR. SPOLZINO:  Well, that's my understanding of the

8    facts, Your Honor, but the Justice Department would know more

9    about where it stands.

10             THE COURT:  That's what they said.  I take them at

11   their word.  But go ahead.  You can stay seated.  Just pull

12   the microphone up.

13             MS. DEFFEBACH:  Sure, Your Honor.  The portions of

14   the rule that plaintiffs challenge here, the portions of the

15   interim final rule, I should say, have been vacated -- the

16   portions of the interim final rule that plaintiffs challenge

17   here have been vacated and those provisions are not currently

18   being currently applied in the independent dispute resolute

19   proceedings that are ongoing.

20             THE COURT:  Okay.

21             MS. DEFFEBACH:  The final decision is anticipated to

22   be issued early this summer.

23             THE COURT:  So I think that at the moment there is

24   no real controversy about that, that an injunction can address

25   because there is nothing happening.

**JA-163**

Proceedings                                                           4

1          Do you agree with that?

2          MR. SPOLZINO:  We agree, Your Honor.  The only

3    question I have is you did not mention the motion to

4    submission.  Are we not arguing that?

5          THE COURT:  No, we are arguing that too.  I just

6    have so many things on my list today.  So, also, just a

7    reminder, and I will do the same thing, everybody try not to

8    speak too quickly.  I think it's a lot harder for the court

9    reporter.  In fact, I know it's a lot harder for the court

10   reporter if we don't speak slowly and I see that as a reformed

11   fast talker.

12         So let's move on then to this question about the --

13   let's start with the injunction.  I know everybody knows the

14   standards for issuing a preliminary injunction, but I think it

15   is good to remind everyone that the four tests that the Court

16   looks at is whether there is a likelihood of success on the

17   merits, whether the party who is applying will suffer

18   irreparable harm, the question of the public interest, and the

19   balance of the equities.

20         And, so, I think that's a good way to frame our

21   discussion about this.

22         I guess my first question is, I'm not sure what harm

23   the plaintiffs have suffered because, as I understand it, this

24   -- you haven't gone through the process; correct?

25         MR. SPOLZINO:  That's correct.

**JA-164**

Proceedings                                                          5

1          THE COURT:  So what's the --

2          MR. SPOLZINO:  Well --

3          THE COURT:  And don't you have to first go through

4    the IDR process and then establish that you have suffered some

5    kind of harm as a result of it?

6          MR. SPOLZINO:  Well, Judge, the -- the issue was --

7    with that is that this Complaint was filed December 31st.

8          THE COURT:  Right.

9          MR. SPOLZINO:  Before the process started, in

10   anticipation of the process, and that there's case law which

11   we have cited in our brief which says that forcing a party to

12   go into an unjustified arbitration is itself a harm.

13         THE COURT:  But what's the property interest?

14   There's no -- I mean, it's not like those Medicare, Medicaid

15   cases because there is a fee schedule for those.

16         Here, as I understand it, the property interest, and

17   I know you will correct me if I have this wrong, but the

18   property interest seems to be in future revenue at a rate that

19   your client sets.

20         Do I have that about right?

21         MR. SPOLZINO:  Well, yes and no, Judge.  If I may.

22         THE COURT:  That's why I asked.

23         MR. SPOLZINO:  On December 31st, we were talking

24   about future services that would be provided commencing

25   January 1st, but would be subject to the Act.

**JA-165**

Proceedings                                                    6

1          The -- starting January 1st and going forward, all

2     of services that are provided are subject to the Act and the

3     billing and collection for those services are subject to the

4     Act.

5          THE COURT:  Right.

6          MR. SPOLZINO:  So, I mean, we can go back and amend

7     our complaint now to allege all of that, but I don't think

8     what purpose would that serve since the Complaint does allege

9     that Dr. Haller does these -- and Long Island Surgical do

10    these procedures on a regular basis and are subject to -- will

11    be subject to and are now subject to the Act.

12          THE COURT:  Doesn't that presume -- first of all,

13    New York has a version of this, correct?

14          MR. SPOLZINO:  Correct.

15          THE COURT:  Since 2014?

16          MR. SPOLZINO:  Correct.

17          THE COURT:  And I take it your client has

18    participated in that?

19          MR. SPOLZINO:  They have.

20          THE COURT:  And it seems to be working out I guess;

21    right?

22          MR. SPOLZINO:  I don't know that I would say it is

23    working out from his perspective.  He's getting paid less than

24    he thinks he should be paid, but he has decided to accept that

25    based on his case mix and based on the services that he

Proceedings                                                    7

1    provides.

2              THE COURT:  And just so we're talking about what the

3    object of the Act is, is to prevent patients from getting

4    surprise billings, you know, either after some kind of

5    emergency surgery or something that's more routine, but there

6    was a participating physician that the patient had no reason

7    to know was out of network.

8              MR. SPOLZINO:  Well, that's part of the purpose of

9    the Act.  The other part of the purpose of the Act is to drive

10   down healthcare costs by reducing physician's bills.

11             THE COURT:  Okay.  And then this kind of leads into

12   something that I really don't think that you addressed in

13   terms of the four factors for a preliminary injunction, which

14   are the public interest or the balance of equities.

15             So can you address that for me?

16             MR. SPOLZINO:  Judge, we have cited cases that talk

17   about the fact that the public interest in compliance with the

18   Constitution is paramount, and that in terms of balancing of

19   the equities, we don't have to establish anything beyond the

20   likelihood of success on the constitutional violation.

21             THE COURT:  Just explain to me again what your

22   theory is of the constitutional violation?

23             MR. SPOLZINO:  We have three theories.  The first

24   theory is that the mandatory arbitration violates the Seventh

25   Amendment guarantee of a trial by jury.

**JA-167**

Proceedings                                                              8

1          THE COURT:  Let me pause just for another question.
2     In the New York -- under the New York law, is it also
3     arbitration, it's kind of the same process?
4          MR. SPOLZINO:  I believe it is.
5          THE COURT:  Does that violate the New York
6     Constitution?
7          MR. SPOLZINO:  I can't answer that question because
8     we didn't look at that at all.
9          THE COURT:  Go ahead.
10         MR. SPOLZINO:  The second violation is the taking of
11    the property interest, which you alluded to earlier, the
12    taking of the right to bill for the services that are
13    provided.
14         THE COURT:  And just so I'm clear, it's the right to
15    bill at whatever rate your client deems appropriate; correct?
16         MR. SPOLZINO:  No, it's the right to bill at a fair
17    rate.
18         THE COURT:  But who sets that?  That's my question.
19         MR. SPOLZINO:  Under the common law, it is set in
20    quantum meruit.  And quantum meruit is whatever a fair rate,
21    going rate is for that kind of service.
22         THE COURT:  Who's making the determination under
23    your theory?
24         MR. SPOLZINO:  A jury would make that decision.
25         THE COURT:  Wait.  So, I'm talking in general

Proceedings                                                    9

1   practice.  Your client bills somebody.  Your client sets --

2   bills the amount, right?

3            MR. SPOLZINO:  In general practice, the physician

4   has a charge.

5            THE COURT:  Right.

6            MR. SPOLZINO:  The physician charges the patient.

7   99 percent of the time, according to Dr. Haller, the patient

8   assigns his claim against the insurance company to the

9   physician.  The physician then negotiates with the insurance

10  company.  And if they can't reach a resolution, the physician

11  has a quantum meruit claim.

12           THE COURT:  Against the patient?

13           MR. SPOLZINO:  Against the patient and against the

14  insurer because based on the assignment.

15           THE COURT:  Even under the New York law, depending

16  on which plan we are talking about, is it your position that

17  the doctor has a cause of action against the patient even

18  under the no-surprise billing law that's in New York?  I don't

19  think so.

20           MR. SPOLZINO:  I don't think under the law to which

21  the New York -- under the New York law, there's no claim

22  against the patient where the plan is one that's covered by

23  that law.

24           THE COURT:  Right.

25           MR. SPOLZINO:  But that's not what we are talking

Proceedings                                            10

1   about here.  We're talking about the plans that are covered by

2   the No Surprise Act that Congress passed.

3          THE COURT:  Correct, but the theory is the same?

4          MR. SPOLZINO:  I --

5          THE COURT:  Except there are some plans that aren't

6   included in the New York law.  I mean, all this is to say

7   that, you know, I'm -- you would know better than I, but under

8   the way it stands that before the No Surprises Act, you would

9   sue either the insurance company or the patient.  But not

10  every one of those cases goes to a jury; correct?

11         MR. SPOLZINO:  I would assume that most of them get

12  resolved along the way somehow.

13         THE COURT:  That's right.  My other question, just

14  in terms of the public interest.  Do you agree that there is a

15  public interest in avoiding these kinds of surprise billings

16  to patients?

17         MR. SPOLZINO:  Well, the answer is the public would

18  like that, yes.  But I would say that if doing so violates the

19  Constitution, than whatever interest there may be in the

20  public avoiding for paying medical services is well outweighed

21  by the Constitution.

22         THE COURT:  So -- I'm sorry to the court reporter.

23  But, again, the Constitutional right at issue sounds to me

24  like it's whatever -- the property right is to a future

25  payment at a rate that is essentially defined by the

Proceedings                                           11

1   plaintiff, correct?

2           MR. SPOLZINO:  Well, no.  Respectfully, I disagree

3   with that on a couple of scores, okay.  In terms of who

4   defines it, it's like any other transaction.  The provider

5   defines a service, defines a fee for this service and that fee

6   may or may not be consistent with what the law allows.  In

7   this case, the law would provide a quantum meruit recovery,

8   whatever the quantum meruit amount would be, I would suggest

9   is the property right that's involved.

10          And now I'm forgetting the first part of your

11  question.

12          THE COURT:  Well, it's future.  It's a future right.

13          MR. SPOLZINO:  But the claim arises when the service

14  is provided.

15          THE COURT:  But under the -- so I guess one of the

16  difficulties I'm having here is that because, at least as far

17  as I know, that your client hasn't participated in one of

18  these arbitrations, and, I mean, for all you know, it could

19  turn out fine.  The IDR process could compensate him

20  appropriately for his services and then you wouldn't have a

21  complaint.  I assume in much the same way that the New York

22  statute has worked.

23          MR. SPOLZINO:  Well, I mean, I assume -- I would

24  suppose we can present proof on this, but I can cite for you

25  the one example under the New York Act that Dr. Haller cited

Proceedings                                                    12

1   in his affidavit -- declaration.

2           THE COURT:  And just do it slowly.

3           MR. SPOLZINO:  Sorry.  Which was that with respect

4   to a hernia repair, he's been fighting to get $238.  Now, I

5   think we can probably all agree $238 is not a fair fee for a

6   surgeon to repair a hernia.

7           THE COURT:  So anecdotally, one case where he is --

8   under the New York -- okay, I think I get your point.

9           I do want to hear from the Government just on the

10  four factors in terms of granting a preliminary injunction and

11  then on the larger question of whether there is a

12  constitutional right at issue here.

13          And if you could, I'm going to remind you slowly and

14  pull the microphone up a little bit.

15          MS. DEFFEBACH:  Yes, thank you, Your Honor.

16          I think Your Honor got it exactly right when you

17  characterized the property interest that plaintiffs are

18  seeking here as essentially a future revenue at a rate that

19  plaintiffs set unilaterally.

20          We believe that there is no property interest at

21  stake here.  And, additionally, on the irreparable harm

22  factor, not only have plaintiffs not claimed to have

23  participated in any arbitrations, but they also don't point to

24  any disputes that are headed for arbitration.  So they claim

25  kind of a generalized future fear of arbitrations, but they

Proceedings                                          13

1   have provided no reasons why relief is so urgently needed now.

2   So we believe that both as to likelihood of success and the

3   irreparable harm plaintiffs have failed to carry their burden.

4          Additionally, we agree with Your Honor that to the

5   extent that there is a public interest here, that a public

6   interest in preventing these kinds of devastating medical

7   bills for patients who, you know, were not suspecting them,

8   who thought they had good insurance, that serves a strong

9   public interest and Congress conducted extensive hearings and

10  looked into this issue and concluded that there was a strong

11  public interest in not only protecting patients from these

12  kinds of medical bills, but also creating an efficient,

13  effective system and ensuring that providers received adequate

14  payment in a timely manner.

15         THE COURT:  Your adversary points out that he is

16  entitled to a jury trial under the Seventh Amendment and cites

17  the common law.

18         What's your response to that?

19         MS. DEFFEBACH:  Our response to that, Your Honor, is

20  that the right that is adjudicated in the independent dispute

21  resolution process under the No Surprises Act is very

22  different from the quantum meruit claims under the common law

23  that plaintiffs used to bring against their patients.

24         The right at issue in the IDR process is a public

25  right because it was created by Congress in the act and it is

Proceedings                                                    14

1    an integral part of the comprehensive statutory framework that

2    is designed to achieve Congress' goals of creating an

3    efficient and cost-effective dispute resolution system for

4    these very narrow and specialized kinds of claims.

5              THE COURT:  So the -- and then your position is is

6    that the public's right doctrine precludes the plaintiffs's

7    claim.  Tell me about your position on that.

8              MS. DEFFEBACH:  Yes, Your Honor.

9              So the Supreme Court has held throughout the years

10   in a number of cases, including cases like *Atlas Roofing* and

11   *Thomas versus Union Carbide*, *CFTC Versus Shor*, and *Stern V.*

12   *Marshall* that cases that involve public rights can properly be

13   adjudicated outside of Article III courts and without a jury.

14   And the Supreme Court has identified several kinds of

15   overlapping categories of public rights or claims that fall

16   within the public rights doctrine.  And those include claims

17   that were created by Congress; in other words, claims that

18   could not have been pursued under the common law.

19             The Supreme Court recognized that Congress can

20   create statutory claims that are closely analogous to common

21   law claims and then set those claims to be adjudicated in

22   non-Article III procedures without a jury trial and that

23   entirely comports with the Constitution.

24             The Court has also looked at the purposes of the

25   dispute resolution process or the non-Article III adjudication

Proceedings                                                      15

1    and in cases like *Thomas*, which is very similar on the facts

2    to the case here, has concluded that where an adjudication

3    procedure is an integral part of a statutory scheme that is

4    designed and its integral really to achieving Congress' goals,

5    that that is appropriately a public right that can be

6    adjudicated outside of Article III courts and without a jury.

7             And, finally, a factor that the Supreme Court looked

8    heavily to in the *Shor* case, the right -- the IDR process

9    adjudicates a very narrow class of particularized, specialized

10   claims and does not exercise the broad range of powers and

11   jurisdictions that are normally vested in Article III courts.

12   There is no danger here of encroachment on the province of

13   Article III courts' authorities.

14            So combining all of those three factors, the IDR

15   process meets all of those indicia of being a public right.

16   Because it's a public right it can be adjudicated outside of

17   Article III courts and without a jury trial.  And the Supreme

18   Court has blessed similar statutory systems like this in the

19   past.

20            THE COURT:  But the plaintiffs' position is that

21   they have a common law, I guess a common law right against a

22   different party.  I don't think anybody's saying that the

23   plaintiffs have a common law right against the insurers;

24   correct?

25            MR. SPOLZINO:  As a legal matter, no. But as a

Proceedings                                                    16

1    practical matter, 99 percent of the claims are assigned.

2            THE COURT:  Okay.  But I think for purposes of our

3    discussion, I don't think you're claiming that there is an

4    actual common law right against the insurers.  I know that's

5    how it works out, but it's against the patient.

6            MR. SPOLZINO:  That's correct.

7            THE COURT:  All right.  So I guess my question is

8    the plaintiffs say that that is analogous, since they have the

9    common law right against the patient, that it is the same

10   thing as having a common law against the insurer.  Do I have

11   that right?

12           MR. SPOLZINO:  Yes.

13           THE COURT:  What's your response to that?

14           MS. DEFFEBACH:  Your Honor, even the wording that

15   you used analogous is exactly the same wording that the

16   Supreme Court used in *Granfinanciera* to explain that Congress

17   may fashion a cause of action that is analogous to a common

18   law claim and assign it to a non-Article III tribunal.

19           And there are, as Your Honor mentioned, important

20   differences between quantum meruit claims that providers used

21   to assert before 2014 as it comes to New York plan, insurance

22   plans and before the No Surprises Act as it comes to federal

23   plans.  The claims are against a different party and then

24   require an entirely different, you know, proof required.  For

25   example, there is no need in the IDR process to prove the

Proceedings                                    17

1    elements of a quantum meruit cause of action.  So we believe

2    that the claims are distinct and that Congress is fully

3    empowered to create analogous or similar claims and assign

4    them to a specialized adjudication process that is an integral

5    part of a Congressional purpose.

6             THE COURT:  So I just want to make sure that I

7    understand what the process is.

8             I feel like I know baseball, but everybody calls it

9    a baseball process.  Anyway, putting that aside, the physician

10   and the insurers try to work something out, correct so far?

11            MS. DEFFEBACH:  Yes.

12            THE COURT:  If they can't, they go to the

13   arbitrator, and putting aside this question of the rule, which

14   is the subject of -- which I think everybody agrees there's

15   nothing for us to do here today on that, but putting aside

16   that question of the rule, then the arbitrator takes into

17   account certain factors and reaches a decision.  Do I have

18   that right?

19            MS. DEFFEBACH:  Yes, Your Honor.

20            I would say the arbitrator -- the parties can submit

21   any information that's relevant to the statutory factors.  The

22   arbitrator can also request information from the parties and

23   the parties will provide that and the arbitrator can consider

24   it.  And, additionally, the parties can submit additional

25   information that is relevant to the offer.

Proceedings                                    18

1      So there's -- it's more than just the statutory

2  factors, but, yes, the IDR entity considers a variety of

3  information.

4      THE COURT:  And if somebody were to disagree with

5  the arbitrator's decision, either the insurance company or the

6  plaintiff, it's the standard arbitration rules -- I can't

7  remember what they all are, but fraud, mistake, those are the

8  bases for an appeal; is that correct?

9      MS. DEFFEBACH:  Yes, Your Honor, and those were the

10  same standards in the arbitration system in the *Thomas versus*

11  *Union Carbide* case as well.

12      THE COURT:  Okay.  I guess I'm repeating myself, but

13  how do you know this is not going to turn out, you know, just

14  the same as if you had bargained with them, with the insurers

15  on your own?

16      MR. SPOLZINO:  Two reasons, Your Honor, the first

17  is, this goes to our due process claim, one of the elements

18  that I mentioned earlier that would be present in an unjust

19  enrichment or quantum meruit claim --

20      THE COURT:  Against the patient?

21      MR. SPOLZINO:  Against the patient.

22      -- is the fee normally charged.  That would be

23  relevant.

24      THE COURT:  Normally charged, right.

25      MR. SPOLZINO:  The market.  That's not permitted to

Proceedings                                              19

1   be introduced in the arbitration.

2           THE COURT:  But I don't think that's accurate.  I

3   think -- I thought -- are you talking about the rule now?

4           MR. SPOLZINO:  No, I'm talking about the statute.

5   The statute doesn't permit that.

6           THE COURT:  That you can't submit evidence of what

7   the usual fee is?

8           MR. SPOLZINO:  Correct, or what the usual charge.

9           The second point is this:  And I understand that the

10  -- the rule makes the QPA, which I'm drawing a blank on what

11  that means.  It's the average that the insurer pays.  It's

12  in-network providers.  I forget what the QPA stands for right

13  now.

14          THE COURT:  Something payment amount.

15          MR. SPOLZINO:  Yeah, but it makes -- the rule made

16  that the only factor.

17          THE COURT:  It made it -- that's not exactly

18  correct.

19          MR. SPOLZINO:  The paramount factor.

20          THE COURT:  Right.

21          MR. SPOLZINO:  The statute still makes it a factor.

22          And what that is is the average that the insurer

23  pays its physicians, its in-network physicians.  What the

24  statute is essentially does is introduce into that arbitration

25  a factor that is completely weighted against the physicians.

Proceedings                                    20

1          THE COURT:  Why is that?

2          MR. SPOLZINO:  Because the network physicians --

3    physicians drawing networks for two reasons, one when they

4    can't develop practices outside networks and they get business

5    from that network.  So they're willing to take less on each

6    case in order to get the volume that comes from being within

7    network.

8          The physicians out of network have never chosen out

9    to do that and shouldn't be held to that standard.

10         And remember, the physicians we represent, Dr.

11   Haller and his surgical group, are not picking their patients.

12   They're showing up at the hospital when they get called and

13   are dealing with a patient that in many cases they couldn't

14   even talk to when they got there because the patient was

15   unconscious or in pain or whatever.  They just do the

16   surgeries.  And what they're being held to under the statute

17   then is this negotiated rate as one of the factors that they

18   had nothing to do with negotiating.

19         So the long answer to your short question is that

20   because the factors are weighted in favor of the insurer, it

21   is highly likely, I would suggest, that those fees will not be

22   what the physician would have obtained on a quantum meruit

23   basis.  In fact, the Government admits that the purpose of

24   this act is to reduce healthcare costs.

25         The only issue here is what physicians,

Proceedings                                                      21

1   out-of-network physicians get paid.  If you're not reducing

2   what I pay out of network physicians, you're not reducing

3   costs.  So the statute was intended to reduce what

4   out-of-network physicians are paid.

5               THE COURT:  I think what the statute was intended to

6   reduce was the patient who gets a huge bill when the patient

7   thinks that the patient has insurance and then gets a bill

8   from the anesthesiologist or whomever for thousands and

9   thousands of dollars, which is completely unexpected, and I

10  guess that leads me -- do you think that's something that the

11  Government has the right to address, that Congress has the

12  right to address in legislation?

13              MR. SPOLZINO:  The --

14              THE COURT:  The billing, the surprise billing, is

15  that something that is within Congress' purview to do?

16              MR. SPOLZINO:  I would say in the abstract, yes, but

17  we are focused on the way they did it here.

18              THE COURT:  All right.  Then my second question is,

19  and I apologize for repeating myself, but I just don't think I

20  understand your position.

21              How is it that what your out of network billing rate

22  is, how does that equate to the usual and customary cost of

23  the service?  That's what I'm having a little trouble with.

24              What you're saying is that your client should be

25  able to get what he usually charges and I guess be able to get

Proceedings                                          22

1    it from the patient; correct?

2             MR. SPOLZINO:  No, I'm not saying that the physician

3    is entitled -- if the physician routinely charged a million

4    dollars, maybe he was able to get it from some Saudia Arabian

5    prince, but that doesn't mean that quantum meruit would get

6    him or her that result.

7             THE COURT:  But then you are talking about a jury

8    trial every time there is a dispute.  So the patient whose

9    gotten the huge medical bill, then has to get a lawyer, right?

10   I mean, theoretically under -- I mean, I realize in the real

11   world a lot of these things work out, but that's what the plan

12   would be, right?  Because your right is against the patient.

13            MR. SPOLZINO:  The question is what is the right

14   that's being taken away.  The fact that many, probably most,

15   if not all cases get settled -- I'm sure not all cases get

16   settled, but most cases get settled -- doesn't mean that the

17   right is not important.  What the Congress has done is take

18   away that right entirely.

19            THE COURT:  Take away what right?

20            MR. SPOLZINO:  It's taken away two rights.  It's

21   taken away multiple rights, we've alleged.

22            There are two pieces to this legislation that are

23   relevant here.  One is that the No Surprise Act, the billing

24   to the patients.

25            THE COURT:  Right.

**JA-182**

Proceedings                                              23

1         MR. SPOLZINO:  The other is forcing the physician to

2   arbitrate with the insurer so that the physician doesn't get a

3   jury on their claim.  The claim that the physician had against

4   the insurer -- this is not a situation where the Congress just

5   created this remedy against the insurer and said you have to

6   arbitrate it.  What they did was they substituted that for the

7   right that the patient -- the physician already had against

8   the patient.

9         THE COURT:  So it's a different party?

10        MR. SPOLZINO:  Different party, but not the -- but

11  the same right, same underlying right to be paid.  What I

12  would suggest, if I can say, to that party issue, Judge, is if

13  you look at the Fifth Circuit -- the reasoning of the Fifth

14  Circuit case in *Jarkesy*, the Fifth Circuit case in *Jarkesy*

15  disposes of these issues and defeats, I would submit, the

16  Government's argument here.

17        I mean, there the Fifth Circuit said that the right

18  of the SEC to obtain civil penalties is subject to a jury

19  trial because it's not a public right.

20        THE COURT:  What has the Second Circuit said about

21  that?  Those are my bosses.

22        MR. SPOLZINO:  I understand that.  And I'm not

23  arguing that you are bound by that.  I'm arguing that the

24  reasoning is persuasive in the Fifth Circuit case, and that,

25  frankly, it cites all of the same Supreme Court cases, it

Proceedings                                              24

1  analyzes the United States Supreme Court cases that we've been

2  discussing here in our briefs.

3          The Government has said it's inconsistent with

4  Second Circuit precedent, but hasn't cited what that precedent

5  is.  And in the short time that we have looked at this, we

6  haven't been able to identify any.

7          It's not authoritative because you have to follow

8  it; it's authoritative because the reasoning follows what the

9  Supreme Court has done here.  That's a right in favor of a

10  separate party.  The SEC is -- the fraud remedy that is the

11  private right was not a right of the SEC; it's a right of

12  individuals.

13          It -- because -- the Fifth Circuit said because it

14  was a right of individuals giving it to the SEC didn't make it

15  a public right.  And that's exactly what's happening here.

16          And, in fact, in that case it is the Government that

17  is asserting the right.  If it were a right that the

18  Government asserts is not a public right, then it's certainly

19  a right that a physician has to charge a patient or an

20  insurance company is not a public right.  It still remains a

21  private right.

22          And if the securities acts are not a regulatory

23  scheme that would make this some public right, certainly the

24  billing process for individual doctors claims are not going to

25  involve public rights.  This is a private rights case under

Proceedings                                               25

1    the reasoning in *Jarkesy.*  I don't think there is any escaping

2    that except for you to hold that *Jarkesy* doesn't convince you.

3           So I think I have answered -- I'm not sure if I've

4    answered the question.

5           THE COURT:  I think so.  I just want to give the

6    Government an opportunity to respond.

7           MS. DEFFEBACH:  Your Honor, we don't think that the

8    *Jarkesy* opinion should be persuasive here.  Not only is it, as

9    Your Honor pointed out, an out-of-circuit precedent, but the

10   reasoning in *Jarkesy* is frankly inconsistent with the Supreme

11   Court precedence that that court purports to rely on.

12          For example, in several of the Supreme Court cases,

13   the Supreme Court has characterized the paradigm of a public

14   rights case as a case where the Government is one of the

15   parties.  And the *Jarkesy* case kind of disregarded that

16   language entirely.

17          We think that the dissent in the *Jarkesy* case

18   provides a very well-reasoned analysis of that case.  But even

19   under --

20          THE COURT:  I'm so sorry.  When was that decided?

21   Fairly recently, wasn't it?

22          MS. DEFFEBACH:  I believe it was May 18th.  Very

23   recently, Your Honor.

24          THE COURT:  Are they applying for en banc review or

25   are they just appealing it to the Supreme Court?  Do you know

Proceedings                                                        26

1   what --

2         MS. DEFFEBACH:  The deadlines have not passed for

3   the solicitors general's office to make that decision.

4         THE COURT:  Sorry.  Go ahead.

5         MS. DEFFEBACH:  Even under the test that the Fifth

6   Circuit put out for when a right would be a public right, the

7   IDR process at issue here would meet that test because it

8   involves a right that Congress created after Congress found

9   that the existing rights and remedies were insufficient to

10  deal with, frankly, a public health crisis.

11        And, additionally, the IDR process and its system

12  created by the Act is one where requiring a jury trial would

13  utterly frustrate Congress' purposes.  So we believe that this

14  Court should not follow the *Jarkesy* opinion.

15        But even under that very narrow and novel public

16  rights test, the IDR process would still be a public right.

17        THE COURT:  This is definitely beyond my

18  responsibility, but I'm sort of curious as a general matter,

19  why hasn't someone addressed this question?  Why does a

20  patient get surprised by a bill like that when they have no

21  reason to expect that they're going to be billed?  I'm curious

22  as to why nobody has tried to fix that before this.

23        MR. SPOLZINO:  Well, I'm not sure I know the answer

24  to that, Your Honor.

25        THE COURT:  Because it's a thing for sure.

**JA-186**

Proceedings                                           27

```
1          MR. SPOLZINO:  I would venture to guess, based on,

2    you know, what I know of this case and some actual experience

3    on board of hospitals, that it's because patients don't

4    understand the internal relationships in hospitals.  They

5    think they go to the hospital and get one bill.

6          THE COURT:  So why doesn't someone tell them?

7          MR. SPOLZINO:  In many of the cases we are talking

8    about is because they are unconscious or unable to deal with

9    billing issues when they come to the hospital.

10         THE COURT:  What if somebody goes in for some kind

11   of a routine procedure?

12         MR. SPOLZINO:  My understanding that there are

13   processes for disclosure of all of these separate bills.

14         THE COURT:  I see.

15         So I'm going to give you a decision soon because it

16   is -- but I'm not doing it today.  I have some thoughts on it,

17   I want to consider all of the arguments that you have made.

18         Is there anything that anybody wants to say that

19   they haven't had a chance to say?

20         MR. SPOLZINO:  Let's see.

21         Well, first, Judge, in terms of the motion to

22   dismiss, are you -- we have essentially argued likelihood of

23   success on the merits is the same thing.  Do you need any

24   additional argument on that?

25         THE COURT:  I don't think so, I think that I get.
```

**JA-187**

Proceedings                                                 28

1          MR. SPOLZINO:  I don't think so, Judge.  I think you

2     have raised all the issues.

3          THE COURT:  Is there anything else from the

4     Government?

5          MS. DEFFEBACH:  I think we've addressed all the

6     issues.

7          I would like to just briefly kind of add to

8     something that plaintiff's counsel said about the qualifying

9     payment amount, and that is calculated as the median rate of

10    negotiated in-network payments, but it is as to same or

11    similar specialty for the same or similar service in the

12    similar geographic area.  So, it compares apples to apples.

13    In this case, emergency physicians to emergency physicians.

14         THE COURT:  The other thing I realize is that I know

15    there is also a motion to dismiss, and as counsel said, I'm

16    sort of thinking that in terms of likelihood of success on the

17    merits.  Is there anything else that you wanted to say about

18    that?

19         MS. DEFFEBACH:  We think -- I believe we've

20    addressed the public rights doctrine in depth.

21         As to plaintiff's due process and takings claims, I

22    think our brief explains that the IDR process provides more

23    details about how that process works and we additionally don't

24    believe that plaintiffs have identified any cognizable

25    property interest.  They have no property interest in the

Proceedings                                                    29

1   future revenue that they want to bill their clients.  But they

2   also don't have a property interest in the continued operation

3   of the rule of common law.  And Congress has here extinguished

4   and pre-empted the -- to the extent State laws allowed

5   surprise bills and suing patients for those bills, we believe

6   that Congress has clearly preempted any preexisting State

7   rights that remained.

8              THE COURT:  Anything that you want to say in

9   response to that?

10             MR. SPOLZINO:  Yes.

11             THE COURT:  I was a lawyer once myself.  Go ahead.

12             MR. SPOLZINO:  Judge, the only thing I would say is

13  what I have said already, which is essentially the issue is

14  that when we brought this lawsuit on December 31, we didn't

15  have any claims.

16             THE COURT:  Right.

17             MR. SPOLZINO:  Please give us leave to re-plead.

18             THE COURT:  Have you had any claims since?

19             MR. SPOLZINO:  We have provided services.

20             THE COURT:  I see.

21             MR. SPOLZINO:  I know Dr. Haller has provided

22  services since.

23             THE COURT:  Okay.  Haven't gone through the IDR

24  process, though?

25             MR. SPOLZINO:  I don't know to be sure, but we can

**JA-189**

Proceedings                                                    30

1   certainly present that in an amended pleading.

2            THE COURT:  I will let you know if that's something

3   I think ought to happen.

4            I want to thank the parties for such thorough

5   briefing and professional presentations.  Very interesting

6   issue.  Thanks so much.

7            MR. SPOLZINO:  Thank you, Your Honor.

8            MS. DEFFEBACH:  Thank you, Your Honor.

9            (Matter adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA-190

**CERTIFICATE OF SERVICE**

On August 21, 2023 I filed and served the forgoing Amended Joint Appendix via this Court's electronic-filing system.

14-point font, Times New Roman.

Dated: New York,
New York, April 26, 2023

*/S/ Nick Wilder, Esq.*
The Wilder Law Firm
301 West 57 Street, Suite 19B
New York, NY 10019
(212) 951-0042
nick@wilder.law
*Counsel for Plaintiffs-Appellants*